Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>**CENTURY 21 DEPARTMENT STORES LLC,**<br>***et al.*,**<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 20-12097 (SCC)<br><br>(Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND
FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, DEBTORS
TO (A) PAY CERTAIN PREPETITION WAGES, REIMBURSABLE
EXPENSES, AND SUPPLEMENTAL WORKFORCE OBLIGATIONS,
(B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND
(C) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND FOR RELATED RELIEF**

---

[1]     The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033).  The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Century 21 Department Stores LLC ("**C21 Stores**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Norman R. Veit Jr. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "**Veit Declaration**"),[2] and the *Debtors' Memorandum in Support of Chapter 11 Filings*, each filed with the Court contemporaneously herewith and incorporated by reference herein.

---

[2]      Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Veit Declaration.

## **Jurisdiction**

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The Debtors confirm their consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## **Relief Requested**

6.     The Debtors' employees perform a variety of critical functions, including sales, customer service, distribution, information technology, purchasing, administrative, accounting, finance, and management-related tasks.  The skills and experience of the Debtors' employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' operations and ability to effectively administer their business during these Chapter 11 Cases.  To maintain morale and enhance the Debtors' ability to maintain the Debtors' critical workforce during these Chapter 11 Cases, the Debtors request the authority, but not direction, pursuant to sections 105(a), 363, and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003(b), 6004(a), and 6004(h), to pay and honor certain prepetition claims and obligations, continue programs, and maintain funding, in the exercise of their discretion, relating to the Debtors' workforce (collectively, the "**Workforce Obligations**"), including: (a) Unpaid Compensation, Deductions, and Payroll Taxes; (b) compensation on account of their

3

Supplemental Workforce; (c) Reimbursable Expenses and Corporate Cards; (d) Benefit Plans; and (e) Retirement Plans (each as defined herein).

7. A proposed form of order granting the relief requested in this Motion on an interim basis is attached hereto as **Exhibit A** and on a final basis as **Exhibit B**.

**The Debtors' Workforce**

## I. The Debtors' Workforce

8. As of the Petition Date, the Debtors [3] employ approximately 1,390 employees, of which approximately 1,205 are full-time and approximately 185 are part-time (collectively, the "**Employees**"). The great majority of Employees work in or support the Debtors' stores: approximately 1,215 Employees work in retail, distribution, or loss prevention roles in the Debtors' retail stores and distribution centers. The approximately 175 remaining Employees work in corporate roles such as accounting, information technology, and management.

9. As of the Petition Date, approximately 985 Employees (approximately 71% of the workforce) are represented by unions. The Debtors are party to a collective bargaining agreement (the "**CBA**") with UFCW Local 888, which represents all of the Debtors' union-represented Employees. The Debtors pay all union Employees and approximately 185 non-union Employees on an hourly basis, while the remaining non-union Employees are paid on a salaried basis.

10. In addition to their Employees, the Debtors rely on services of a supplemental workforce (the "**Supplemental Workforce**"), composed of approximately fifty temporary workers as of the Petition Date, that provides services related to the Debtors' operations. The temporary workers comprising the Supplemental Workforce staff the Debtors' four

---

[3] Employees are employed by Debtors L.I. 2000, Inc., C21 Stores, Century 21 Department Stores of New Jersey, L.L.C., and C21 Philadelphia LLC.

distribution centers, which supply the inventory for the Debtors' stores and fulfill orders placed through the Debtors' online platform. The Debtors staff the distribution centers according to the volume of sales. Accordingly, the Supplemental Workforce fluctuates significantly in number of workers and hours depending on seasonality, which peaks before and during the holiday season, reaching approximately 300 workers during this time.

**Wage and Benefit Obligations**

11. The Debtors estimate that, as of the Petition Date, they owe approximately $3.60 million on account of the Workforce Obligations, as described in more detail herein:

| Workforce Obligations | Estimated Outstanding |
|---|---:|
| Unpaid Compensation | $1,300,000 |
| Accrued and Unpaid PTO | $680,000 |
| Payroll Taxes (including regarding PTO) | $149,000 |
| Deductions | $112,000 |
| Supplemental Workforce Obligations | $545,000 |
| Reimbursable Expenses and Corporate Cards | $80,000 |
| Benefits Plans (not including PTO) | $669,000 |
| Retirement Plans | $55,000 |
| Associated Third Party Costs | $10,000 |
| **Total Estimated Outstanding** | **$3,600,000** |

I. **Wages, Salaries, and Other Compensation**

A. **Unpaid Compensation**

12. In the ordinary course of business, the Debtors pay all their Employees on either a weekly or bi-weekly basis. Hourly workers are paid on a weekly basis, while salaried workers are paid bi-weekly.[4] The Debtors' payroll obligations include wages and salaries. On average, the Debtors' gross payroll is approximately $5 million to $6 million per month. The

---

[4] In addition to bi-weekly payments, the Debtors historically in the ordinary course make regularly scheduled monthly bonus payments to certain officers, which are paid every month and are not contingent on performance or other criteria. The Debtors estimate that there are no outstanding obligations regarding such monthly payments, but intend to continue making such monthly payments – reduced by 50% of the prepetition amounts paid – to only the co-Chief Executive Officers in the ordinary course.

Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' accounts or through physical paychecks.[5]  Approximately 80% of Employees are enrolled in direct deposit.

13.     The Debtors estimate that as of the Petition Date they owe approximately $1.4 million to Employees on account of prepetition payroll obligations, which amount includes accrued but unpaid wages and salaries (the "**Unpaid Compensation**").  The prepetition obligation is based on an 11-day accrual for the biweekly payroll covering the period since August 29, 2020, and a 4-day accrual for the weekly payroll covering the period since September 5, 2020.  The Debtors are not requesting herein authority to pay any prepetition obligations in excess of the statutory cap imposed by section 507(a)(4) of the Bankruptcy Code.

14.     Through this Motion, the Debtors request authority to pay all prepetition amounts owed to Employees on account of Unpaid Compensation up to the section 507(a)(4) cap.[6]  The Debtors intend to continue paying postpetition obligations on account of compensation consistent with past practice.[7]

---

[5]     The Debtors use five accounts at JPMorgan Chase Bank, N.A. to fund direct deposits and payroll checks.

[6]     The Debtors have historically operated four bonus plans: (i) a corporate and manager plan; (ii) a merchandising and buying plan; (iii) a plan-centered on store operations; and (iv) an "ExCom Bonus Plan" for senior executives (collectively, the "**Bonus Plans**").  The Debtors do not intend, and do not seek by this Motion, to make payments under or continue the Bonus Plans, but reserve the right to seek, by separate motion, authority for a key employee incentive or retention plan.

[7]     The Debtors instituted a 20% reduction in pay to salaried Employees making $75,000-$150,000 annually for the two pay periods in the month of July, which returned to normal salary levels in the first pay period of August.  In addition, the Debtors instituted a 20% reduction in pay for salaried Employees making $150,000 or greater annually for the months of July and August, which returned to normal levels in the first pay period of September 2020.  Accordingly, August compensation may be greater than July, and September may be greater than August, as compensation levels normalized following the reductions.  The Debtors intend to pay retained Employees at their prepetition compensation levels but reserve the right to institute further reductions or furloughs as necessary at their discretion.

**B.** **Gross Pay Deductions, Governmental Withholdings and Payroll Taxes**

15.     Federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withheld Amounts**"). The Debtors must then match from their own funds for Social Security and Medicare withholdings, based on gross earnings and additional amounts for federal and state unemployment insurance (collectively the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**"). In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $85,000 during each bi-weekly pay period.[8] In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $50,000 during each weekly pay period.   As of the Petition Date, the Debtors estimate approximately $98,000 remains outstanding on account of prepetition Payroll Taxes for Unpaid Compensation (not including amounts owed on account of PTO).

16.     For each applicable pay period, the Debtors may routinely deduct certain amounts from each Employee's gross payroll, including garnishments, child support, spousal support and service charges and similar deductions, union initiation fees and membership dues for union Employees, and other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "**Deductions**"). The Debtors deduct from Employees' paychecks over the course of each bi-weekly pay period a total of

---

[8]     Certain vendors, including ADP, provide services to ensure compliance with state and federal requirements and, as such, are necessary vendors for the Debtors payroll. Their fees are invoiced separately and are not included in the gross payroll figures.

approximately $112,000, which the Debtors remit to the appropriate third-party recipients. The frequency and schedule of payments relating to the Deductions and the due dates on the various pay cycles may encompass more than one period. The Debtors may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date.

17. To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, through this Motion, the Debtors seek authority to forward prepetition Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll Taxes on a postpetition basis, whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**II.    Supplemental Workforce Obligations**

18. The Debtors retain temporary employees comprising the Supplemental Workforce through temporary agencies such as Full Steam Staffing and On Target Staffing (the "**Temporary Agencies**"). Temporary Agencies track the hours of work provided by the Supplemental Workforce and bill the Debtors on an aggregate-hours basis without identifying the hours worked per temporary employees. The Debtors remit fees for the services performed to the Temporary Agency on a weekly basis through accounts payable. As of the Petition Date, the Debtors owe approximately $550,000 to the Temporary Agencies for prepetition services provided by the Supplemental Workforce. The Debtors believe it is necessary to pay the obligations owed to the Temporary Agencies, for the benefit of temporary employees, so that the temporary employees and the Temporary Agencies will continue to assist with the Debtors' staffing needs as needed.

19. The Debtors believe that if these amounts go unpaid, the Temporary Agencies or temporary employees may stop providing their services to the Debtors – an especially

critical element of the Debtors' workforce in light of the expectation that the Debtors' liquidation sales will draw consumers to the Debtors' stores and website, and because of the critical role of distribution centers in connection with the Debtors' distribution operations. Accordingly, the Debtors request authority to pay, in their sole discretion, any unpaid compensation for or on account of the Supplemental Workforce, including the Temporary Agencies, in the ordinary course of business and consistent with past practice. The Debtors do not intend to pay any individual amounts in excess of the $13,650 statutory priority cap imposed by section 507(a)(4) of the Bankruptcy Code. However, because Temporary Agencies invoice the Debtors on an aggregate basis, the Debtors request authority to pay Temporary Agencies up to the amount the Debtors in good faith believe is equal to $13,650 per individual, including by relying on data provided by Temporary Agencies to the Debtors.

## III.    Reimbursable Expenses

20.    In the ordinary course of business, the Debtors provide a travel stipend and reimburse certain Employees for travel and other miscellaneous business expenses incurred on behalf of the Debtors (collectively, the "**Reimbursable Expenses**"). Generally, Employees pay for Reimbursable Expenses personally and submit expense report forms to the Debtors for reimbursement. In some cases, Employees may not have submitted reimbursement requests in time to have been processed, or processing has not been completed, prior to the Petition Date. The Debtors provide a monthly travel stipend to approximately a dozen Employees in the aggregate approximating $7,350 per month. In the aggregate, the Debtors' Employees incur, on average, approximately $30,000 per month in Reimbursable Expenses, including the travel stipend. Based on historical figures, the Debtors estimate approximately $25,000 remains outstanding on account of prepetition Reimbursable Expenses as of the Petition Date and seek authority to honor such obligations. Through this Motion, the Debtors also seek authority, but not direction, to honor such

obligations arising from the Reimbursable Expenses as they accrue and to continue such programs in the ordinary course.

21.    Certain Employees have corporate credit cards with American Express (the "**Corporate Cards**") which they use to make authorized business purchases on behalf of the Debtors.  Although the Employees are primarily liable for the charges on the Corporate Cards, the Debtors pay such Corporate Cards directly.  Employees using the Corporate Cards must submit expense reports for the charges incurred.  There are approximately thirty-five Employees who carry company-issued Corporate Cards that are used for various expenses including travel, tolls, meals, photo shoots, and equipment.  In the aggregate, the Debtors' Employees incur approximately $55,000 to $60,000 per month in business expenses charged to the Corporate Cards.  Based on historical figures, the Debtors estimate approximately $55,000 remains outstanding on account of prepetition business expenses charged to such corporate credit cards as of the Petition Date.  The use of the Corporate Cards is critical to the Debtors' business operations insofar as it is one of the mechanisms by which Employees' expenses incurred in the ordinary-course discharge of their employment duties are paid.  Through this Motion, the Debtors seek authority to honor obligations arising from the Corporate Cards as they accrue and to continue such programs in the ordinary course.

## IV.    Employee Benefit Plans

22.    In the ordinary course of business, the Debtors maintain various employee benefit plans and policies for their Employees, including medical, dental, and vision plans, life insurance, short and long-term disability insurance, accident insurance, critical illness insurance, paid time off, paid family leave, flexible spending and health savings accounts, and miscellaneous other benefits (collectively, the "**Benefits Plans**").  The benefits available to non-union Employees include medical plans, a dental plan, a vision plan, life insurance, short-term and long-term

disability, accident insurance, critical illness, vacation and other paid time off (collectively, the "**Non-Union Benefit Plans**"). The Debtors estimate, based on historical obligations and withholdings that, as of the Petition Date, they are obligated to contribute approximately $644,500[9] to the Non-Union Benefit Plans.

23. Eligible union-represented Employees participate in certain Employee benefit programs, including medical plans, a dental plan, a vision plan, life insurance, accident insurance, and critical illness (collectively, the "**Union Benefit Plans**"). The Debtors estimate, based on historical obligations and withholdings that, as of the Petition Date, they are obligated to contribute approximately $24,500[10] to the Union Benefit Plans.

24. Through this Motion, the Debtors seek authority, but not direction, in the exercise of their discretion, to pay prepetition claims (if applicable), to honor obligations, and to continue programs, in the ordinary course of business and consistent with past practice, as they relate to the Benefits Plans, in amounts up to the statutory cap imposed by section 507(a)(5) of the Bankruptcy Code, as applicable, subject to the Debtors' ability to modify or discontinue any Benefits Plans (as permitted by the CBA and applicable law) to reduce applicable costs or the benefits provided thereunder.

A. **Health Care Plans**

25. Eligible Employees can participate in programs, through Debtors' sponsored plans, which provide medical insurance coverage (the "**Medical Plans**"), dental insurance coverage (the "**Dental Plans**"), and vision coverage (the "**Vision Plans**," and, together

---

[9] Not including PTO.

[10] Not including PTO.

with the Medical Plans and Dental Plan, a union discount program, and any related administration of the foregoing, the "**Health Care Plans**").

       i.     *Medical Plans*

26.    <u>Union Medical Plan</u>.  All union Employees are eligible for three plans of their choice – two minimum essential coverage plans and one high deductible health plan – administered by Prime Health/Magellan Rx and Aetna.  Eligible Employees may participate in the Medical Plans on the first of the month following sixty days of employment.  The union Medical Plans are self-funded by C21 Stores.  The union Medical Plans have approximately 460 participants and the annual cost to the Debtors is approximately $180,000.  As of the Petition Date, the Debtors estimate that approximately $21,000 remains outstanding on account of the union Medical Plan.

27.    <u>Non-Union Medical Plan</u>.  Non-union Employees are eligible for three Medical Plans their choice – two copay plans and one high deductible health plan – administered by Prime Health/Magellan Rx and Aetna.  Eligible Employees include all non-union Employees. Eligible Employees may participate in the Medical Plans on the first of the month following sixty days of employment.  The non-union Medical Plans are self-insured.  The Debtors pay approximately $5 million per year on account of the non-union Medical Plans and there are 242 plan participants.  As of the Petition Date, the Debtors estimate that approximately $590,000 remains outstanding on account of the non-union Medical Plan.

      ii.     *Dental Plans*

28.    <u>Union Dental Plan</u>.  The Debtors offer union Employees one dental maintenance organization Dental Plan administered by Aetna.  The plan is fully insured.  All union Employees are eligible to participate on the first of the month following sixty days of employment. The union Dental Plan has approximately 355 participants as of the Petition Date.  The Debtors

pay approximately $13,000 per year on account of the union Dental Plans. As of the Petition Date, the Debtors estimate that approximately $1,500 remains outstanding on account of the union Dental Plan.

29. <u>Non-Union Dental Plans</u>. The Debtors offer non-union Employees a choice of two Dental Plans – a dental maintenance organization plan and a preferred provider organization plan – both administered by Aetna. The plans are fully insured. All non-union Employees are eligible to participate on the first of the month following sixty days of employment. The non-union Dental Plan has approximately 250 participants as of the Petition Date. The Debtors pay approximately $11,000 per year on account of the non-union Dental Plans. As of the Petition Date, the Debtors estimate that approximately $1,300 remains outstanding on account of the non-union Dental Plan.

iii. *Vision Plans*

30. <u>Union Vision Plan</u>. The Debtors offer union Employees one preferred provider organization Vision Plan administered by Aetna. The plan is fully insured. All union Employees are eligible to participate on the first of the month following sixty days of employment. The union Vision Plan has approximately 375 participants as of the Petition Date. The Debtors have no costs on account of the union Vision Plan but intend to continue providing the plan to Employees consistent with past practice.

31. <u>Non-Union Vision Plan</u>. The Debtors offer non-union Employees a preferred provider organization Vision plan administered by Aetna. The plan is fully insured. All non-union Employees are eligible to participate on the first of the month following sixty days of employment. The non-union Vision Plan has approximately 210 participants as of the Petition Date. As of the Petition Date, the Debtors estimate that approximately $200 remains outstanding on account of the non-union Vision Plan.

32.     The Debtors also provide union Employees with a dental/vision discount program administered by Careington, which provides reduced pricing for select dental and vision procedures and products.  All union Employees are eligible to participate on the first of the month following sixty days of employment.  The union discount plan has approximately 510 participants as of the Petition Date.  The Debtors pay approximately $20,000 per year on account of the union discount program.  As of the Petition Date, the Debtors estimate that approximately $2,000 remains outstanding on account of the union discount program.

33.     Through this Motion, the Debtors request authority to honor any prepetition obligations related to the Health Care Plans and intend to continue such programs in the ordinary course.

**B.      Insurance Plans**

34.     The Debtors provide eligible Employees with basic life insurance, short-term and long-term disability, accident, and critical illness coverage (collectively, the "**Insurance Plans**").  The Insurance Plans are administered by SunLife.  Employees are eligible for benefits on the first day of the month following the first sixty days of employment.

35.     The Debtors provide automatic basic life insurance coverage equal to a flat benefit of $100,000 for salaried non-union Employees and a flat $10,000 benefit for all other Employees.  The life insurance benefits are fully insured.  The Debtors do not withhold on account of life insurance.  Total costs to the Debtors of the life insurance plans are approximately $40,000 per year.

36.     The Debtors provide non-union Employees with long-term and short-term disability coverage.  The Debtors pay annual premiums of approximately $68,000 related to the short-term disability coverage and pay 100% salary for the first 4 weeks.  The long-term disability coverage is 100% employee-paid.  The Debtors also provide non-union Employees with short-

term disability benefits that are required under state law.  In New York, when a claim is duly made, the law requires the Debtors to pay 50% of the participant's salary, up to a maximum payment of $170 per week over a maximum term of 26 weeks. The short-term disability benefits are fully insured.  The Debtors pay approximately $70,000 per year on account of short-term disability coverage and, as of the Petition Date, the Debtors estimate approximately $53,000 remains outstanding on account of such claims.

37.    The Debtors also offer union and non-union Employees accident and critical illness insurance, which is fully funded by Employee premiums.  The Debtors do not have any costs related to this coverage, but intend to continue such programs consistent with past practice.

38.    The Debtors request authority to remit any premiums collected from Employees prepetition and pay any prepetition costs in connection with the Insurance Plans.

## C.    New York State Paid Family Leave

39.    For eligible Employees who work in the State of New York, the Debtors take a weekly tax deduction amount contributable to the cost of the Debtors' fully-insured paid family leave benefit (the "**NYSPFL**").  The NYSPFL annual premium payment amount is equal to the annual deduction in amounts taken from the New York state Employees.  The deduction is based upon compensation up to a cap of 0.27% of wages. The estimated Employee contribution to the NYSPFL is approximately $5,000 per month.  Through this Motion, the Debtors seek authority to honor their obligations under the NYSPFL and to continue such program in the ordinary course.

## D.    Flexible Spending and Health Accounts

40.    The Debtors offer the eligible Employees the ability to contribute a portion of their pre-tax compensation to fund certain health care and expenses or dependent care expenses through various programs administered by Benefit Resource (the "**Flexible Spending Programs**").  The Debtors offer a flexible spending account to non-union Employees, who are

eligible to participate in the flexible spending account program after first of the month following initial sixty days of employment. Flexible accounts are funded with Employee pre-tax payroll deductions and non-Union Employees can use funds for eligible healthcare and commuting expenses. Annual contributions are subject to maximums required by law. The Debtors also offer a flexible spending account to union Employees that does not include a commuter benefit. The Debtors pay a $2.50 per Employee per month administrative fee for the Flexible Spending Programs.

41.     Furthermore, the Debtors provide health savings accounts (the "**HSAs**") for non-union Employees. Employees contribute pretax dollars to an account that can be used for eligible medical expenses. The HSA programs are fully member-funded. Approximately seventy-five Employees participate in the HSA program.

42.     The Debtors estimate that they withhold approximately $2,900 per month to fund program participants' flexible spending accounts. As of the Petition Date, the Debtors estimate that they may hold approximately $2,900 in withholdings intended to fund the Flexible Spending Programs and HSAs. In addition, the Debtors pay Benefit Resource approximately $22,000 per year in connection with various costs and fees related to the Flexible Spending Account Program and HSAs and, as of the Petition Date, estimate that no amounts are outstanding on account of the prepetition administrative fees.

43.     Through this Motion, the Debtors seek authority to honor their obligations under the Flexible Spending Account Program and HSAs and intend to continue such program in the ordinary course.

### E.     Vacation and Paid Time Off

44.     The Debtors provide paid time off ("**PTO**") to eligible Employees (the "**PTO Policies**") in the form of vacation days, personal days and sick days. The Debtors maintain

one policy for non-union Employees[11] and offer union Employees PTO consistent with the terms of the CBA. The accrual and use of paid time off under the PTO Policies varies depending on, among other things, the Employee's tenure, the Employee's position, the particular type of paid time off in question, the time of year (there are restrictions during the holiday season), and the discretion of an Employee's supervisor.[12] The Debtors estimate that they have accrued and unpaid PTO of approximately $680,000.

45. Through this Motion, the Debtors seek authority to honor their prepetition obligations under the PTO Policies and to continue such programs in the ordinary course.

## F. Miscellaneous Benefits

46. The Debtors offer select miscellaneous benefits (the "**Miscellaneous Benefits**") to eligible Employees. As of the Petition Date, there are approximately 20 Employees and their dependents as well as former Employees and their dependents who qualify and elect continuation of benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"). For both union and non-union Employees, COBRA applies when the Employees and/or dependents are no longer eligible for Debtors' sponsored benefits. If the eligible Employee is participating in the Debtors' sponsored medical, vision, and/or dental benefits immediately prior to the termination date, and are eligible for and timely elect to continue coverage under COBRA, the Debtors pay for a certain period that is determined based on the eligible Employees' job classification. The COBRA claims run through the Debtors as if they were claims under the Debtors' Health Benefits Plans. COBRA is administered by Benefit Resource, which collects

---

[11] Although referred to internally as the "Executive" PTO policy, the policy covers all non-union Employees.

[12] The amount of annual vacation days available to a given program participant ranges from five to 30 days based on length of service and whether the Employee is a union or non-union member. Eligible Employees receive six paid holidays, which are determined by a set schedule of holidays and are paid with regular payroll for the applicable holiday week. The Debtors also offer Employees from three to six paid sick days depending on tenure and position.

COBRA premiums from participants. The Debtors do not anticipate any prepetition costs associated with the COBRA program but intend to continue this program consistent with past practice.

47.    The Debtors also offer pet insurance to Employees for veterinary care for their pets which is 100% paid by employees. The Debtors do not anticipate any prepetition costs associated with the pet insurance program and intend to continue this program consistent with past practice.

### G.    Benefits Consultants

48.    In the ordinary course of business, the Debtors utilize the services of benefits consultants, brokers, and third party administrators, including USI, OperationsInc, International Planning Alliance, and Leading Edge. These third parties assist the Debtors with choosing, delivering, and administering the Debtors benefits and Deferred Compensation Plans. The annual cost to the Debtors for such services is approximately $650,000 annually. The Debtors do not anticipate any prepetition amounts are owed, but request authority to continue the engagement and payment of such consultants and brokers consistent with past practice.

### V.    Retirement Plans

### A.    Union 401(k) Plan

49.    With respect to the union-represented Employees, the Debtors remit Employee 401(k) contributions to a union-sponsored plan[13]   Under the CBA, eligible union Employees are able to participate in a 401(k) savings plan sponsored by the Union (the "**Union 401(k) Plan**"). The Debtors deduct Employee contributions weekly for Employees that have

---

[13] The Debtors historically maintained a pension plan for union Employees, however, as of April 29, 2011 the Debtors stopped making contributions to the pension plan and the plan was terminated. The Debtors are subject to a negotiated termination liability. The Debtors, however, do not seek to honor this liability in connection with this Motion and reserve all rights with respect to the claims resolution process.

elected to participate and remit those contributions to the union 401(k) plan. In total, the Debtors deduct approximately $3,900 per month on account of the union 401(k) plan, and approximately $600 has accrued on account of this program as of the Petition Date.

### B. Non-Union 401(k) Savings Plans

50. The Debtors maintain defined contribution plans for the benefit of all non-union eligible Employees meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "**Non-Union 401(k) Savings Plan**" and together with the Union 401(k) Plan, the "**Retirement Plans**"), which are managed by Principal as the record keeper. There are approximately 686 Employees or former employees with current account balances in the Non-Union 401(k) Savings Plan, with a total of approximately $56,000 withheld each bi-weekly period from program participants' paychecks on account thereof. The Debtors currently have a matching program for non-union program participants, who are eligible after they have both completed one year of employment and reached twenty-one years of age. Pursuant to this program, the Debtors match program participants' contributions at a rate of 2.5% of eligible compensation the Employee contributes to their 401(k) plan account. The Debtors estimate they pay approximately $13,000 per bi-weekly pay period in matching contributions under the Non-Union 401(k) Savings Plan. As of the Petition Date, the Debtors estimate that they may hold approximately $45,000 in prepetition 401(k) withholdings and approximately $11,000 has accrued on account of prepetition matching obligations. Through this Motion, the Debtors seek the authority to continue to honor their prepetition obligations related to Non-Union 401(k) Savings Plan and to continue to honor such obligations in the ordinary course after the Petition Date.

<u>**The Relief Requested Should be Granted**</u>

**I.    Payment of the Workforce Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.**

51.    The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims for suppliers).

52.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtor to carry out its fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). Section 105(a) of the

Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain pre-petition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).

53.     The Court may also rely on its general equitable powers to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court (commonly referred to as the "necessity of payment" rule or the "doctrine of necessity"), empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Long standing precedent in this district has established that the doctrine of necessity allows a debtor to make payments outside of a plan of reorganization on account of prepetition obligations where such payment is necessary for the preservation of value. *See, e.g.*, *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991); *see also CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use section 105(a) of the Bankruptcy Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.")

54.     In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport, C. & S. W. R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to

prevent "stoppage of the continuance of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

55. This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code.").

56. The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. Authorizing the Debtors to pay prepetition compensation, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Without the relief requested herein being granted, the Debtors' Employees or Supplemental Workforce may seek alternative opportunities, perhaps with the Debtors' competitors. The loss of valuable Employees and Supplemental Workforce, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors'

ability to meet their customer obligations and the Debtors' ability to successfully carry out their chapter 11 strategy.

57.     Failure to satisfy certain prepetition obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the preservation of the Debtors' estates.  The majority of the Debtors' Employees are hourly workers.  They may rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees will not receive health coverage and, thus, may become obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers.  The loss of health care coverage during a global pandemic will result in considerable anxiety for Employees at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate replacements, severely disrupting the Debtors' operations at a critical juncture.  Certain obligations are also entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Accordingly, payment of these obligations would affect simply the timing of payment.

## II.     Payment of Certain of the Workforce Obligations Is Required by Law.

58.     The Debtors seek authority to pay Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Benefit Plans and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from

Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co. v. State of Mich. (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Payroll Taxes to the proper parties in the ordinary course of business.

## III. Debtors Are Not Seeking Relief For Payments to Insider Employees Under Any Incentive Plan.

59. For the avoidance of doubt, the Debtors are not seeking relief as to any incentive plan. Therefore, section 503(c) of the Bankruptcy Code is not implicated by this Motion. Should the Debtors' determine to institute an incentive or retention plan in accordance with the Bankruptcy Code, the Debtors will request such relief at the appropriate time.

### **Reservation of Rights**

60. Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of

the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## The Debtors Satisfy Bankruptcy Rule 6003(b)

61. Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition Date. Fed. R. Bankr. P. 6003(b). The Debtors request authority, on an interim basis, to the honor and satisfy any Workforce Obligations as they become due and payable prior to the entry of a final order, subject to the statutory priority cap as applicable. As described above, the Debtors' Employees and Supplemental Workforce are vital to the Debtors' operations. Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 21 days of these Chapter 11 Cases will jeopardize their loyalty and trust, which may cause such individuals to leave the Debtors' employ or service at a time when they are needed most. The disruption to the Debtors' business and operations by Employee unrest would be severe and irreparable. Moreover, the Debtors' Employees and Supplemental Workforce rely on the Debtors' compensation, benefits and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous during a global pandemic if the Debtors cannot immediately pay them or Insurance Programs in the ordinary course of business. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

62. To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances,

and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Veit Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Notice

63.     Notice of this Motion has been provided to (i) the United States Trustee for Region 2; (ii) the holders of the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) the United States Attorney's Office for the Southern District of New York; (iv) counsel to the Prepetition Agent, Julia Frost-Davies (julia.frost-davies@morganlewis.com) and David Riley (david.riley@morganlewis.com); and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

### No Prior Request

64.     No prior request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 10, 2020
      New York, New York

Respectfully submitted,

/s/ *Lucy F. Kweskin*

Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email: lkweskin@proskauer.com
Email: mskrzynski@proskauer.com

-and-

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Email: jmarwil@proskauer.com
Email: bblackwell@proskauer.com


-and-

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 557-2900
Facsimile: (310) 577-2193
Email: pyoung@proskauer.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*