Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**CENTURY 21 DEPARTMENT STORES LLC,** *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-12097 (SCC)<br><br>(Joint Administration Requested) |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (A)(1) CONFIRMING, ON AN INTERIM BASIS, THAT THE STORE CLOSING AGREEMENT IS OPERATIVE AND EFFECTIVE AND (2) AUTHORIZING, ON A FINAL BASIS, THE DEBTORS TO ASSUME THE STORE CLOSING AGREEMENT, (B) AUTHORIZING AND APPROVING STORE CLOSING SALES FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (C) APPROVING DISPUTE RESOLUTION PROCEDURES, (D) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, AND (E) APPROVING THE DEBTORS' STORE CLOSING PLAN

---

[1]    The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033).  The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Century 21 Department Stores LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

<u>**Background**</u>

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Norman R. Veit Jr. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "**Veit Declaration**"),[2] and the *Debtors' Memorandum in Support of Chapter 11 Filings*, each filed with the Court contemporaneously herewith and incorporated by reference herein.

---

[2]      Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Veit Declaration.

**Jurisdiction**

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The Debtors confirm their consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**Relief Requested**

6.      By this Motion, pursuant to sections 105(a), 363, 365, and 554 of the Bankruptcy Code, and Rules 6003, 6004, and 6007 of the Bankruptcy Rules, the Debtors request entry of an interim order, substantially in the form annexed hereto as **Exhibit A** (the "**Interim Order**"), and a final order, substantially in the form annexed hereto as **Exhibit B** (the "**Final Order**" and, together with the Interim Order, the "**Proposed Orders**"), (a)(1) authorizing, upon entry of the Final Order, the Debtors to assume[3] the agreement dated as of September 1, 2020, by and among Hilco Merchant Resources, LLC (together with Gordon Brothers Retail Partners, LLC, the "**Consultant**"),[4] on the one hand, and the Debtors, on the other, a copy of which is attached

---

[3]      Pursuant to this Motion, the Debtors seek entry of the Interim Order confirming that the Store Closing Agreement (as defined below) is operative and effective, and entry of the Final Order granting the Debtors authority to assume the Store Closing Agreement.

[4]      Pursuant to Section N of the Store Closing Agreement, Hilco Merchant Resources, LLC ("**HMR**") was authorized to syndicate this transaction with a third party upon notice to the Debtors. In accordance with the Store Closing Agreement, after notice to the Debtors, HMR syndicated the transaction with Gordon Brothers Retail Partners, LLC ("**GBRP**").

hereto as **Exhibit C** (as amended, modified, or restated as of the date hereof, and together with all exhibits thereto, the "**Store Closing Agreement**") and (2) confirming, upon entry of the Interim Order, that the Store Closing Agreement is operative and effective until the Court considers the relief requested by the Motion on a final basis, (b) authorizing the Debtors to continue to conduct store closing sales (collectively, the "**Closing Sales**") at the store locations listed on Exhibit A to the Store Closing Agreement (the "**Closing Stores**") and, if requested by the Debtors, through the Debtors' e-commerce platform, in accordance with the proposed sale guidelines (the "**Sale Guidelines**") attached hereto as **Exhibit D**, with such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the "**Encumbrances**"), (c) approving the proposed dispute resolution procedures described herein to resolve any disputes with governmental units regarding certain applicable non-bankruptcy laws that regulate liquidation and similar-themed sales, (d) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the applicable Closing Sale (collectively, the "**Store Closing Bonuses**"), and (e) approving the Debtors' strategic plan in connection with the closure of each of their retail locations by giving effect to the above-referenced documents and implementing the above-referenced procedures (the "**Store Closing Plan**").

## Engagement of the Consultant and the Closing Sales

7.      As noted in the Veit Declaration, the Debtors reached out to two nationally-recognized liquidation firms so that such parties could provide proposals for the liquidation of the Debtors' inventory (as defined in the Store Closing Agreement, the "**Merchandise**") and the Debtors' furniture, fixtures, and equipment (collectively, the "**FF&E**"[5] and, together with the

---

[5]      For the avoidance of doubt, the FF&E includes furniture, fixtures, and equipment (including owned furnishings, trade fixtures, equipment and improvements to real property) owned by the Debtors wherever those items

Merchandise, the "**Store Assets**").  The Debtors provided the liquidation firms with access to a

data room with all of the relevant information necessary to build a liquidation model and for the

liquidation firms to evaluate the potential transaction.  The Debtors obtained two proposals from

liquidators.

8.      After evaluating the proposals, providing each of the liquidation firms with

the opportunity to submit their best and final proposals and consulting with the Prepetition Agent,

the Debtors determined that the bid submitted by the Consultant was in the best interests of the

Debtors and their estates.   The Debtors made this determination after considering numerous

factors, including, but not limited to, (a) the Consultant's prior experience handling the liquidation

of various similar retailers, (b) the amount and experience of supervisors designated by the

Consultant to handle the project, (c) potential upside that could be realized under a "fee" based

structure,[6] (d) the ability of the Consultant to supplement the Debtors' inventory with additional

goods procured by the Consultant (referred to in the Store Closing Agreement as the "**Additional

Agent Goods**"), and (e) overall economics.

9.      In short, the Debtors determined that entering into the Store Closing

Agreement and commencing Closing Sales immediately was essential to ensure that the liquidation

of the Store Assets is managed efficiently and effectively.

10.      The Debtors negotiated the terms and conditions of the Store Closing

Agreement in good faith and at arms' length, and entered into the Store Closing Agreement on

---

may be located, including, for example, the Debtors' corporate offices, distribution centers, warehouses, and the
Closing Stores.

[6]      A "fee" based structure generally provides for a commission or fee to the liquidation firm in exchange for
assisting with the sale of particular asset(s) in addition to reimbursing the liquidation firm for its out-of-pocket
expenses.  The "fee" based structure allows the company to retain a majority of the dollars realized for the asset(s)
since the liquidation firms do not risk their own capital and also gives the Debtors the maximum amount of flexibility
in the process.

September 1, 2020.  In order to avoid, among other potential negative outcomes, a disorganized "self-liquidation" scenario, *i.e.*, a scenario in which more desirable items sell faster than items with a slower turnover, the Closing Sales began on September 3, 2020, immediately following entry into the Store Closing Agreement.

11.     The Debtors anticipate moving expediently so to maximize overall recovery for the estates while minimizing the Debtors' liabilities, with each of the Closing Sales to be completed as soon as possible and, in all cases, in no longer than three months.

**A.     Store Closing Agreement**

12.     The material terms of the Store Closing Agreement are summarized in the table below:

| TERM | STORE CLOSING AGREEMENT[7] | |
|---|---|---|
| **Services Provided by the Consultant** | (i) | Provide qualified supervisors (the "**Supervisors**") engaged by the Consultant to oversee the management of the Stores. |
| | (ii) | Determine appropriate point-of-sale and external advertising for the Stores, approved in advance by the Debtors. |
| | (iii) | Determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by the Debtors, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by the Debtors. |
| | (iv) | Oversee display of Merchandise for the Stores. |
| | (v) | To the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses. |
| | (vi) | Maintain the confidentiality of all proprietary or non-public information regarding the Debtors in accordance with the provisions of the confidentiality agreement signed by the Consultant and the Debtors. |

---

[7]     Capitalized terms used in the summary of the Store Closing Agreement, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Store Closing Agreement.  To the extent there is any conflict between this summary and the Store Closing Agreement, the Store Closing Agreement shall govern in all respects.

6

| TERM | STORE CLOSING AGREEMENT[7] |
|---|---|
| | (vii)   Assist the Debtors in connection with managing and controlling loss prevention and employee relations matters. |
| | (viii)   Implement HMR's CareerFlex program for the Debtors' Store-level and other employees. |
| | (ix)   Recommend allocations and balancing of Merchandise between and among the Stores to maximize the overall recovery, including (where necessary or appropriate) collapsing Stores. |
| | (x)   Provide such other related services deemed necessary or appropriate by the Debtors (in consultation with the Prepetition Agent) and the Consultant. |
| **Sale Term** | The term "Sale Term" with respect to each Closing Store commenced on September 3, 2020 (the "**Sale Commencement Date**") and shall end with respect to each respective Closing Store no later than November 30, 2020 (the "**Sale Termination Date**"); *provided, however*, that the Consultant and the Debtors, upon notice to and in consultation with the Prepetition Agent, may mutually agree in writing to extend or terminate the Closing Sales at any Closing Store prior to the Sale Termination Date.<br><br>To the extent that the Closings Sale as it pertains to a particular Closing Store is delayed or interrupted because it is required to be closed due to the issuance of an order, rule, or regulation by a federal, state or local government agency related to COVID-19, (i) the Sale Termination Date as to the affected Closing Store shall be extended by the time period for which the Closing Sale was delayed or interrupted, and/or (ii) the Debtors and Consultant may mutually agree on the transfer of the Merchandise in the affected Closing Store to another Closing Store. |
| **Vacating Stores** | Upon the conclusion of the Sale Term at each Closing Store, the Consultant shall leave such Closing Store in broom clean condition and in accordance with the lease requirements for such premises; *provided, however*, the Debtors shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Consultant and the Debtors, upon notice to and in consultation with the Prepetition Agent, subject to the Consultant's right pursuant to Section I of the Store Closing Agreement to abandon at the Closing Stores, the distribution centers, warehouses, and corporate offices any unsold FF&E, upon prior notice to and written consent of the Debtors and consultation with the Prepetition Agent. |

| TERM | STORE CLOSING AGREEMENT[7] |
|---|---|
| **Expenses of the Consultant** | All expenses incident to the conduct of the Closing Sale and the operation of the Closing Stores during the Sale Term (including, without limitation, all Closing Store-level and corporate expenses associated with the Sale) shall be in accordance with the Expense Budget and borne by the Debtors. |
| **The Advance** | On September 4, 2020, the Debtors provided an advance payment in the amount of $525,000 for costs and expenses delineated in the Expense Budget (the "**Advance**"), which shall be held by the Consultant and applied to any unpaid obligation owing by the Debtors to the Consultant under the Store Closing Agreement.  Any portion of the Advance not used to pay amounts explicitly contemplated by the Store Closing Agreement shall be returned to the Debtors within three days following the Final Reconciliation (as described in the Store Closing Agreement). |
| **Compensation for the Consultant** | The Debtors shall pay the Consultant a fee weekly equal to one percent (1.0%) of Gross Proceeds (the "**Tier 1 Fee**").  In addition to the "Tier 1 Fee," the Consultant may also earn a "Tier 2 Fee" and "Tier 3 Fee" (together with the Tier 1 Fee, the "**Merchandise Fee**") equal to the aggregate sum of the percentages shown in the following table, based upon the following thresholds of Net Recovery Percentage (*i.e.*, in each case, as calculated back to first dollar): |

| Net Recovery Percentage | Merchandise Fee |
|---|---|
| Less than 90.0% | 1.0% Tier 1 Fee is the total Merchandise Fee |
| Greater than or equal to 90.0% but less than 94.0% | 1.0% Tier 1 Fee<br>0.25% Tier 2 Fee<br>Total Merchandise Fee of 1.25% |
| Equal to or greater than 94.0% | 1.0% Tier 1 Fee<br>0.25% Tier 2 Fee<br>0.50% Tier 3 Fee<br>Total Merchandise Fee of 1.75% |

To the extent (i) the Sale Term is changed – longer or shorter – and/or (ii) the Merchandise included in the Sale is materially greater or less than the files provided to Agent during due diligence, the Net Recovery Percentages and ranges shall be adjusted in accordance with updated models mutually acceptable to the Debtors and the Consultant.

In addition, the Consultant shall be paid a fee equal to the Merchandise Fee on account, and from the sales, of Consigned Goods, which fee shall be paid at the same times as the Merchandise Fee associated with the sale of Merchandise is paid.

| TERM | STORE CLOSING AGREEMENT[7] |
|---|---|
| | With respect to the FF&E, the Consultant shall have the right to sell such FF&E during the Sale Term on a commission basis equal to 15% of the Gross Proceeds of the sale of the FF&E ("**FF&E Commission**"). |
| **Additional Agent Goods** | The Consultant may supplement the Merchandise in the Closing Sales at the Closing Stores with additional goods procured by the Consultant, which may include goods provided to the Consultant on consignment, which are of like kind, and no lesser quality to the Merchandise in the Closing Sales at the Closing Stores.  The Consultant shall pay to the Debtors an amount equal to 5% of the gross proceeds (excluding only Sale Taxes) from the sale of the Additional Agent Goods (the "**Additional Agent Goods Fee**"), in aggregate amount of not less than $1 million (the "**Guaranteed Amount**"). |
| **Insurance; Risk of Loss** | (i)    The Debtors shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause the Consultant to be named an additional insured with respect to all such policies.<br><br>(ii)    At the Consultant's request, the Debtors shall provide the Consultant with a certificate or certificates evidencing the insurance coverage required under the Store Closing Agreement and that the Consultant is an additional insured thereunder.  In addition, the Debtors will maintain throughout the Sale Term, in such amounts as it currently has in effect, worker's compensation insurance in compliance with all statutory requirements. |
| **Indemnification by the Consultant** | The Consultant shall indemnify and hold the Debtors and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential coinvestors, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, the "**Debtors' Indemnified Parties**") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to:<br><br>(i)    the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties;<br><br>(ii)    the material breach of any provision of the Store Closing Agreement by the Consultant, after the Consultant has received |

| TERM | STORE CLOSING AGREEMENT[7] |
|---|---|
| | notice of the asserted breach and the Consultant fails to promptly cure the same to the extent the breach is curable; |
| | (iii)  any liability or other claims made by Consultant Indemnified Parties or any other person (excluding Debtors' Indemnified Parties) against a Debtors' Indemnified Party arising out of or related to the Consultant's conduct of the Closing Sales, except claims arising from the Debtors' negligence, willful misconduct, or unlawful behavior; |
| | (iv)  any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Debtors' Indemnified Parties, or the Debtors' customers by the Consultant or any of the Consultant Indemnified Parties; |
| | (v)  any claims made by any party engaged by the Consultant as an employee, agent, representative or independent contractor arising out of such engagement; and/or |
| | (vi)  any product liability, consumer protection, or similar claims regarding Additional Agent Goods. |
| **Indemnification by Debtors** | The Debtors shall indemnify, defend, and hold the Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "**Consultant Indemnified Parties**") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: |
| | (i)  the willful or negligent acts or omissions of the Debtors or the Debtors' Indemnified Parties; |
| | (ii)  the material breach of any provision of the Store Closing Agreement by the Debtors, after the Debtors have received notice of the asserted breach and the Debtors fail to promptly cure the same to the extent the breach is curable; |
| | (iii)  any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding the Consultant Indemnified Parties) against the Consultant or a Consultant Indemnified Party, except claims arising from the Consultant's negligence, willful misconduct or unlawful behavior; |

| TERM | STORE CLOSING AGREEMENT[7] |
|------|---------------------------|
|  | (iv)  any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of the Consultant Indemnified Parties or the Debtors' customers by the Debtors or the Debtors' Indemnified Parties; and/or<br><br>(v)  the Debtors' failure to pay over to the appropriate taxing authority any taxes required to be paid by the Debtors during the Sale Term in accordance with applicable law. |

**B.      Closing Sales According to Sale Guidelines; Assumption of Store Closing Agreement**

13.      The Sale Guidelines provide, among other things, that:  (a) all sales of Store Assets will be deemed free and clear of all Encumbrances; (b) Merchandise will be sold with the benefit of various marketing techniques and price mark-downs to promote efficient liquidation; and (c) certain Store Assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, with notice to, and in consultation with the Prepetition Agent, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates.

**C.      Dispute Resolution Procedures Relating to Liquidation Laws**

14.      Certain Closing Stores may be subject to (a) liquidation laws, which include, but are not limited to, various federal, state, and local statutes, ordinances, rules, and licensing requirements directed at regulating "going out of business," "store closing," "sale on everything," "everything must go," "liquidation sale," or similar themed sales, (b) bulk sale laws, laws restricting safe, professional, and non-deceptive customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale, including ordinances establishing license or permit requirements, waiting periods, time limits, or (c) bulk sale restrictions that would otherwise apply solely to the sale of the Store Assets (collectively, the

"**Liquidation Laws**").  While many such Liquidation Laws do not apply to court-ordered sales,

some Liquidation Laws may not expressly carve-out court-ordered sales.

15.    To the extent that the Closing Sales of Store Assets are subject to any

Liquidation Laws, the Debtors propose that the following resolution procedures (the "**Resolution**

**Procedures**") shall apply:

(a)    Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, the Store Closing Agreement and the Sale Guidelines (as may be modified by Side Letter Agreements), and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, the Store Closing Agreement and the Sale Guidelines (as may be modified by Side Letter Agreements) without the necessity of further showing compliance with any such Liquidation Laws.

(b)    Within two (2) business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Motion and the as-entered Interim Order, on the following: (i) the landlords for the Closing Stores (the "**Landlords**"); (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; and (iv) the division of consumer protection for each state in which the Closing Sales are being held (collectively, the "**Dispute Notice Parties**").  Within two (2) business days after entry of the Final Order, the Debtors will likewise serve the Dispute Notice Parties with a copy of the as-entered Final Order.

(c)    To the extent that there is a dispute arising from or relating to the Closing Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Laws (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within ten (10) days following entry of the Interim Order any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "**Dispute Notice**") explaining the nature of the dispute to: (i) Proskauer Rose LLP,

Eleven Times Square, New York, New York 10036 (Attn: Lucy F. Kweskin, Esq.); Proskauer Rose LLP, 70 West Madison, Suite 3800, Chicago, Illinois 60602 (Attn: Jeff J. Marwil, Esq.); Proskauer Rose LLP, 2029 Century Park East, Suite 2400, Los Angeles, California 90067-3010 (Attn: Peter J. Young, Esq.), (ii) counsel to any statutorily appointed committee, (iii) the United States Trustee for Region 2 (the "**U.S. Trustee**"), U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, (iv) any affected Landlord, (v) counsel to the Prepetition Agent, Morgan Lewis & Bockius LLP, One Federal Street, Boston, MA 02110, (Attn: Julia Frost-Davies); Morgan Lewis & Bockius LLP, 2049 Century Park East, Los Angeles, CA 90067 (Attn: David Riley, Esq.) and (vi) Troutman Pepper Hamilton Sanders LLP, 1313 Market Street, Suite 5100, P.O. Box 1709, Wilmington, Delaware 19899-1709, Attn: Douglas D. Herrmann, Esq. and Marcy McLaughlin Smith, Esq. (Douglas.Herrmann@Troutman.com and Marcy.Smith@Troutman.com).

(d)     If the Debtors, the Consultant, and the Governmental Unit are unable to resolve the Reserved Dispute within fourteen (14) days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "**Dispute Resolution Motion**").

(e)     In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors or any other interested party from asserting (i) that the provisions of any Liquidation Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors or the Consultant pursuant to the Interim Order or the Final Order violates such Liquidation Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors and the Consultant to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Agreement, and the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such Liquidation Laws by the Bankruptcy Code. Nothing in the

Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(f)     If, at any time, a dispute arises between the Debtors or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs.   Any determination with respect to whether a particular law is a Liquidation Law shall be made *de novo*.

## D.     Fast Pay Laws

16.     Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**" and, together with the Liquidation Sale Laws, the "**Applicable State Laws**").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

17.     The nature of the Closing Sales contemplated by this Motion will result ultimately in each of the Store-level employees being terminated during the Closing Sales.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the Debtors' payroll systems will simply be practically unlikely to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing.  Given the number of employees who will be terminated during the Closing Sales, this process could easily

take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

**E.     Return and Exchange Policies**

18.     Consistent with industry practice and to accommodate customers' needs, the Debtors maintain liberal return, exchange, and store credit policies with respect to both in-store and online purchases (collectively, the "**Return and Exchange Policies**"). For example, Century21.com provides for a forty-five-day return policy from the order date. Similarly, the in-store return policy is forty-five days from the date of purchase with exceptions for certain items that have a shorter return policy. As a result of the COVID-19 pandemic, the Debtors have allowed customers to return items purchased since February 4, 2020, and to return items purchased thirty days after store reopening.

19.     In order to maintain the goodwill of their customers, many of whom will likely purchase items during the Closing Sales, the Debtors propose to slightly amend their Return and Exchange Policies so to allow the Debtors to permit returns and exchanges for items purchased prior to September 10, 2020, until the earlier of (a) the applicable policy under the Return and Exchange Policies and (b) October 10, 2020 (the "**Modified Return Policy**").

20.     The Debtors do not intend to apply the Modified Return Policy to any merchandise sold in accordance with the Closing Sales described herein, all of which will be conducted on a final basis.

**F.     Customer Programs**

**_Gift Cards_**

21.     The Debtors maintained a program (the "**Gift Card Program**") through which their customers could purchase physical, non-expiring gift cards in various denominations

15

(the "**Gift Cards**").  The Debtors historically sold the Gift Cards in their retail stores and through

their website.  On occasion, the Debtors also sold and distributed Gift Cards in connection with

sales promotions, other special events or to members of their C21STATUS loyalty program

described below.  All of the Debtors' Gift Cards were redeemable in-store or online.

22.     As of the Petition Date, the Debtors have suspended the issuance of new

Gift Cards and notified third-party vendors to cease selling the Gift Cards through other retailers

and to pull any unsold Gift Cards from the shelves.  By this Motion, the Debtors propose to

continue honoring all outstanding Gift Cards through October 10, 2020, after which Gift Cards

will be deemed to have no value.

### *Loyalty Program*

23.     The Debtors operated a customer loyalty program, "C21STATUS,"

whereby customers who signed up for "loyalty" accounts could accrue reward points for each

dollar spent towards award certificates.  The Debtors also have "C21STATUS" branded credit

cards with respect to which credit cardholders would accrue reward points for all purchases made

on the credit cards.   However, as of the Petition Date, the Debtors have discontinued the

C21STATUS program and are no longer honoring reward points or any other benefits accrued

thereunder.  Accordingly, the Debtors do not seek authority to continue the C21STATUS program

on a postpetition basis or to compensate loyalty members for benefits accrued prepetition.

24.     The credit cards are issued by Comenity Capital Bank ("**Comenity**"), which

bears all credit risks associated with the cards.  While the primary purpose of offering the credit

cards is to increase customer loyalty and drive sales, the Debtors also receive credit card revenue

through a program agreement with Comenity, which provides the Debtors with certain financial

benefits.

16

*__Coupons and Sale Promotions__*

25.     The Debtors occasionally maintained a coupon redemption program pursuant to which they distributed and honored their own coupons (the "**Coupons**").  Further, in the ordinary course of business, the Debtors conducted sales promotions, either online or at selected stores (the "**Sales Promotions**"), which included "buy one get one free" programs, cash off future purchases, seasonal discounts, online promotions and discount codes, and free shipping promotions.  Although the Debtors do not believe that any unexpired Coupons or Sales Promotions are in circulation or pending, as of the Petition Date, the Debtors nonetheless do not intend to honor Coupons or Sales Promotions in light of discounts that will apply to the Closing Sales.

**G.     Store Closing Bonus Plan**

26.     Through this Motion, the Debtors are requesting the authority, but not the obligation, subject to the terms of the Cash Collateral Order (as defined below) and associated budget, to pay Store Closing Bonuses (the "**Store Closing Bonus Plan**") to Store-level non-insider employees, who remain in the employ of the Debtors during the Closing Sales.  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Closing Sales and will enable the Debtors to retain those employees necessary to successfully complete the Closing Sales.  Payments under the Store Closing Bonus Plan, if any, are to be made exclusively to non-insiders and on the condition of employment through the date on which the respective employee's Store closes.

27.     The amount of the Store Closing Bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the duration of his or her employment.

28.     The total aggregate cost of the Store Closing Bonus Plan will not be more than $1,013,000, assuming 100% of the eligible employees remain employed through the duration of the Closing Sales at each Closing Store.

29.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' workforce due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

30.     In order to ensure a successful Store Closing and Closing Sale process and maximize revenues for the benefit of the Debtors' estates, the Store Closing Bonuses incentivize store management to provide uninterrupted leadership during this challenging period, and tie payment to maintaining employment with the Debtors through the conclusion of the Closing Sales. Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates.

### Relief Requested

31.     By this Motion, the Debtors seek the entry of the Proposed Orders approving the Store Closing Plan and the Debtors' continued efforts in accordance therewith, including (a)(1) approving and authorizing, upon entry of the Final Order, the Debtors' assumption of the Store Closing Agreement and (2) confirming, upon entry of the Interim Order, that the Store Closing Agreement is operative and effective until the Court considers the relief requested by the Motion on a final basis, (b) approving the Sale Guidelines, (c) authorizing the Closing Sales in accordance with the Sale Guidelines, (d) authorizing Store Closing Bonuses to non-insider Closing Store employees who remain employed for the duration of the applicable Closing Sale, and

(e) approving the Resolution Procedures related to any Liquidation Laws.  The Debtors further request that the Court (x) set a deadline for filing objections to this Motion and entry of the Final Order, (y) set a final hearing on the Motion, and (z) enter the Final Order on this Motion in connection with such final hearing.

## **The Relief Requested Should Be Granted**

**A.    Assumption of the Store Closing Agreement (Upon Entry of the Final Order) Is Warranted Under Section 365 of the Bankruptcy Code.**

32.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard.[8]  In applying the "business judgment" standard, courts show substantial deference to the debtor's decision to assume or reject.[9]  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"[10]  The business judgment rule applies in chapter 11 cases.[11]

---

[8]    *See, e.g., In re Hawker Beechcraft, Inc.*, 486 B.R. 264 (Bankr. S.D.N.Y. 2013) (holding chapter 11 debtor did not have to show anything more than ordinary business judgment in order for bankruptcy court to uphold its decision to reject executory contracts).

[9]    *See, e.g., In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2014) (A court will normally approve the assumption of an executory contract "upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment" … and generally not second-guess a debtor's business judgment regarding whether the assumption or rejection of a contract will benefit the debtor's estate.) (quoting *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012)); *see also Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject executory contracts "should be granted as a matter of course").

[10]    *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

[11]    *See id.* at 656; *see also In re Genco Shipping & Trading Ltd*, 509 B.R. at 464 (citing *In re Integrated Res., Inc.*, 147 B.R. at 656) (applying the business judgment rule in chapter 11); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

33.     Here, the Debtors have satisfied the "business judgment" standard and have a sound business reason for seeking to assume the Store Closing Agreement and perform their obligations thereunder, which will include the reimbursement of prepetition and postpetition expenses and the payment of prepetition and postpetition obligations arising under the Store Closing Agreement, and continue the Closing Sales, which commenced prepetition, with the Consultant's assistance in accordance with the Sale Guidelines.   As described in the Veit Declaration, the Debtors filed these Chapter 11 Cases to liquidate their assets and maximize distributions to their creditors.  The Closing Sales further both of these goals:  with the cooperation of their employees and the services of the Consultant, the Debtors will be able to liquidate Store Assets at the Closing Stores so that the Debtors can exit the Closing Stores quickly and efficiently, thereby monetizing their assets and eliminating related expenses.

34.     The Closing Sales are a significant component of the Debtors' efforts to maximize value because these Closing Sales enable the Debtors to sell Store Assets at the Closing Stores in a manner that is designed to maximize efficiency and increase overall profitability. Allowing the Closing Sales – which commenced prepetition – to proceed in accordance with the Sale Guidelines will allow the Debtors to most efficiently and quickly monetize the Store Assets in a uniform and orderly process with the assistance of an experienced consultant.

35.     Assumption of the Store Closing Agreement will allow the Debtors to engage the Consultant, on a postpetition basis, to manage the Closing Sales at the Closing Stores. The Consultant is experienced in facilitating processes such as the Closing Sales and will help the Debtors maximize their recovery on the Store Assets located at all Closing Stores for the benefit of the Debtors' estates and their creditors.

36.      Given the complexity of the Closing Sales across various states and given the multitude of stores, the Consultant will provide invaluable strategic, managerial, and accounting services, allowing the Debtors to focus their efforts on other key aspects of their chapter 11 efforts.  Therefore, efficient and effective liquidation sales and procedures, as contemplated by the Sale Guidelines, and the services to be provided by the Consultant will allow the Debtors to more quickly vacate those locations and avoid the accrual of unnecessary administrative expenses.

37.      On the other hand, if the Debtors do not assume the Store Closing Agreement and their obligations thereunder, the Debtors' estates will suffer significant and irreparable harm because they will likely lose the benefit of the Consultant's momentum initiated prior to the Petition Date.  As a result, the Debtors and their advisors will likely need to suspend the Closing Sales, which would then require the Debtors to devote substantial time and effort preparing for and managing the Closing Sales internally, or to once again seek bids from other advisors who could prepare for and run the Closing Sales, a process the Debtors have already undertaken prior to the Petition Date in connection with the selection of Consultant and commencement of the Closing Sales.  Ultimately, such disruption and delay would materially increase the Debtors' administrative expenses and overall losses, without any associated benefits of such delays to their estates.

38.      For the reasons stated above, the Debtors submit that they have exercised their reasonable business judgment in seeking to assume the Store Closing Agreement and thereby engaging and enabling the Consultant to proceed with the Closing Sales at the Closing Stores.  As such, there is sufficient business justification for the assumption of the Store Closing Agreement and, on interim basis, the entry of an order that confirms that the Store Closing Agreement is operative and effective.

21

**B.    Continuing the Closing Sales Pursuant to the Sale Guidelines, Including
Modification of the Debtors' Prepetition Customer Programs and Implementation
of the Store Closing Bonus Plan, Is Authorized Pursuant to Sections 105(a) and
363(b) of the Bankruptcy Code.**

39.    Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code permits a

debtor to use, sell, or lease, estate property "other than in the ordinary course of business" after

notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts have authorized relief under section 363(b)

where a debtor demonstrated a sound business justification for such relief.[12]

40.    As noted above, once a debtor has articulated a valid business justification,

the court accords great deference to such judgment, even in the context of chapter 11 cases.[13]  The

benefit of the business judgment rule is equally applicable in the context of sales under section

363.[14]

41.    As discussed in the preceding section, the Debtors have determined, in the

sound exercise of their business judgment, that continuing the Closing Sales at the Closing Stores

on and after the Petition Date, or as soon thereafter as possible, is essential to their efforts to

minimize administrative expenses and liquidate assets at the Closing Stores as efficiently and

---

[12]    *See Comm. of Equity Sec. Holders* v. *Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983)
("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence
presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs,
Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1985) ("[T]he debtor must articulate some business justification, other than
mere appeasement of major creditors.").

[13]    *See In re Integrated Res., Inc.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. at 615-16.

[14]    *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. at 464 (quoting *In re Global Crossing Ltd.*, 295
B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("The standard used for judicial approval of the use of estate property outside
of the ordinary course of business is also the business judgment of the debtor."); *Fulton State Bank* v. *Schipper* (*In re
Schipper*), 933 F.2d 513, 515 (7th Cir. 1991) ("[D]ebtor in possession can sell property of the estate outside the
ordinary course of business if . . . he has an 'articulated business justification.'"); *Stephens Indus., Inc.* v. *McClung*,
789 F.2d 386, 390 (6th Cir. 1986) (authorizing sale of debtor's assets pursuant to section 363 "when a sound business
purpose dictates such action") (citation omitted).

quickly as possible.  The Sale Guidelines, including the modification of the Debtors' prepetition

customer programs to comport with the Closing Sales process, will allow the Debtors to move

forward with a uniform and orderly process of monetizing the Store Assets at the Closing Stores.

Along with the aid and efforts of an experienced consultant to maximize value and efficiency, the

Debtors anticipate that the Closing Sales will take less than three months to complete.  Without

the Sale Guidelines, the Debtors are unlikely to be able to liquidate such assets as effectively and

efficiently, which will be to the detriment of all interested parties.

42.    Implementation of the Store Closing Bonus Plan is also a sound exercise of

the Debtors' business judgment, in the best interests of the Debtors and all their estates'

stakeholders and justified by the facts and circumstances of these Chapter 11 Cases.[15]  The store

employees – along with their skills, knowledge, and hard work – are more critical now than ever.

Through their commitment and performance, they can ensure that the Debtors continue to

maximize stakeholder value in a challenging economic environment and at a time when those

employees' positions will soon be terminated.

---

[15]    Section 503(c)(3) of the Bankruptcy Code generally prohibits certain transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case. *See* 11 U.S.C. § 503(c)(3). Though section 503(c)(3) is not applicable here because this Motion does not seek authorization to pay Store Closing Bonuses to insiders, if it did apply, the Store Closing Bonus Plan would be well within the "facts and circumstances" test articulated therein. Importantly, section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different than the business judgment standard under section 363(b) [of the Bankruptcy Code]." *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011); *see also In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the key employee retention program is] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (concluding that the standard under section 503(c)(3) of the Bankruptcy Code reiterates the business judgment standard).  For the reasons discussed above, a possible loss of the employees would disrupt the Debtors' ability to effectively close their Stores and maximize value for the benefit of all stakeholders.  Because implementation of the Store Closing Bonus Plan will incentivize store level employees to enhance the value of the Debtors' estates, the Store Closing Bonus Plan is justified by the facts and circumstances of these Chapter 11 Cases and is a sound exercise of the Debtors' business judgment. *See, e.g., In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that bonus payments are "'justified by the facts and circumstances of the case' under section 503(c)(3) [where] they are within the 'sound business judgment' of the Debtors") (citation omitted).

23

43.     The total cost of the Store Closing Bonus Plan is reasonable in light of the total revenue projected from the Sales and competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performance despite the added stress inherent in the chapter 11 process.

44.     The Store Closing Bonus Plan is comparable to employee incentive and retention plans regularly paid in other "store closing" and similar-themed sales.  As in those other instances, some aspects of the Store Closing Bonus Plan will be devised and implemented with the input of the Consultant (as set forth in the Store Closing Agreement) based upon its view of maximizing the sale process and recoveries for creditors.  As such, courts have approved incentive payments similar to those completed in the Store Closing Bonus Plan.  *See, e.g., In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Mar. 17, 2020) (authorizing store closing retention bonus program on a final basis); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (same).

45.     Accordingly, the Debtors submit that they have a compelling business justification for seeking approval to continue the Closing Sales, including modification of the their prepetition customer programs to comport with the Closing Sales process and implementation of the Store Closing Bonus Plan, pursuant to section 363(b) and in accordance with the Sale Guidelines.

C.     **Sale of the Store Assets Free and Clear of Liens, Claims, and Encumbrances Is Authorized Under Section 363 of the Bankruptcy Code.**

46.     A debtor in possession may sell property under section 363(b) and section 363(f) of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.     Although the term "any interest" is not defined in the Bankruptcy Code, courts have permitted a "broader definition that encompasses other obligations that may flow from ownership of the property."[16]   The scope of section 363(f) is not limited to *in rem* interests in a debtor's assets.[17]   A debtor may therefore sell its assets under section 363(f) free and clear of successor liability that otherwise would have arisen under federal statute.[18]

48.     The Debtors request approval to sell the Store Assets on a final "as is" basis, free and clear of any Encumbrances in accordance with section 363(f) of the Bankruptcy Code. The Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) in connection with any Encumbrance a party may assert against the Store Assets.

---

[16]     *In re Motors Liquidation Co.*, 829 F.3d 135, 155 (2d Cir. 2016), *quoting* 3 Collier on Bankruptcy ¶ 363.06[1].

[17]     *Id.* (citing *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996)).

[18]     *Id.* at 156.

Furthermore, the Debtors propose that any such liens, claims, and encumbrances be transferred

and attach to the Debtors' share of the proceeds of the Closing Sales, as applicable, with the same

force, effect, and priority as such liens currently have on the Store Assets, and subject to the same

rights, claims, defenses, and objections, if any, of all parties with respect thereto.

**D.      Waiver of Contractual Restrictions in Leases Restricting the Closing Sales Is Authorized and Appropriate.**

49.      The Debtors recognize that the Closing Sales and the Sale Guidelines may

be inconsistent with certain contractual restrictions contained in leases, subleases, agreements,

licenses, reciprocal easement agreements, recorded documents, or other obligations applicable to

certain Closing Stores.   However, the Debtors request that the Court override or invalidate any

contractual restrictions that may impair the Debtors' ability to conduct the Closing Sales at the

Closing Stores.

50.      Store closing or liquidation sales have become a routine aspect of chapter

11 cases involving retail debtors.  Such sales are consistently approved by courts despite provisions

in various contractual and recorded documents that seek and purport to prohibit or restrict such

sales.[19]  Here, for the reasons discussed in this Motion and the Veit Declaration, the Debtors

believe that the Closing Sales are an essential and critical component of the Debtors' strategy to

maximize value for the benefit of the Debtors' estates, creditors, and parties in interest.

Accordingly, the Debtors respectfully request that the Court waive the applicability of, or deem

---

[19]      *See In re R.H. Macy & Co.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (restrictive lease provision is unenforceable against debtor seeking to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); *In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("[T]o enforce the anti-[going out-of-business] sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress."); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (clause in lease prohibiting going-out-of-business sales is unenforceable).

unenforceable, any contractual restrictions with respect to any Closing Stores that could otherwise inhibit the Debtors' ability to conduct the Closing Sales.

**E.      Exemption from Liquidation Laws Imposing Restrictions on the Closing Sales Is Warranted and Appropriate.**

51.      To the extent that any Liquidation Laws purport to prohibit, restrict, or otherwise interfere with the Closing Sales at any Closing Stores, the Debtors request that the Court deem such Liquidation Laws to be waived with respect to the Closing Sales, which are under the supervision of the Court.  The Debtors request that the Court retain exclusive jurisdiction to resolve any Reserved Disputes, and that the Court resolve any Dispute Resolution Motions at the next scheduled omnibus hearing.

52.      The Debtors recognize that various Liquidation Laws, including, but not limited to, state and local rules, laws, ordinances, and regulations that relate to permitting, licensing, bonding, waiting periods, time limits, bulk sale restrictions, and other related laws governing the conduct of store closing, liquidation, or other inventory clearance sales, may exist in certain states in which the Closing Stores are located.  Such Liquidation Laws often provide that court-ordered liquidation sales are exempt from compliance therewith.

53.      In the event, however, that a Liquidation Law does not expressly waive compliance therewith of a court-supervised bankruptcy sale, the Debtors submit that such Liquidation Law should be deemed to be waived to the extent that it conflicts with section 363 of the Bankruptcy Code.  Here, the Closing Sales are already subject to the Court's supervision.[20] Therefore, the Court is able to supervise the Closing Sales and such supervision adequately protects the public interest and the Debtors' creditors.  Moreover, section 363 of the Bankruptcy

---

[20]      *See* 28 U.S.C. § 1334.

Code requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, but compliance with Liquidation Laws could constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors. The Closing Sales are a legitimate method by which the Debtors can maximize returns from the sale of the Store Assets for the benefit of their estates, their creditors, and their stakeholders, in accordance with the obligations under section 363 of the Bankruptcy Code.

54.   Therefore, to the extent that any Liquidation Laws purport to interfere with the Closing Sales, the Debtors seek authority to nevertheless proceed with the Closing Sales without the necessity of, and the delay associated with, complying with such Liquidation Laws (except health and safety laws), which would otherwise require the Debtors to obtain various state licenses or permits, observe state and local waiting periods or time limits, or satisfy any additional requirements with respect to advertising or conducting the Closing Sales, or transferring merchandise among the Debtors' various stores and distribution centers. Specifically, the Debtors submit that such Liquidation Laws should be deemed inapplicable given the Court's supervision of the Closing Sales. The Debtors further request that no other person or entity, including (but not limited to) any Governmental Unit, including any federal, state, or local agency, department, or governmental authority, or any lessor be allowed to take any action to prevent, interfere with, or otherwise hinder the conduct of the Closing Sales, including the advertisement and promotion of the Closing Sales, as contemplated in the Store Closing Agreement and in accordance with the Sale Guidelines.

55.   The Debtors propose that, to the extent that any Governmental Unit seeks to dispute a Closing Sale at a Closing Store on the basis of one or more Liquidation Laws, such

party may serve a Reserve Dispute Notice on the Debtors, in accordance with the Resolution

Procedures described in this Motion and set forth in the Interim Order and the Final Order.

56.     Accordingly, the Debtors submit that they have a compelling business

justification for seeking approval of the (a) exemption from the Liquidation Laws, (b) Resolution

Procedures, and (c) relief from Fast Pay Laws.

**F.     Abandonment of Certain Property in Connection with the Closing Sales and in Accordance with the Sale Guidelines Is Warranted Under Section 554 of the Bankruptcy Code.**

57.     Section 554 of the Bankruptcy Code provides that after notice and a hearing,

a debtor "may abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate."[21]   Here, in accordance with the Sale Guidelines

and with the aid of the Consultant, the Debtors will make every reasonable effort to sell all Store

Assets at the Closing Stores as quickly and efficiently as possible for the purpose of monetizing

such assets and vacating the Closing Stores as soon as possible.   As noted above, the Debtors are

seeking to liquidate Merchandise and FF&E located at each of the Closing Stores or elsewhere, in

consultation with the Consultant.   However, during the course of the Closing Sales, the Debtors

may determine that the costs associated with the continued storage and sale efforts respecting

FF&E is likely to exceed the projected proceeds that could be realized from the sale thereof, or

that certain FF&E may have low prospects for resale.   In such event, any remaining FF&E would

likely impose a financial burden on the estates, in the form of storage and removal costs, but are

unlikely to provide much, if any, value in return to the estates (such remaining FF&E, the

"**Remaining Property**").

---

[21]     11 U.S.C. § 554(a); *see also Bryson v. Bank of New York*, 584 F. Supp. 1306, 1316 (S.D.N.Y. 1984) (citing *Hanover Ins. Co.* v. *Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974)) ("'[A] trustee may abandon his claim to any asset which he deems to be less valuable than the cost of recovering it.' ").

58.     To maximize the value of the Debtors' assets and to minimize unnecessary costs to the estates, the Debtors respectfully request authority to designate any property located at the Closing Stores as Remaining Property and to abandon such Remaining Property located at any of the Closing Stores without incurring liability to any person or entity.  Before designating any assets as Remaining Property or abandoning any Remaining Property at any Closing Store, the Debtors will have determined in the exercise of their sound business judgment that such Remaining Property to be abandoned by the Debtors is either (a) burdensome to the estates because removal and storage costs for the Remaining Property are likely to exceed any net proceeds therefrom or (b) of inconsequential value and benefit to the estates.

59.     The Debtors will use all commercially reasonable efforts to remove, or cause to be removed, any confidential or personal identifying information (which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that constitute any FF&E or any Remaining Property before any such property is sold or abandoned.

60.     Accordingly, the Debtors respectfully request Court authority to designate and thereafter abandon Remaining Property if they determine that the benefits of retaining such property for storage or resale are greater than the costs of such retention

**G.    Appointment of a Consumer Privacy Ombudsman Is Not Required by Sections 332 and 363(b)(1) of the Bankruptcy Code.**

61.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or lease personally identifiable information unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman (a "**CPO**") pursuant to section

332 of the Bankruptcy Code. Section 332 requires the appointment of a CPO no less than seven (7) days in advance of a hearing on a sale under section 363(b)(1) so that such CPO can assist the Court in its consideration of a "proposed sale or lease of personally identifiable information under section 363(b)."

62. Here, pursuant to the Store Closing Agreement, the Consultant will not be purchasing any assets from the Debtors, much less personally identifiable information from the Debtors (*e.g.*, customer lists). The Debtors also do not intend to sell any personally identifiable information in the course of the Closing Sales, and indeed, intend to scrub all Store Assets to ensure that no confidential and personally identifiable information is transferred in connection with the sale of any such assets.

63. Accordingly, the Debtors submit that the appointment of a CPO is not necessary in connection with the Closing Sales.[22]

### The Debtors Have Satisfied Bankruptcy Rule 6003(b)

64. Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." There is no question that the Debtors' failure to continue conducting the Closing Sales would result in immediate and irreparable harm to the Debtors' estates. Given that the sales began prepetition and are well underway, any unnecessary delay and expense will severely disrupt the Debtors' efforts in these Chapter 11 Cases and decrease the recovery to the Debtors' estates from the Closing Sales. Accordingly, the Debtors submit that the relief requested

---

[22] To the extent it is determined that the appointment of a CPO may be necessary or advisable in connection with any other proposed sale of the Debtors' assets in these Chapter 11 Cases, the Debtors will work cooperatively with the U.S. Trustee in connection therewith.

herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Bankruptcy Rules 6004(a) and (h)

65.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).   As explained above and in the Veit Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Notice

66.    Notice of this Motion has been provided to (i) the United States Trustee for Region 2; (ii) the holders of the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) the United States Attorney's Office for the Southern District of New York; (iv) counsel to the Prepetition Agent, Julia Frost-Davies (julia.frost-davies@morganlewis.com) and David Riley (david.riley@morganlewis.com); (v) the Landlords; (vi) sublessees, licensees, or concessionaires of the Debtors and consignors and bailors of Consigned Goods; (vii) the Internal Revenue Service; (viii) all parties known to the Debtors who hold any liens, security interests or other interests in the Debtors' assets; (ix) the applicable Governmental Units; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

## **No Prior Request**

67.    No prior request for the relief sought herein has been made by the Debtors

to this or any other court.

[*Remainder of page intentionally left blank*]

**<u>Conclusion</u>**

WHEREFORE the Debtors respectfully request entry of the Proposed Orders and such other and further relief as the Court may deem just and appropriate.

Dated: September 10, 2020
      New York, New York

Respectfully submitted,

/s/  *Lucy F. Kweskin*

Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email: lkweskin@proskauer.com
Email: mskrzynski@proskauer.com

-and-

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Email: jmarwil@proskauer.com
Email: bblackwell@proskauer.com

-and-

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 557-2900
Facsimile: (310) 577-2193
Email: pyoung@proskauer.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*