**Exhibit C**

**Store Closing Agreement**



September 1, 2020

<u>*VIA EMAIL*</u>
Raymond Gindi
Chief Executive Officer
Century 21 Department Stores, LLC
22 Cortlandt Street
New York, NY 10007
rgindi@c21stores.com

Re: **Letter Agreement Governing Inventory Disposition**

Dear Sir/Madam:

By executing below, this letter shall serve as an agreement ("<u>Agreement</u>") between Hilco Merchant Resources, LLC, on the one hand ("<u>Agent</u>" or a "<u>Party</u>"), and Century 21 Department Stores, LLC and its affiliated loan parties identified on <u>Schedule 1</u> attached hereto, on the other hand ("<u>Merchant</u>" or a "<u>Party</u>" and together with the Agent, the "<u>Parties</u>"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) at the Merchant's stores set forth on <u>Exhibit A</u> (each a "<u>Store</u>" and collectively, the "<u>Stores</u>") and through Merchant's e-commerce platform through a "Store Closing", "Everything Must Go", "Everything on Sale", "Going out of Business" (provided the Merchant and Lender Agent consent in writing), or similar themed sale (the "<u>Sale</u>").

**A.   <u>Merchandise</u>**

For purposes hereof, "<u>Merchandise</u>" shall mean all goods, saleable in the ordinary course, located in the Stores, distribution centers, and/or warehouses or in transit to or from the forgoing as of the Sale Commencement Date (defined below).  "Merchandise" does not mean and shall not include: (1) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores, the distribution centers, warehouses and corporate offices (collectively, "<u>FF&E</u>"); (2) any Additional Agent Goods (as defined below), (3) damaged or defective merchandise that cannot be sold and [(4) goods that belong to consignors, sublessees, licensees or concessionaires of Merchant (with respect to (4), "<u>Consigned Goods</u>").

**B.   <u>Sale Term</u>**

For each Store, the Sale shall commence no later than September 2, 2020 (the "<u>Sale Commencement Date</u>") and conclude no later than November 30, 2020 (the "<u>Sale Termination Date</u>"); <u>provided</u>, <u>however</u>, that the Parties (with the written consent of Lender Agent (as defined below)) may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date, and/or to start on an earlier Sale Commencement Date.  The Merchant, Lender Agent, and Agent shall mutually agree on the date on which Sale signage in the Stores shall be installed.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>."  At the conclusion of the Sale, Agent shall surrender the premises

for each Store to Merchant in broom clean condition and in accordance with the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises according to a budget mutually agreed to between the Agent and Merchant (with the written consent of Lender Agent).  To the extent that the Sale as it pertains to a particular Store is delayed or interrupted because it is required to be closed due to  the issuance of an order, rule, or regulation by a federal, state or local government agency related to COVID-19, (i) the Sale Termination Date as to the affected Store shall be extended by the time period for which the Sale was delayed or interrupted, and/or (ii) the Merchant and Agent may mutually agree on the transfer of the Merchandise in the affected Store to another Store.  At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store and contemporaneously provide copies of the photographs by electronic means to Merchant.  Such photographs shall refer with specificity to each Store by number, name, and/or location.

**C.**     **Project Management**

(i)     Agent's Undertakings

During the Sale Term, Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) determine the necessity for obtaining any applicable permits and governmental approvals to conduct the Sale, including working with Merchant to obtain each in a timely and orderly fashion and preparing or causing to be prepared all forms necessary to assist in Merchant's securing any applicable permits and governmental approvals necessary to conduct the Sale, the costs and expenses of which shall be paid by Merchant and shall be in addition to the costs and expenses set forth on the Expense Budget; (i) implement Agent's affiliate CareerFlex program for Merchant's Store level and other employees; (j) recommend allocations and balancing of Merchandise between and among the Stores to maximize the overall recovery, including (where necessary or appropriate) collapsing Stores; and (k) provide such other related services deemed necessary or appropriate by Merchant (in consultation with the Lender Agent) and Agent.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

Notwithstanding anything to the contrary herein, (a) Agent is authorized to provide confidential information to JPMorgan Chase Bank, N.A., as Administrative Agent ("Lender Agent"), its advisors, and the Lenders under the Merchant's existing asset-based credit facility

("Lenders"), (b) the Merchant hereby authorizes Agent to communicate with Lender Agent (and its advisors) and the Lenders regarding the Sale and the other matters described herein and to participate in discussions and update calls with Lender Agent and the Lenders, and authorizes Agent to provide to Lender Agent and the Lenders with copies of reports and other information or materials prepared or reviewed by Agent as Lender Agent or the Lenders may reasonably request from time to time, and (c) Lender Agent and the Lenders are intended third party beneficiaries of the provisions in this paragraph and the other provisions of this Agreement that reference a consent, agreement or approval of Lender Agent, and no such provisions shall be amended or otherwise modified or waived without the written consent of Lender Agent.

(ii)     Merchant's Undertakings

During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; (h) apply for and obtain, with Agent's assistance and support, all applicable permits and authorizations (including landlord approvals and consents) for the Sale; (i) assist Agent with implementing the CareerFlex program for Merchant's Store level and other employees; and (j) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, all at no cost to Agent.

Merchant shall be responsible for providing direction to and supplies for the Stores in order to comply with federal, state and local COVID-19 related health and safety requirements, and Agent will assist with the implementation of such requirements at the Stores; provided, however, that Agent shall not be responsible for the payment of nor liable for any fine, injury, death, or damage caused by or related to COVID-19.  Agent's supervisors will provide their own personal protective equipment ("PPE") at no additional cost to Merchant.  To the extent that temporary labor do not source and provide their own PPE, Agent will provide Merchant with Agent's cost (without lift or mark-up) for PPE and, if requested by Merchant, Agent will procure such PPE, and Merchant agrees to reimburse Agent for the costs associated therewith (in addition to amounts reflected in Exhibit B).

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.    The Sale**

All sales of Merchandise shall be made on behalf of Merchant.  Agent does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, debit card, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.    Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)    "Cost Value" shall mean the cost of each item of Merchandise, as reflected in the Merchant's books, records, and files provided to Agent during due diligence.

(ii)   "Gross Proceeds" shall mean the sum of the gross proceeds of all sales of Merchandise made through the Stores or the e-commerce platform during the Sale Term, net only of sales taxes.

(iii)  "Net Recovery Percentage" shall mean (A)(1) the Gross Proceeds, calculated using the "gross rings" method, less (2) the aggregate actual (x) costs of Store-level payroll (consisting of salaries and bonuses, incentives, and benefits), (y) other Store-level operating expenses (consisting of occupancy, e-commerce shipping, e-commerce creative, bank and credit card fees, and other Store expenses), and (z) liquidation expenses (consisting of costs and expenses set forth on the Expense Budget), in each case which arise during the Sale Term and are attributable to the Sale, divided by (B) the Cost Value of the Merchandise sold, calculated using the "gross rings" method, and the result of such equation expressed as a percentage.  The Net Recovery Percentage (and the amounts contemplated by sections (1) and (2) of this paragraph) shall be calculated in a manner consistent with the files provided by Agent during due diligence.  For the avoidance of doubt, the Merchandise Fee shall not be included in determining or calculating the Net Recovery Percentage.

In consideration of its services hereunder, Merchant shall pay Agent a fee weekly equal to one percent (1.0%) of Gross Proceeds (the "Tier 1 Fee").  In addition to the "Tier 1 Fee", Agent may also earn a "Tier 2 Fee" and "Tier 3 Fee" (together with the Tier 1 Fee, the "Merchandise Fee") equal to the aggregate sum of the percentages shown in the following table, based upon the following thresholds of Net Recovery Percentage[1] (e.g., in each case, as calculated back to first dollar):

---

[1] To the extent (i) the Sale Term is changed – longer or shorter – and/or (ii) the Merchandise included in the Sale is materially greater or less than the files provided to Agent during due diligence, the Net Recovery Percentages and ranges shall be adjusted in accordance with updated models mutually acceptable to the Merchant and Agent.

| Net Recovery Percentage | Merchandise Fee |
|---|---|
| Less than 90.0% | 1.0% Tier 1 Fee is the total Merchandise Fee |
| Greater than or equal to 90.0% but less than 94.0% | 1.0% Tier 1 Fee<br>0.25% Tier 2 Fee<br>Total Merchandise Fee of 1.25% |
| Equal to or greater than 94.0% | 1.0% Tier 1 Fee<br>0.25% Tier 2 Fee<br>0.50% Tier 3 Fee<br>Total Merchandise Fee of 1.75% |

The definitive Net Recovery Percentage shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of any applicable Tier 2 Fees and Tier 3 Fees due and payable to Agent. Merchant shall pay Agent's definitive Tier 2 Fees and Tier 3 Fees in connection with the Final Reconciliation. In addition to the above, Agent shall be paid a fee equal to the Merchandise Fee on account of and from the sales of sales of Consigned Goods, which fee shall be paid at the same times as the Merchandise Fee associated with the sale of Merchandise is paid.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's other reasonable, documented out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs (including signage and the shipping, freight, and sales tax related thereto where applicable). The Expense Budget for the Sale is attached hereto as Exhibit B. The Expense Budget may only be modified by mutual agreement of Agent, Merchant and the Lender Agent. The costs of supervision set forth on Exhibits C include, among other things, industry standard deferred compensation. Notwithstanding anything to the contrary contained in this Agreement, Merchant shall not be responsible or obligated to pay Agent's costs that have not been included, or provided for, in the Expense Budget, as the same may be amended in accordance with this Agreement

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty five (45) days following the Sale Termination Date for the last Store.

Upon execution of this Agreement, the Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $525,000 (the "Sale Expense Advance"). Other than with respect to the costs of Agent's signage (which shall be offset against the Sale Expense Advance), the Sale Expense Advance shall be held by Agent until the Final Reconciliation (and Merchant shall not apply the balance of the Sale Expense Advance to, or otherwise offset any portion of the balance of the Sale Expense Advance against, any weekly reimbursement, payment of fees, or other amount owing to Agent under this Agreement prior to the

Final Reconciliation).  Without limiting any of Agent's other rights, Agent may apply the Sale Expense Advance to any unpaid obligation owing by Merchant to Agent under this Agreement.  Any portion of the Sale Expense Advance not used to pay amounts explicitly contemplated by this Agreement shall be returned to the Merchant within three days following the Final Reconciliation.

**F.** **Indemnification**

    (i)    Merchant's Indemnification

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant, after Merchant has received notice of the asserted breach and Merchant fails to promptly cure the same to the extent the breach is curable; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

    (ii)    Agent's Indemnification

Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) ) the material breach of any provision of this Agreement by Agent, after Agent has received notice of the asserted breach and Agent fails to promptly cure the same to the extent the breach is curable; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties; (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement; and (f) any product liability, consumer protection, or similar claims regarding Additional Agent Goods.

G.  **Insurance**

  (i)  Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

  (ii)  Agent's Insurance Obligations

As an expense of the Sale, Agent shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least two million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

H.  **Representations, Warranties, Covenants and Agreements**

  (i)  Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with customary Merchant's practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii) Agent warrants, represents, covenants and agrees that (a) Agent is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent, and (e) Agent will not take any disciplinary action against any employee of Merchant.

**I.    Furniture, Fixtures and Equipment**

Agent shall sell the FF&E in the Stores, the distribution centers, warehouses and corporate offices. Merchant shall be responsible for all reasonable costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a budget or budgets to be established from time to time by mutual agreement of the Parties. Agent shall have the right to abandon at the Stores, the distribution centers, warehouses and corporate offices any unsold FF&E upon prior notice to (and written consent of) Merchant and Lender Agent.

In consideration for providing the services set forth in this section I, Agent shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15.0%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E. During each weekly reconciliation described in section E above, Agent's FF&E fee shall be calculated, and Agent's calculated FF&E fee and all FF&E costs and expenses then incurred shall paid within seven (7) days after each such weekly reconciliation.

**J.    Additional Agent Goods**

Agent shall have the right, at Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent, which may include goods provided to Agent on consignment, which are of like kind, and no lesser quality to the Merchandise in the Sale at the Stores ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent as part of the Sale, and delivered to the Stores at Agent's sole expense (including as to labor, freight and insurance relative to shipping such Additional Agent Goods to the Stores). Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided, however, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Further, Merchant agrees to use reasonable efforts based upon its then-existing technologies and staffing capabilities to expeditiously create SKUs and other information technology related items necessary or appropriate to track the sale of the Additional Agent Goods and the proceeds thereof.

Agent shall pay to Merchant an amount equal to five percent (5.0%) percent of the gross proceeds (excluding only Sale Taxes) from the sale of the Additional Agent Goods (the "<u>Additional Agent Goods Fee</u>"), and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods, which amounts shall be wired to the Agent no less than weekly.  Agent hereby guarantees that the Additional Agent Good's Fee payable to Merchant shall be not less than $1,000,000 (the "<u>Guaranteed Amount</u>") on account of the sale of the Additional Agent Goods, which Guaranteed Amount shall be paid by Agent through payment of the Additional Agent Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time) and, to the extent the Guaranteed Amount is not paid by the time of the Final Reconciliation, the difference between the amount then paid and the Guaranteed Amount shall be paid by Agent as part of the Final Reconciliation.

Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

Merchant shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

Merchant acknowledges, and, to the extent applicable, the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) Agent's portion of the Additional Agent Goods proceeds, and Agent is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties; provided, however, in the event the Merchant files a Bankruptcy Case, the Approval Order shall also provide that the security interest granted to Agent hereunder shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Agent's portion of the Additional Agent Goods proceeds).

K.  **Termination**

The following shall constitute "Termination Events" hereunder:

(a) Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party;

(b) Any representation or warranty made by Merchant or Agent is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default. If this Agreement is terminated, Merchant shall be obligated to pay Agent all amounts due under this Agreement through and including the termination date.

L.  **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax, email or by recognized overnight delivery service as follows: (a) To Merchant: at the address listed above; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 849-0859, Attn: Ian S. Fredericks; or (c) such other address as may be designated in writing by Merchant or Agent, in each case with a copy sent via email to the Lender Agent at JPMorgan Chase Bank, N.A., 4 New York Plz, Floor 17, New York, NY 10004, Attention: Bonnie David; email: bonnie.j.david@jpmorgan.com and Morgan, Lewis & Bockius LLP, One Federal Street, Boston, MA 02110, Attention: Marc Leduc; email: marc.leduc@morganlewis.com. For the avoidance of doubt, any reference to written consent in this Agreement may be satisfied by providing consent by email.

M.  **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

N.  **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party, provided that Agent may syndicate this transaction with the third party Agent previously provided notice thereof to Merchant. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement,

shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**O.        Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**P        Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of New York (without reference to the conflicts of laws provisions therein). Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**Q.        Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**R.        Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

S.  **Bankruptcy**

If Merchant commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its commercially reasonable efforts to ensure that such motion is approved by an order (the "Approval Order") that provides, among other things, as follows: (i) the payment of all fees and reimbursement of expenses hereunder to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) [reserved], (iii) [reserved], (iv) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (v) approval of the transaction contemplated hereby; (vi) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (vii) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; (viii) approval of the sale of Additional Agent Goods in accordance with the terms and conditions hereof; (ix) authorizing Merchant to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement; and (x) other terms and conditions substantially similar to orders recently entered in other large chapter 11 retail cases.  In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens.  From and after entry of the Approval Order, Agent shall conduct the Sale in accordance with the terms of the Approval Order in all material respects.

\*          \*          \*

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity – we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian S. Fredericks
Its: EVP

**AGREED AND ACCEPTED as of the 3rd day of September, 2020:**

CENTURY 21 DEPARTMENT STORES LLC

By:
Its:

L.I. 2000, INC.

By:
Its:

CENTURY 21 DEPARTMENT STORES OF NEW JERSEY, L.L.C.

By:
Its:

C21 GA BLUE LLC

By: */s/ [signature]*
Its:


C21 SAWGRASS BLUE, LLC

By: */s/ [signature]*
Its:


CENTURY 21 GARDENS OF JERSEY, LLC

By: */s/ [signature]*
Its:


CENTURY PARAMUS REALTY, LLC

By: */s/ [signature]*
Its:


C21 DEPARTMENT STORES HOLDINGS LLC

By: */s/ [signature]*
Its:

GIFTCO 21 LLC

By: /s/ Raymond Gindi
Its:


CENTURY 21 FULTON LLC

By: /s/ Raymond Gindi
Its:


C21 PHILADELPHIA LLC

By: /s/ Raymond Gindi
Its:

## Schedule 1

**[Affiliated Loan Parties]**

1. L.I. 2000, Inc.
2. Century 21 Department Stores of New Jersey, L.L.C.
3. C21 GA Blue LLC
4. C21 Sawgrass Blue, LLC
5. Century 21 Gardens Of Jersey, LLC
6. Century Paramus Realty, LLC
7. C21 Department Stores Holdings LLC
8. Giftco 21 LLC
9. Century 21 Fulton LLC
10. C21 Philadelphia LLC

# Century 21
## Exhibit A

**Store List**

| Store # | Name | Address | Selling Sq. Ft. |
|---|---|---|---|
| 7 | Sawgrass | 12801 West Sunrise Blvd, Sunrise, FL 33323 | 50,208 |
| 10 | New York | 22 Cortlandt Street, New York, NY 10007 | 113,832 |
| 18 | Lincoln Square | 1972 Broadway, New York, NY 10023 | 31,890 |
| 20 | Bay Ridge | 472 86th Street, Brooklyn, NY 11209 | 76,396 |
| 26 | City Point | 445 Albee Square, Brooklyn, NY 11201 | 40,873 |
| 30 | Westbury | 1085 Old Country Road, Westbury, NY 11590 | 90,653 |
| 36 | Green Acres | 1127 Green Acres Mall, Valley Stream, NY 11581 | 43,747 |
| 40 | Morristown | 1 North Park Place, Morristown, NJ 07960 | 60,019 |
| 48 | Jersey Gardens | 651 Kapkowski Road, Elizabeth, NJ 07201 | 19,922 |
| 50 | Paramus | 200 Bergen Town Center, Paramus, NJ 07652 | 80,839 |
| 52 | Cross Country | 750 Central Park Ave, Yonkers, NY 10704 | 43,469 |
| 60 | Rego Park | 61-35 Junction Blvd, Rego Park, NY 11374 | 76,185 |
| 76 | Philadelphia | 821 Market St, Philadelphia, PA 19107 | 51,035 |
| **13** | | | **59,928** |

# Century 21
## Exhibit B

| **Expense Budget (1)** | |
|---|---:|
| **Advertising** | |
| Media | 867,500 |
| Signs (2) | 135,400 |
| Sign Walkers | 132,398 |
| Subtotal Advertising | 1,135,298 |
| | |
| **Supervision** | |
| Fees / Wages / Expenses (3) | 941,846 |
| Subtotal Supervision | 941,846 |
| | |
| Miscellaneous /Legal (4) | 50,000 |
| | |
| Total Expenses | 2,127,143 |

Notes:

1. This Expense Budget contemplates a sale term of September, 10, 2020 through November 30, 2020. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.

2. Includes Sales Tax.
3. Includes Deferred Compensation and Insurance.
4. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.