Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **CENTURY 21 DEPARTMENT STORES LLC,** ***et al.*,** | **Case No. 20-12097 (SCC)** |
| **Debtors.**[1] | **(Joint Administration Requested)** |

### DECLARATION OF NORMAN R. VEIT JR. IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Norman R. Veit Jr., make this declaration under 28 U.S.C.  § 1746:

1.      I am the Chief Financial Officer and Chief Information Officer of each of the above-

captioned debtors and debtors in possession (each a "**Debtor**" and together, the "**Debtors**").  In

that role, I am familiar with the Debtors' day-to-day operations, business and financial affairs,

---

[1]      The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033).  The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

books and records, and the circumstances leading to the commencement of the Debtors' above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.　　As Chief Financial Officer and Chief Information Officer for the Debtors, I am responsible for all technology strategy, operations, development and support for the Debtors. Prior to joining the Debtors, I held leadership roles at a number of retail companies, including serving as Executive Vice President and Chief Information Officer at The Bon Ton Stores, Executive Vice President, Distribution, Real Estate and Facilities and Chief Information Officer at Nine West Holding s Inc. (formerly the Jones Group), and Vice President, Technology for Ames Department Stores.

3.　　On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of New York (the "**Court**" or the "**Bankruptcy Court**"). The Debtors continue to operate their business and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.　　To enable the Debtors to operate effectively and minimize potential adverse effects in the Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and applications filed with the Court (collectively, the "**First Day Motions**") concurrently herewith. The First Day Motions, summarized below, seek, among other things, to (a) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (b) allow the Debtors to continue using cash collateral, (c) preserve the Debtors' valuable relationships with customers, (d) permit the Debtors to effectuate an orderly liquidation of their business, (e) resolve the Insurance Action (as defined below) in an expedited fashion, (f)

maintain employee morale and confidence, and (g) implement certain administrative procedures that will promote a seamless transition into chapter 11. This relief is critical to the Debtors' efforts to maximize value for the benefit of their creditors.

5.     I submit this Declaration in support of the First Day Motions. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the retail industry. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.     This Declaration is intended to provide an overview of the Debtors' business and their need to commence the Chapter 11 Cases. Section I sets forth certain relevant background. Section II provides a brief overview of the Debtors' business operations and workforce. Section III describes the Debtors' prepetition capital structure and debt obligations. Section IV describes certain circumstances that precipitated commencement of the Chapter 11 Cases and the Debtors' objectives in the Chapter 11 Cases. Sections V and VI provide a summary of the First Day Motions and the factual bases supporting the relief requested therein. Finally, section VII provides additional information required by the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**").

## I.      <u>PRELIMINARY STATEMENT</u>

### <u>*Background*</u>

7.     The Debtors are pioneers in off-price retail offering unmatched access to designer brands at amazing prices. They opened their iconic flagship location in downtown Manhattan in 1961. Despite sustaining serious physical damage following the September 11th attacks as the

company's flagship location is across the street from Ground Zero and closing for six months, the Debtors rebuilt their downtown Manhattan location, which is credited with helping revitalize Manhattan's Financial District in the aftermath of September 11th.

8.     As of the Petition Date, the Debtors have thirteen stores across New York, New Jersey, Pennsylvania and Florida and an online retail presence, operate seasonal pop-ups, and employ other innovative retail concepts.  Prior to the COVID-19 pandemic, the Debtors were planning to open three new brick-and-mortar locations, including a premier location at the American Dream Mall.  The Debtors' business operations, like those of many of their peers in the retail space, have been negatively impacted by adverse market trends, including the shifting of sales from traditional brick-and-mortar retailers to online retailers, and changing consumer preferences.  As a result of these changes, the Debtors retained prepetition the services of Moelis & Company ("**Moelis**") in connection with a potential strategic transaction for the Debtors. However, the recent economic impact of the pandemic, including the required closure in mid-March of all of the Debtors' brick-and-mortar locations to comply with government directives to combat the pandemic, proved to be too much of a strain on the Debtors' business and any previously-contemplated transactions.

*Insurance Providers' Failure to Honor Obligations*

9.     While the effects of COVID-19 on the American economy, the retail industry and the Debtors' business have been devastating, the Debtors were well positioned to weather this storm as a result of their careful insurance planning.  Debtor Century 21 Department Stores LLC and several of its non-debtor affiliates are named insureds under various insurance policies (collectively, the "**Insurance Policies**") that collectively provide for up to $350 million of insurance coverage, including for property damage, business interruption and other situations that

would prevent the public from entering the Debtors' stores.[2]  The Debtors and their non-debtor affiliates paid premiums to their insurance providers under the Insurance Policies (collectively, the "**Insurance Providers**") in excess of $1.2 million annually.  And although the Debtors' losses are clearly covered by the Insurance Policies and notwithstanding the Debtors' repeated requests to the Insurance Providers to honor their obligations – even to pay in the interim only a relatively small portion of the Debtors' aggregate claim so to allow the Debtors to sustain their business operations – the Insurance Providers delayed in responding to their insureds' claims, repeatedly requested irrelevant or duplicative materials, and refused to make any meaningful payments.  By July 2020, it became clear that the Insurance Providers would not honor the majority of their obligations under the Insurance Policies and as a result, on July 8, 2020, the Debtors and certain of their affiliates filed in the Supreme Court of the State of New York (the "**State Court**") a suit, captioned  *Century 21 Department Stores, LLC* v. *Starr Surplus Lines Insurance Co*., 652975/2020) (the "**Insurance Action**"), against several of the Insurance Providers (a) alleging breach of the relevant Insurance Policies as a result of the Insurance Providers' failure to compensate the Debtors for their losses under the policies and (b) seeking damages of over $175 million for the period March 2020 through May 31, 2020 and reserving their right to seek additional amounts for later time periods, as their losses mount.  As of the Petition Date, no answer has been filed by the Insurance Providers and no orders (substantive or otherwise have been entered by the State Court).

10.    Contemporaneously with the filing of the Chapter 11 Cases, the Debtors will be filing a Notice of Removal to remove the Insurance Action from the State Court to the United

---

[2]    The Debtors renewed the Insurance Policies for a full year and have opted for a quarterly payment plan.

States District Court for the Southern District of New York (and then to the Bankruptcy Court) (the "**Removed Action**"). The Debtors are also contemporaneously filing with this Court a letter requesting that the Court hear the Removed Action on an expedited basis. The Insurance Policies and proceeds thereof constitute property of the Debtors' estates and are the Debtors' largest assets, representing an important source of recovery for the Debtors' creditors.

11. The Insurance Providers' refusal to honor their contractual obligations under the Insurance Policies and requests for additional irrelevant information are simply delay tactics to force the Debtors to pursue costly and protracted litigation and ultimately settle their claims for less than the face amount of the Insurance Policies. The Insurance Providers' delay tactics would be even more pronounced if the Removed Action were to remain in the State Court as a result of the impact of the pandemic on the State Court. The Debtors believe that this Court can provide an expedited resolution of the Insurance Action that will yield significant proceeds and certainty for the Debtors and their estates.

12. An overview of the Insurance Action, including the events precipitating its commencement, is more fully set forth in the *Debtors' Memorandum in Support of Chapter 11 Filings* filed contemporaneously herewith.

### *Liquidity Constraints*

13. Without proceeds of the Insurance Policies available to them and with mounting losses the result of sustained store closures and lower demand, the Debtors estimated they needed approximately $75 million of additional financing to continue to effectively operate their business. However, they were unable to borrow under their existing Bank Facility (as defined below) as a result of various defaults thereunder and lack of inventory to support additional borrowings under

the Bank Facility. The lenders under the Bank Facility ultimately exercised their right to "cash dominion" over the Debtors' essential collections and operating account.

<u>*Search for Strategy Alternatives*</u>

14.     It was against this backdrop that, prior to the Petition Date, the Debtors and their professionals worked diligently to solicit and develop strategic alternatives to maximize the Debtors' value for the benefit of all of their stakeholders. In June 2020, with the support of their secured lenders, the Debtors retained Berkley Research Group, LLC ("**BRG**") to provide financial advice to the Debtors and to facilitate discussions with certain of the Debtors' constituents. At that time, Moelis also began to contact prospective financial and/or strategic partners to gauge interest in a strategic transaction with the Debtors. The Debtors also asked their equity owners to consider infusing additional capital, but their equity owners ultimately declined to do so.

15.     While the Debtors searched for a strategic partner, they also worked diligently to maintain their operations in the face of declining liquidity and increasing financing challenges. They took significant measures to reduce their expenses including furloughing approximately 50% of their workforce, some of whom were ultimately laid off. Although each of the Debtors' stores has now re-opened, sales continue to be slow and the Debtors still have insufficient liquidity to pay vendors and acquire additional inventory.

16.     The Debtors recognized that the financial difficulties they faced may render a strategic transaction challenging. Accordingly, I worked with the Debtors' professionals to prepare for the very real possibility that the best interests of the Debtors' stakeholders would be served by a bankruptcy case until proceeds of the Insurance Policies are realized.

17.     The lenders and the company worked together leading up to the decision to liquidate, with the lenders providing funding, support, and forbearance while the company pursued

third party investors and other sources of capital to support a going concern. Ultimately, the Debtors' efforts did not yield any viable strategic transaction counterparty and the Debtors have commenced these Chapter 11 Cases to expeditiously resolve the Insurance Action, effectuate an orderly liquidation of their assets and maximize the value of their estates for the benefit of their stakeholders. The Debtors determined that filing for Chapter 11 protection, utilizing cash collateral (with the consent and support of their secured lenders), and pursuing the Insurance Action in an expedited fashion while also commencing an orderly liquidation of their assets is their best available option. The Debtors believe that the chapter 11 process described in this Declaration and in contemporaneous filings will maximize recovery to the Debtors' creditors.

## II. THE DEBTORS' BUSINESS

### A. Corporate Structure

18. The Debtors are a family-owned and operated business. Raymond Gindi, I.G. Gindi, Eddie Gindi and Isaac Gindi (collectively, the "**Gindi Family**") and certain trusts maintained for the benefit of the members of the Gindi Family and certain of their relatives (the "**Gindi Trusts**") own directly or indirectly each of Debtors L.I. 2000, Inc. ("**LI 2000**") and C21 Department Stores Holdings LLC ("**C21 Holdings**"). Each of the other Debtors are direct or indirect subsidiaries of LI 2000 and C21 Holdings. The Gindi Family also owns 100% of the equity interests in non-Debtor Century 21, Inc., which after a reorganization of the Debtors and its affiliates in 2017 contemporaneously with the Debtors' entry into the Prepetition Credit Agreement (as defined below), resulted in the retail operations and intellectual property being housed exclusively in the Debtors and real estate ownership and other assets being housed exclusively in Century 21, Inc. and its non-Debtor affiliates. An organizational chart illustrating the corporate structure of the Debtors and certain non-Debtor affiliates is shown below.



19.     The governing board of each of the Debtors (collectively, the "**Boards**") is currently comprised of Lawrence Meyer, an independent director appointed in August 2020, and Gindi Family members Isaac A. 'IG' Gindi, Raymond Gindi, Isaac S. Gindi, and Edward Gindi. Each of the Debtors' Boards has delegated to Mr. Meyer, as independent director, sole authority to review and approve, reject or negotiate, as the case may be, any transaction in which the Gindi Family members or senior management are conflicted.

**B.      The Debtors' Business Operations**

20.     The Debtors operate thirteen retail stores across New York, New Jersey, Pennsylvania and Florida and maintain an e-commerce retail sales platform.  In fiscal year 2019, the Debtors' generated approximately $747 million of revenue.

21.     The Debtors' stores are stand-alone or located in shopping centers or traditional shopping malls.  The Debtors do not own any real estate but lease property for their retail space, distribution centers, and two corporate locations.  Approximately twenty-three of the Debtors'

leases are with third-party landlords, and approximately seventeen of the leases are with certain non-Debtor related parties, including subsidiaries of Century 21, Inc. The Debtors' aggregate rental expenses total approximately $65 million per year.

22. The Debtors historically maintained a supply chain comprised of more than 1,400 vendors designed to ensure the uninterrupted flow of new merchandise to their brick-and-mortar locations and to their e-commerce customers. The Debtors' greatest expense has been its merchandise, on which the Debtors historically have spent approximately $400 million annually. The Debtors used financing factors to increase their cash flow and allow them to purchase inventory on credit. The Debtors' profitability has been highly dependent on maintaining strong relationships and favorable trade terms with key vendors, including many highly-regarded brands and their financing factors. The Debtors do not manufacture any merchandise, and have relied upon their vendors, factors shippers, and warehousemen to ensure a continuous supply of goods to their customers.

## C.    **Employees**

23. As of the Petition Date, the Debtors[3] employ approximately 1,390 employees, of which approximately 1,205 are full-time and approximately 185 are part-time (collectively, the "**Employees**"). The great majority of Employees work in or support the Debtors' stores: approximately 1,215 Employees work in retail, distribution, or loss prevention roles in the Debtors' retail stores and distribution centers. The approximately 175 remaining Employees work in corporate roles such as accounting, information technology, and management.

---

[3]    Employees are employed by Debtors L.I. 2000, Inc., C21 Stores, Century 21 Department Stores of New Jersey, L.L.C., and C21 Philadelphia LLC.

24. As of the Petition Date, approximately 985 Employees (approximately 71% of the workforce) are represented by unions. The Debtors are party to a collective bargaining agreement (the "**CBA**") with UFCW Local 888, which represents all of the Debtors' union-represented Employees. The Debtors pay all union Employees and approximately 185 non-union Employees on an hourly basis, while the remaining non-union Employees are paid on a salaried basis..

25. With the pandemic forcing the closure of their stores, almost all retail employees were furloughed. Soon after, the Debtors furloughed half of their corporate and support staff. As stores have reopened, many of the employees have returned to work, though Employees who have salaries greater than $150,000 per year experienced 20% pay cuts beginning in July.[4]

### III. CAPITAL STRUCTURE

#### A. Prepetition Secured Debt

*Background on the Bank Facility*

26. As described below in greater detail, the Debtors finance their business operations primarily through a $125 million asset-based revolving credit facility on which the Debtors traditionally owe anywhere from $50 to $100 million (including outstanding Letters of Credit), depending on the time of year (the "**Bank Facility**"). The Bank Facility is secured by security interests in and first-priority liens upon substantially all of the Debtors' assets including proceeds of the Insurance Policies.

27. The Bank Facility is evidenced by that certain the Credit Agreement, dated January 4, 2017 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Credit Agreement**" and, collectively, with any other agreements and documents

---

[4] As described in further detail below, such Employees' salaries returned to normal levels in the first pay period of September 2020.

executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified in accordance with the terms thereof, the "**Prepetition Credit Documents**"), by and among the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, (in such capacity, "**Prepetition Agent**"), and the lenders party thereto from time to time (the "**Prepetition Lenders**", and, together with the Prepetition Agent, collectively, the "**Prepetition Secured Parties**"), pursuant to which the Prepetition Secured Parties made loans, advances and provided other financial accommodations to the Debtors. Pursuant to the Prepetition Credit Documents, each Debtor granted senior liens upon and security interests in substantially all of such Debtors' assets to the Prepetition Agent for the benefit of itself and the Prepetition Secured Parties as security for the Prepetition Secured Obligations (as defined below).

28.     As of the Petition Date, the Debtors were jointly and severally indebted and liable to the Prepetition Secured Parties under the Prepetition Credit Documents in principal amounts not less than (a) $56,260,439.40 (inclusive of letters of credit) plus (b) all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and all other Obligations (as defined in the Prepetition Credit Agreement) accrued, accruing or chargeable in respect thereof or in addition thereto, (collectively, the "**Prepetition Secured Obligations**").

*The Debtors' Default under the Bank Facility*

29.     As a result of the COVID-related closures of their stores and resulting decreased sales and cash flow described above, the Debtors defaulted under the Bank Facility. On June 18, 2020, the Prepetition Agent notified the Debtors of certain "Events of Default" under the Prepetition Credit Agreement as a result of the Debtors' failure to provide audited financial

statements without a "going concern" qualification by June 16, 2020, and to name the Prepetition Agent as a lender loss payee on certain of the Insurance Policies.

30.     On July 10, 2020, the Prepetition Agent notified the Debtors that the Prepetition Agent remained in default under the Bank Facility and that the Prepetition Agent would exercise its rights to establish cash dominion over the Debtors' concentration account, where all of the Debtors' collections are aggregated. However, the Prepetition Agent and the Prepetition Lenders have provided additional funding on a discretionary basis including to fund the appointment of an independent director and a third-party Chief Restructuring Officer.

## B.     **General Unsecured Creditors**

31.     As of the Petition Date, the Debtors believe that general unsecured claims against the Debtors are in excess of $100 million. Unsecured claims against the Debtors include (a) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (b) unpaid amounts owed to the Debtors' vendors, and (c) claims for unpaid rent and other obligations under the Debtors' leases.

## IV.     **THE NEED FOR CHAPTER 11 RELIEF AND CERTAIN EVENTS COMPELLING THE COMMENCEMENT OF THE CHAPTER 11 CASES**

## A.     **Diminished Operating Performance**

32.     The Debtors, like many other retail companies, have faced a challenging commercial environment over the past several years. The Debtors' challenges have been exacerbated by a shift in customer preferences away from physical retail stores and toward online-only stores. Given the Debtors' substantial brick-and-mortar retail presence, their business has been heavily dependent on in-store traffic, which has declined in recent years as a result of broad market factors as well as decreased tourism to downtown Manhattan, the site of the Debtors' flagship store.

**B.**     **The Impact of COVID-19 and the Insurance Providers' Failure to Honor Their Obligations to the Debtors**

33.     In early 2020, the Debtors were evaluating a strategic transaction to help restructure the Debtors' operations and finances. By mid-March, however, initial responses to the COVID-19 pandemic required the Debtors to close all of their retail locations without any indication of when they would be able to reopen. Although the Debtors' e-commerce sales provided some revenue for the period, online sales were nowhere near sufficient to offset the Debtors' fixed real estate lease expenses. With the Insurance Providers failing to honor their obligations under the Insurance Policies, the Debtors are unable to sustain their business.

**C.**     **Landlord and Vendor Issues**

34.     Due to the cessation of retail operations and insufficient liquidity, the Debtors did not pay their rent in full for the months of April through August as they and their owners sought concessions from various landlords. During this time, the Debtors also significantly curtailed payments to the majority of their vendors. As a result, several vendors held deliveries of merchandise and ultimately conditioned deliveries on cash in advance or provided the Debtors with otherwise unworkable payment terms.

35.     Although initially the Debtors' landlords largely were understanding of the Debtors' inability to pay rent and, in some instances, were barred by local governmental regulation and executive orders preventing them from commencing eviction proceedings, as time passed, the Debtors' landlords began taking a more aggressive posture. It eventually became clear that the Debtors would require the protections afforded by the Bankruptcy Code to prevent landlords from pursuing eviction proceedings to judgment and (where allowed) exercising self-help to lockout the Debtors and/or seize the Debtors' inventory to satisfy rents due.

36.     As of the Petition Date, several of the Debtors' landlords have sent the Debtors default notices and threatened eviction, which, without the commencement of these Chapter 11 Cases, undoubtedly would continue.

**D.      Proposed Course of the Chapter 11 Cases**

37.     As set forth above, in the weeks leading to the Petition Date, I have worked determinedly with vendors, landlords, and potential strategic partners in the hopes of sustaining the business so that a strategic transaction could be consummated, whether in chapter 11 or outside. Unfortunately, there was no deal to be had.  The Debtors believe, in the exercise of their business judgment, that expeditiously resolving the Insurance Action while also pursuing an orderly liquidation will provide the best process under the circumstances to maximize value for their stakeholders.   To that end, the Debtors solicited bids from several national liquidation firms, ultimately determining that Hilco Merchant Resources, LLC ("**Hilco**") provided the best terms. As noted below, the Debtors are seeking to retain Hilco and approval of store closing procedures.

## V.      FIRST DAY MOTIONS

38.     To minimize the adverse effects of the commencement of these Chapter 11 Cases in a way that will allow the Debtors' to maximize the value of their estates, the Debtors have filed a number of First Day Motions designed to facilitate their transition into chapter 11.

39.     I anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider many of the First Day Motions.  Many of the First Day Motions seek authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtors have narrowly tailored their requests for

immediate authority to pay prepetition claims to instances where the failure to pay such claims would cause immediate and irreparable harm to themselves and their estates. Other relief will be deferred for consideration at a later hearing.

40.　　I have reviewed each of the First Day Motions with the Debtors' counsel and the facts stated therein are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above, is necessary and critical to the Debtors' liquidation efforts, and is in the best interests of the Debtors' creditors and estates. A detailed discussion of the facts supporting, and the relief requested, in each of the First Day Motions follows. I hereby adopt and affirm the factual representations contained in each of the First Day Motions.

## VI.　　EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[5]

### Administrative and Procedural First Day Motions

**A. Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases**

40.　　The Debtors request entry of an order jointly administering these Chapter 11 Cases for procedural purposes only and request that the Court instruct the Clerk of Court to make an entry on each Debtor's docket reflecting the joint administration of these Chapter 11 Cases. Each of the Debtors is "affiliated" with the others as defined by section 101(2) of the Bankruptcy Code. Joint administration of these cases will avoid the unnecessary time and expense of drafting, filing, and serving duplicative motions, applications, orders, and other papers and related notices in each case. Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative dockets and files and will ease the burden on the U.S. Trustee

---

[5] Capitalized terms used but not defined in this section have the meanings ascribed to them in the First Day Declaration and their respective First Day Motions.

in supervising these cases.  The Debtors also request authority to file the monthly operating reports on a consolidated basis in the lead Debtor's case.  I respectfully submit that joint administration will save considerable time and expense for all parties-in-interest and this Court and the relief requested should be granted.

### B. Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs

41.     The Debtors request entry of an order granting a 26-day extension of the time to file their Schedules and Statements for a total of 40 days after the Petition Date without prejudice their right to request additional time.  Preparing the Schedules and Statements will require the Debtors' employees and professionals to devote substantial time and effort to analyzing the Debtors' various constituencies on an entity-by-entity basis.  Given the size and complexity of their operations, the Debtors anticipate that they will be unable to complete their Schedules in the fourteen days provided under Bankruptcy Rule 1007(c) and that it would be unnecessarily burdensome to attempt to do so during the first fourteen days of these Chapter 11 Cases.  I believe that the extension requested is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, I respectfully submit that the Court should grant the Debtors' motion seeking an extension of time in which to file their Schedules and Statements.

### C. Application of Debtors Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto as Claims and Noticing Agent and (II) Granting Related Relief

42.     The Debtors seek entry of an order appointing Bankruptcy Management Solutions, Inc. d/b/a Stretto ("**Stretto**") as claims and noticing agent in these Chapter 11 Cases because it has significant experience in both the legal and administrative aspects of large, complex chapter 11

cases and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity. I believe that Stretto's appointment is the most effective and efficient manner of noticing creditors and parties-in-interest of the filing of and developments in these cases. In addition, Stretto will transmit, receive, docket and maintain proofs of claim filed in connection with these cases. Accordingly, I believe that the appointment of Stretto to act as an agent of this Court is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtors' motion to appoint Stretto.[6]

**D. Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Claims, (II) Authorizing Debtors to Redact Certain Personal Identification Information for Individual Creditors and Interest Holders, and (III) Approving Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases**

43.     The Debtors seek entry of an order authorizing them to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, to file a consolidated list of their top 30 creditors, and to mail initial notices. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be burdensome, result in duplicate mailings, and could increase the risk of errors in translating the Debtors' computerized information into a .txt mailing matrix. Separately, filing a single consolidated list of the Debtors' combined 30 largest unsecured creditors in these Chapter 11 Cases would be more reflective of the unsecured creditor body than filing separate lists for each of the Debtors. Finally, to alleviate the administrative and economic burdens that these Chapter

---

[6] The Debtors intend to file a subsequent application to retain Stretto to perform certain administrative services under section 327 of the Bankruptcy Code.

11 Cases may impose upon the Court and the Clerk's office, the Debtors propose that Stretto undertake all mailings directed by this Court or the U.S. Trustee or required by the Bankruptcy Code or Bankruptcy Rules. Stretto will, among other things, serve the notice of commencement of these Chapter 11 Cases, thus ensuring that all creditors and parties-in-interest receive timely and proper notice of filing of the Debtors' petitions as well as the date, time, and location for the first meeting of creditors pursuant to section 341 of the Bankruptcy Code. In sum, I respectfully submit that the Court should grant the relief requested in the motion in order to alleviate unnecessary administrative burdens during the course of these Chapter 11 Cases.

**Operational First Day Pleadings**

**A. Motion of Debtors Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion")**

44. The Debtors require immediate access to cash to ensure that they are able to conduct their store closing processes, sell their other assets and preserve the value of their estates for the benefit of all parties in interest. The Debtors have no unencumbered cash and the Prepetition Secured Parties have security interests in substantially all of the Debtors' assets, including the Debtors' cash, their inventory and the proceeds thereof. As such, there is no unencumbered cash to support the Debtors' ordinary course business operations, let alone the added costs of administering these chapter 11 cases.

45. Against that backdrop, the Debtors negotiated at length with their Prepetition Lenders to develop a Budget, adequate protection package, and case timeline that would induce the Prepetition Lenders to consent to the use of cash collateral (as defined in section 363 of the Bankruptcy Code, the "Cash Collateral") in light of the circumstances.

46.     The Debtors, with the assistance of their advisors, developed the Budget governing their use of Cash Collateral during the period for which the Budget was prepared. The Budget contains line items for each category of cash flow anticipated to be received or disbursed during this period. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' business for the period set forth in the Budget. Further, I believe that the Budget establishes that the Debtors will have adequate liquidity during this period. Both the Budget and the terms of the proposed Interim Order are a product of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Prepetition Secured Parties. I believe that the terms of the Interim Order (and the Debtors' use of Cash Collateral thereunder) are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment.

47.     It is my understanding that the Debtors propose to provide the Prepetition Secured Parties with an adequate protection package including, among other things, adequate protection liens, superpriority claims, payment of a consent fee, paydowns of the Bank Facility from excess cash and payment of certain other fees and expenses. I believe that each form of adequate protection is appropriate under the circumstances and will adequately protect the Prepetition Secured Parties against any actual diminution in value of their interest in the Cash Collateral. I also understand that courts in this jurisdiction and other jurisdictions have approved similar adequate protection packages in other, recent chapter 11 cases.

48.     Completing the orderly liquidation of the Debtors' assets is the best opportunity to maximize recoveries to the Debtors' stakeholders. The terms of the Cash Collateral Orders, including the marketing process Milestones and the consent fee are the "price of admission" for consensual use of the Prepetition Lenders' Cash Collateral, which will make it possible for the

Debtors to seize that opportunity for the benefit of all creditors. Therefore, I believe the adequate protection package required by the lenders and the other terms of the proposed order and Budget are reasonable and in the best interests of the Debtors' estates and their stakeholder and the relief requested in the Interim Order is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by this Court.

**B. Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, and (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (V) for Related Relief (the "Cash Management Motion")**

49. In the Cash Management Motion, the Debtors request interim and final authority to (i) continue use their existing cash management system, (ii) continue maintenance of their existing Bank Accounts and Business Forms, (iii) implement changes to their Cash Management System in the ordinary course of business, including, without limitation, opening new or closing existing Bank Accounts, in their business judgment and at their sole discretion.

50. The Debtors further request that the Court authorize and direct JPMorgan Chase Bank N.A. ("**Chase**"), the bank where the Debtors' Bank Accounts are located to (a) continue to maintain, service, and administer the Debtors' Bank Accounts, and (b) debit the Bank Accounts in the ordinary course of business on account of (i) wire transfers or checks drawn on the Bank Accounts, provided that any payments drawn, issued, or made prior to the Petition Date shall not be honored absent direction of the Debtors and a separate order of the Court authorizing such prepetition payment, or (ii) undisputed service charges and other fees owed to Chase for maintenance of the Debtors' Cash Management System, if any.

51. The Debtors use an integrated, centralized Cash Management System to collect, concentrate, and disburse funds generated by their operations. The Cash Management System is

tailored to meet the Debtors' operating needs as the operator of 13 retail stores and an e-commerce platform. The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data. The Debtors' Finance Department oversees the Cash Management System, and the Debtors maintain records of all transactions processed through their Cash Management System. Although some of the Cash Management System is automated, Finance Department personnel monitor the Bank Accounts and manage the collection and disbursement of funds.

52. I believe the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business in these Chapter 11 Cases with minimal disruption. Most significantly, maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations, given the significant number of cash transactions processed through the Cash Management System each day. Any disruption to the Cash Management System would significantly hinder the Debtors' day-to-day operations and impede the successful administration of their estates. In light of the foregoing, and for the reasons set forth in the Cash Management Motion, I respectfully submit that the Cash Management Motion should be granted. Absent the relief requested in the Cash Management Motion, the Debtors and their estate would suffer immediate and irreparable harm.

**C. Motion of Debtors for Authorization to Pay Certain Prepetition Taxes and Fees**

53. In the Tax Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the payment of certain Taxes and Fees, in the ordinary course of

business and without regard to whether such obligations accrued or arose before or after the Petition Date.

54.     In the ordinary course of business, the Debtors collect, withhold, or incur an assortment of state and local Sales and Use Taxes and remit same to various state and local taxing Authorities when due. The prepetition Sales and Use Taxes are not property of the Debtors' estates but, rather, are held in trust for the Authorities. The Debtors seek to pay the prepetition Sales and Use Taxes in order to, among other things, prevent the Authorities from taking actions that might interfere with the Debtors' administration of the Chapter 11 Cases, which may include bringing personal liability actions against the Debtors' directors, officers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors) or assessing penalties and/or significant interest on past-due taxes. In addition, non-payment of the Sales and Use Taxes may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, the Debtors submit that the proposed relief is in the best interest of their estates.

55.     Although the Debtors believe they are current with respect to their payment of Sales and Use Taxes, the Debtors estimate that, as of the Petition Date, they have collected or incurred approximately $1.285 million in prepetition Sales and Use Taxes that have not yet been remitted to the appropriate Authorities. The Debtors estimate that approximately $1.073 million in prepetition Sales and Use Taxes will become due and payable within twenty-one (21) days following the Petition Date.

56.     The Debtors must continue to pay the Sales and Use Taxes to continue their business and avoid costly distractions during the Chapter 11 Cases. The failure to pay the Sales and Use Taxes could adversely affect the Debtors' business operations. In addition, certain

Authorities may take precipitous action against the Debtors' officers and directors for unpaid Sales and Use Taxes, which undoubtedly would distract those key individuals from their duties.

57.     The Debtors incur franchise taxes or fees assessed by certain Authorities to operate their businesses in the applicable jurisdiction.   Franchise Taxes vary by jurisdiction but are approximately $10,000 per month.  Although the Debtors believe that they are current with respect to their payment of Franchise Taxes, the Debtors estimate that, as of the Petition Date, they have accrued approximately $10,000 in prepetition Franchise Taxes that have not yet become due and payable.  The Debtors estimate that $10,000 in Franchise Taxes will become due and payable within twenty-one (21) days following the Petition Date.

58.     State and local laws in the jurisdictions where the Debtors operate generally grant the applicable Authorities the power to levy property taxes against the Debtors' real and personal property ("**Real Property Taxes**").  Real Property Taxes may create a lien on or security interest in the property so taxed.  The Debtors generally pay Real Property Taxes in one of two ways:  (i) direct payment to the relevant Authorities if the Debtors lease underlying property in a jurisdiction that requires lessees to pay Real Property Taxes directly to the Authorities (collectively, "**Direct Real Property Taxes**"); or (ii) reimbursement to landlords that pay the property taxes on certain properties that the Debtors' lease ("**Indirect Real Property Taxes**").  The Debtors seek authority to pay all Real Property Taxes, including Indirect Real Property Taxes for leases the Debtors expect to assume.

59.     The Debtors have four leases for which they remit Direct Real Property Taxes to the applicable Authorities, for which they paid $324,329.36 to the applicable Authorities on June 30, 2020.  The Debtors do not believe that any Direct Real Property Taxes will become due and payable within twenty-one (21) days following the Petition Date. For the reasons set forth herein

and in the Tax Motion, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors. Absent the relief requested in the Tax Motion, the Debtors and their estates could suffer immediate and irreparable harm.

### D. Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Interim and Final Authority to (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief (the "<u>Wages Motion</u>")

60.     In the Wages Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, them to pay and honor certain prepetition claims and obligations, continue programs, and maintain funding, in the exercise of their discretion, relating to the Debtors' workforce (collectively, the "**Workforce Obligations**"), including: (a) Unpaid Compensation, Deductions, and Payroll Taxes; (b) compensation on account of their Supplemental Workforce; (c) Reimbursable Expenses and Corporate Cards; (d) Benefit Plans; and (e) Retirement Plans (each as defined herein).

61.     To enable the Debtors to carry out the relief requested, the Debtors also request that the Court authorize and direct financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent the Debtors have sufficient funds standing to their credit with such bank, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and provide that all such financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the Wages Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

<u>**The Debtors' Workforce**</u>

62.     As of the Petition Date, the Debtors[7] employ approximately 1,390 employees, of which approximately 1,205 are full-time and approximately 185 are part-time (collectively, the "**Employees**").  The great majority of Employees work in or support the Debtors' stores: approximately 1,215 Employees work in retail, distribution, or loss prevention roles in the Debtors' retail stores and distribution centers.  The approximately 175 remaining Employees work in corporate roles such as accounting, information technology, and management.

63.     As of the Petition Date, approximately 985 Employees (approximately 71% of the workforce) are represented by unions.  The Debtors are party to a collective bargaining agreement (the "**CBA**") with UFCW Local 888, which represents all of the Debtors' union-represented Employees.  The Debtors pay all union Employees and approximately 185 non-union Employees on an hourly basis, while the remaining non-union Employees are paid on a salaried basis.

64.     In addition to their Employees, the Debtors rely on services of a supplemental workforce (the "**Supplemental Workforce**"), composed of approximately fifty temporary workers as of the Petition Date, that provides services related to the Debtors' operations.  The temporary workers comprising the Supplemental Workforce staff the Debtors' four distribution centers, which supply the inventory for the Debtors' stores and fulfill orders placed through the Debtors' online platform.  The Debtors staff the distribution centers according to the volume of sales.  Accordingly, the Supplemental Workforce fluctuates significantly in number of workers and hours depending on seasonality, which peaks before and during the holiday season, reaching approximately 300 workers during this time.

---

[7]     Employees are employed by Debtors L.I. 2000, Inc., C21 Stores, Century 21 Department Stores of New Jersey, L.L.C., and C21 Philadelphia LLC.

*Wages, Salaries, and Other Compensation*

65.     In the ordinary course of business, the Debtors pay all their Employees on either a weekly or bi-weekly basis.  Hourly workers are paid on a weekly basis, while salaried workers are paid bi-weekly.[8]  The Debtors' payroll obligations include wages and salaries.  On average, the Debtors' gross payroll is approximately $5 million to $6 million per month.  The Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' accounts or through physical paychecks.[9]  Approximately 80% of Employees are enrolled in direct deposit.

66.     The Debtors estimate that as of the Petition Date they owe approximately $1.4 million to Employees on account of prepetition payroll obligations, which amount includes accrued but unpaid wages and salaries (the "**Unpaid Compensation**"). The prepetition obligation is based on an 11-day accrual for the biweekly payroll covering the period since August 29, 2020, and a 4-day accrual for the weekly payroll covering the period since September 5, 2020.  I have been informed the Debtors are not requesting herein authority to pay any prepetition obligations in excess of the statutory cap imposed by section 507(a)(4) of the Bankruptcy Code.

67.     I have been informed the Debtors request authority to pay all prepetition amounts owed to Employees on account of Unpaid Compensation up to the section 507(a)(4) cap.[10]  The

---

[8]     In addition to bi-weekly payments, the Debtors historically in the ordinary course make regularly scheduled monthly bonus payments to certain officers, which are paid every month and are not contingent on performance or other criteria.  The Debtors estimate that there are no outstanding obligations regarding such monthly payments, but intend to continue making such monthly payments – reduced by 50% of the prepetition amounts paid – to only the co-Chief Executive Officers in the ordinary course.

[9]     The Debtors use five accounts at JPMorgan Chase Bank, N.A. to fund direct deposits and payroll checks.

[10]     The Debtors have historically operated four bonus plans: (i) a corporate and manager plan; (ii) a merchandising and buying plan; (iii) a plan-centered on store operations; and (iv) an "ExCom Bonus Plan" for senior executives (collectively, the "**Bonus Plans**").  The Debtors do not intend, and do not seek by the Wages Motion, to make payments under or continue the Bonus Plans, but reserve the right to seek, by separate motion, authority for a key employee incentive or retention plan.

Debtors intend to continue paying postpetition obligations on account of compensation consistent with past practice.[11]

68.     Federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "**Withheld Amounts**").  The Debtors must then match from their own funds for Social Security and Medicare withholdings, based on gross earnings and additional amounts for federal and state unemployment insurance (collectively the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**"). In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $85,000 during each bi-weekly pay period.[12]  In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $50,000 during each weekly pay period.   As of the Petition Date, the Debtors estimate approximately $98,000 remains outstanding on account of prepetition Payroll Taxes for Unpaid Compensation (not including amounts owed on account of PTO).

69.     For each applicable pay period, the Debtors may routinely deduct certain amounts from each Employee's gross payroll, including garnishments, child support, spousal support and service charges and similar deductions, union initiation fees and membership dues for union

---

[11]     The Debtors instituted a 20% reduction in pay to salaried Employees making $75,000-$150,000 annually for the two pay periods in the month of July, which returned to normal salary levels in the first pay period of August.  In addition, the Debtors instituted a 20% reduction in pay for salaried Employees making $150,000 or greater annually for the months of July and August, which returned to normal levels in the first pay period of September 2020. Accordingly, August compensation may be greater than July, and September may be greater than August, as compensation levels normalized following the reductions.  The Debtors intend to pay retained Employees at their prepetition compensation levels but reserve the right to institute further reductions or furloughs as necessary at their discretion.

[12]     Certain vendors, including ADP, provide services to ensure compliance with state and federal requirements and, as such, are necessary vendors for the Debtors payroll. Their fees are invoiced separately and are not included in the gross payroll figures.

Employees, and other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "**Deductions**"). The Debtors deduct from Employees' paychecks over the course of each bi-weekly pay period a total of approximately $112,000, which the Debtors remit to the appropriate third-party recipients. The frequency and schedule of payments relating to the Deductions and the due dates on the various pay cycles may encompass more than one period. The Debtors may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date.

*Supplemental Workforce Obligations*

70.     The Debtors retain temporary employees comprising the Supplemental Workforce through temporary agencies such as Full Steam Staffing and On Target Staffing (the "**Temporary Agencies**"). Temporary Agencies track the hours of work provided by the Supplemental Workforce and bill the Debtors on an aggregate-hours basis without identifying the hours worked per temporary employees. The Debtors remit fees for the services performed to the Temporary Agency on a weekly basis through accounts payable. As of the Petition Date, the Debtors owe approximately $550,000 to the Temporary Agencies for prepetition services provided by the Supplemental Workforce. The Debtors believe it is necessary to pay the obligations owed to the Temporary Agencies, for the benefit of temporary employees, so that the temporary employees and the Temporary Agencies will continue to assist with the Debtors' staffing needs as needed.

71.     I believe that if these amounts go unpaid, the Temporary Agencies or temporary employees may stop providing their services to the Debtors – an especially critical element of the Debtors' workforce in light of the expectation that the Debtors' liquidation sales will draw

consumers to the Debtors' stores and website, and because of the critical role of distribution centers in connection with the Debtors' distribution operations. Because Temporary Agencies invoice the Debtors on an aggregate basis, the Debtors intend to estimate the amounts attributable to individual temporary workers and intend to rely on data provided by Temporary Agencies to the Debtors.

*Reimbursements*

72.     In the ordinary course of business, the Debtors provide a travel stipend and reimburse certain Employees for travel and other miscellaneous business expenses incurred on behalf of the Debtors (collectively, the "**Reimbursable Expenses**"). Generally, Employees pay for Reimbursable Expenses personally and submit expense report forms to the Debtors for reimbursement. In some cases, Employees may not have submitted reimbursement requests in time to have been processed, or processing has not been completed, prior to the Petition Date. The Debtors provide a monthly travel stipend to approximately a dozen Employees in the aggregate approximating $7,350 per month. In the aggregate, the Debtors' Employees incur, on average, approximately $30,000 per month in Reimbursable Expenses, including the travel stipend. Based on historical figures, the Debtors estimate approximately $25,000 remains outstanding on account of prepetition Reimbursable Expenses as of the Petition Date and seek authority to honor such obligations. Through the Wages Motion, the Debtors also seek authority, but not direction, to honor such obligations arising from the Reimbursable Expenses as they accrue and to continue such programs in the ordinary course.

73.     Certain Employees have corporate credit cards with American Express (the "**Corporate Cards**") which they use to make authorized business purchases on behalf of the Debtors. Although the Employees are primarily liable for the charges on the Corporate Cards, the Debtors pay such Corporate Cards directly. Employees using the Corporate Cards must submit

expense reports for the charges incurred. There are approximately thirty-five Employees who carry company-issued Corporate Cards that are used for various expenses including travel, tolls, meals, photo shoots, and equipment. In the aggregate, the Debtors' Employees incur approximately $55,000 to $60,000 per month in business expenses charged to the Corporate Cards. Based on historical figures, the Debtors estimate approximately $55,000 remains outstanding on account of prepetition business expenses charged to such corporate credit cards as of the Petition Date. The use of the Corporate Cards is critical to the Debtors' business operations insofar as it is one of the mechanisms by which Employees' expenses incurred in the ordinary-course discharge of their employment duties are paid. Through the Wages Motion, the Debtors seek authority to honor obligations arising from the Corporate Cards as they accrue and to continue such programs in the ordinary course.

*Employee Benefit Plans*

74. In the ordinary course of business, the Debtors maintain various employee benefit plans and policies for their Employees, including medical, dental, and vision plans, life insurance, short and long-term disability insurance, accident insurance, critical illness insurance, paid time off, paid family leave, flexible spending and health savings accounts, and miscellaneous other benefits (collectively, the "**Benefits Plans**"). The benefits available to non-union Employees include medical plans, a dental plan, a vision plan, life insurance, short-term and long-term disability, accident insurance, critical illness, vacation and other paid time off (collectively, the "**Non-Union Benefit Plans**"). The Debtors estimate, based on historical obligations and withholdings that, as of the Petition Date, they are obligated to contribute approximately $644,500[13] to the Non-Union Benefit Plans.

---

[13] Not including PTO.

75.     Eligible union-represented Employees participate in certain Employee benefit programs, including medical plans, a dental plan, a vision plan, life insurance, accident insurance, and critical illness (collectively, the "**Union Benefit Plans**"). The Debtors estimate, based on historical obligations and withholdings that, as of the Petition Date, they are obligated to contribute approximately $24,500[14] to the Union Benefit Plans.

*Health Care Plans*

76.     Eligible Employees can participate in programs, through Debtors' sponsored plans, which provide medical insurance coverage (the "**Medical Plans**"), dental insurance coverage (the "**Dental Plans**"), and vision coverage (the "**Vision Plans**," and, together with the Medical Plans and Dental Plan, a union discount program, and any related administration of the foregoing, the "**Health Care Plans**").

77.     <u>Union Medical Plan</u>.  All union Employees are eligible for three plans of their choice – two minimum essential coverage plans and one high deductible health plan – administered by Prime Health/Magellan Rx and Aetna.  Eligible Employees may participate in the Medical Plans on the first of the month following sixty days of employment.  The union Medical Plans are self-funded by C21 Stores.  The union Medical Plans have approximately 460 participants and the annual cost to the Debtors is approximately $180,000.  As of the Petition Date, the Debtors estimate that approximately $21,000 remains outstanding on account of the union Medical Plan.

78.     <u>Non-Union Medical Plan</u>.  Non-union Employees are eligible for three Medical Plans their choice – two copay plans and one high deductible health plan – administered by Prime Health/Magellan Rx and Aetna.  Eligible Employees include all non-union Employees.  Eligible Employees may participate in the Medical Plans on the first of the month following sixty days of

---

[14] Not including PTO.

employment.  The non-union Medical Plans are self-insured.  The Debtors pay approximately $5 million per year on account of the non-union Medical Plans and there are 242 plan participants.  As of the Petition Date, the Debtors estimate that approximately $590,000 remains outstanding on account of the non-union Medical Plan.

79.     <u>Union Dental Plan</u>.  The Debtors offer union Employees one dental maintenance organization Dental Plan administered by Aetna.  The plan is fully insured.  All union Employees are eligible to participate on the first of the month following sixty days of employment.  The union Dental Plan has approximately 355 participants as of the Petition Date.  The Debtors pay approximately $13,000 per year on account of the union Dental Plans.  As of the Petition Date, the Debtors estimate that approximately $1,500 remains outstanding on account of the union Dental Plan.

80.     <u>Non-Union Dental Plans</u>.  The Debtors offer non-union Employees a choice of two Dental Plans – a dental maintenance organization plan and a preferred provider organization plan – both administered by Aetna.  The plans are fully insured.  All non-union Employees are eligible to participate on the first of the month following sixty days of employment.  The non-union Dental Plan has approximately 250 participants as of the Petition Date.  The Debtors pay approximately $11,000 per year on account of the non-union Dental Plans.  As of the Petition Date, the Debtors estimate that approximately $1,300 remains outstanding on account of the non-union Dental Plan.

81.     <u>Union Vision Plan</u>.  The Debtors offer union Employees one preferred provider organization Vision Plan administered by Aetna.  The plan is fully insured.  All union Employees are eligible to participate on the first of the month following sixty days of employment.  The union Vision Plan has approximately 375 participants as of the Petition Date.  The Debtors have no costs

on account of the union Vision Plan but intend to continue providing the plan to Employees consistent with past practice.

82.     <u>Non-Union Vision Plan</u>.    The Debtors offer non-union Employees a preferred provider organization Vision plan administered by Aetna.    The plan is fully insured.    All non-union Employees are eligible to participate on the first of the month following sixty days of employment.    The non-union Vision Plan has approximately 210 participants as of the Petition Date.    As of the Petition Date, the Debtors estimate that approximately $200 remains outstanding on account of the non-union Vision Plan.

83.     The Debtors also provide union Employees with a dental/vision discount program administered by Careington, which provides reduced pricing for select dental and vision procedures and products.    All union Employees are eligible to participate on the first of the month following sixty days of employment.    The union discount plan has approximately 510 participants as of the Petition Date.    The Debtors pay approximately $20,000 per year on account of the union discount program.    As of the Petition Date, the Debtors estimate that approximately $2,000 remains outstanding on account of the union discount program.

*Insurance Plans*

84.     The Debtors provide eligible Employees with basic life insurance, short-term and long-term disability, accident, and critical illness coverage (collectively, the "**Insurance Plans**"). The Insurance Plans are administered by SunLife.    Employees are eligible for benefits on the first day of the month following the first sixty days of employment.

85.     The Debtors provide automatic basic life insurance coverage equal to a flat benefit of $100,000 for salaried non-union Employees and a flat $10,000 benefit for all other Employees. The life insurance benefits are fully insured.    The Debtors do not withhold on account of life

insurance. Total costs to the Debtors of the life insurance plans are approximately $40,000 per year.

86. The Debtors provide non-union Employees with long-term and short-term disability coverage. The Debtors pay annual premiums of approximately $68,000 related to the short-term disability coverage and pay 100% salary for the first 4 weeks. The long-term disability coverage is 100% employee-paid. The Debtors also provide non-union Employees with short-term disability benefits that are required under state law. In New York, when a claim is duly made, the law requires the Debtors to pay 50% of the participant's salary, up to a maximum payment of $170 per week over a maximum term of 26 weeks. The short-term disability benefits are fully insured. The Debtors pay approximately $70,000 per year on account of short-term disability coverage and, as of the Petition Date, the Debtors estimate approximately $53,000 remains outstanding on account of such claims.

87. The Debtors also offer union and non-union Employees accident and critical illness insurance, which is fully funded by Employee premiums. The Debtors do not have any costs related to this coverage, but intend to continue such programs consistent with past practice.

*New York State Paid Family Leave*

88. For eligible Employees who work in the State of New York, the Debtors take a weekly tax deduction amount contributable to the cost of the Debtors' fully-insured paid family leave benefit (the "**NYSPFL**"). The NYSPFL annual premium payment amount is equal to the annual deduction in amounts taken from the New York state Employees. The deduction is based upon compensation up to a cap of 0.27% of wages. The estimated Employee contribution to the NYSPFL is approximately $5,000 per month. Through the Wages Motion, the Debtors seek authority to honor their obligations under the NYSPFL and to continue such program in the ordinary course.

*Flexible Spending and Health Accounts*

89.     The Debtors offer the eligible Employees the ability to contribute a portion of their pre-tax compensation to fund certain health care and expenses or dependent care expenses through various programs administered by Benefit Resource (the "**Flexible Spending Programs**").  The Debtors offer a flexible spending account to non-union Employees, who are eligible to participate in the flexible spending account program after first of the month following initial sixty days of employment.  Flexible accounts are funded with Employee pre-tax payroll deductions and non-Union Employees can use funds for eligible healthcare and commuting expenses.  Annual contributions are subject to maximums required by law.  The Debtors also offer a flexible spending account to union Employees that does not include a commuter benefit. The Debtors pay a $2.50 per Employee per month administrative fee for the Flexible Spending Programs.

90.     Furthermore, the Debtors provide health savings accounts (the "**HSAs**") for non-union Employees.  Employees contribute pretax dollars to an account that can be used for eligible medical expenses. The HSA programs are fully member-funded.  Approximately seventy-five Employees participate in the HSA program.

91.     The Debtors estimate that they withhold approximately $2,900 per month to fund program participants' flexible spending accounts.  As of the Petition Date, the Debtors estimate that they may hold approximately $2,900 in withholdings intended to fund the Flexible Spending Programs and HSAs.  In addition, the Debtors pay Benefit Resource approximately $22,000 per year in connection with various costs and fees related to the Flexible Spending Account Program and HSAs and, as of the Petition Date, estimate that no amounts are outstanding on account of the prepetition administrative fees.

92.     Through the Wages Motion, the Debtors seek authority to honor their obligations under the Flexible Spending Account Program and HSAs and intend to continue such program in the ordinary course.

*Vacation and Paid Time Off*

93.     The Debtors provide paid time off ("**PTO**") to eligible Employees (the "**PTO Policies**") in the form of vacation days, personal days and sick days.  The Debtors maintain one policy for non-union Employees[15] and offer union Employees PTO consistent with the terms of the CBA. The accrual and use of paid time off under the PTO Policies varies depending on, among other things, the Employee's tenure, the Employee's position, the particular type of paid time off in question, the time of year (there are restrictions during the holiday season), and the discretion of an Employee's supervisor.[16]  The Debtors estimate that they have accrued and unpaid PTO of approximately $680,000

94.     Through the Wages Motion, the Debtors seek authority to honor their prepetition obligations under the PTO Policies and to continue such programs in the ordinary course.

<u>Miscellaneous Benefits</u>

95.     The Debtors offer select miscellaneous benefits (the "**Miscellaneous Benefits**") to eligible Employees.  As of the Petition Date, there are approximately 20 Employees and their dependents as well as former Employees and their dependents who qualify and elect continuation of benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").  For

---

[15]     Although referred to internally as the "Executive" PTO policy, the policy covers all non-union Employees.

[16]     The amount of annual vacation days available to a given program participant ranges from five to 30 days based on length of service and whether the Employee is a union or non-union member. Eligible Employees receive six paid holidays, which are determined by a set schedule of holidays and are paid with regular payroll for the applicable holiday week. The Debtors also offer Employees from three to six paid sick days depending on tenure and position.

both union and non-union Employees, COBRA applies when the Employees and/or dependents are no longer eligible for Debtors' sponsored benefits.  If the eligible Employee is participating in the Debtors' sponsored medical, vision, and/or dental benefits immediately prior to the termination date, and are eligible for and timely elect to continue coverage under COBRA, the Debtors pay for a certain period that is determined based on the eligible Employees' job classification.  The COBRA claims run through the Debtors as if they were claims under the Debtors' Health Benefits Plans.  COBRA is administered by Benefit Resource, which collects COBRA premiums from participants.  The Debtors do not anticipate any prepetition costs associated with the COBRA program but intend to continue this program consistent with past practice.

96.    The Debtors also offer pet insurance to Employees for veterinary care for their pets which is 100% paid by employees.  The Debtors do not anticipate any prepetition costs associated with the pet insurance program and intend to continue this program consistent with past practice.

*Benefits Consultants*

97.    In the ordinary course of business, the Debtors utilize the services of benefits consultants, brokers, and third party administrators, including USI, OperationsInc, International Planning Alliance, and Leading Edge.  These third parties assist the Debtors with choosing, delivering, and administering the Debtors benefits and Deferred Compensation Plans. The annual cost to the Debtors for such services is approximately $650,000 annually.  The Debtors do not anticipate any prepetition amounts are owed, but request authority to continue the engagement and payment of such consultants and brokers consistent with past practice.

*Retirement Plans*

98.     With respect to the union-represented Employees, the Debtors remit Employee 401(k) contributions to a union-sponsored plan[17] Under the CBA, eligible union Employees are able to participate in a 401(k) savings plan sponsored by the Union (the "**Union 401(k) Plan**"). The Debtors deduct Employee contributions weekly for Employees that have elected to participate and remit those contributions to the union 401(k) plan.   In total, the Debtors deduct approximately $3,900 per month on account of the union 401(k) plan, and approximately $600 has accrued on account of this program as of the Petition Date.

99.     The Debtors maintain defined contribution plans for the benefit of all non-union eligible Employees meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code (the "**Non-Union 401(k) Savings Plan**" and together with the Union 401(k) Plan, the "**Retirement Plans**"), which are managed by Principal as the record keeper.   There are approximately 686 Employees or former employees with current account balances in the Non-Union 401(k) Savings Plan, with a total of approximately $56,000 withheld each bi-weekly period from program participants' paychecks on account thereof.   The Debtors currently have a matching program for non-union program participants, who are eligible after they have both completed one year of employment and reached twenty-one years of age.   Pursuant to this program, the Debtors match program participants' contributions at a rate of 2.5% of eligible compensation the Employee contributes to their 401(k) plan account.   The Debtors estimate they pay approximately $13,000 per bi-weekly pay period in matching contributions under the Non-Union 401(k) Savings Plan.   As

---

[17] The Debtors historically maintained a pension plan for union Employees, however, as of April 29, 2011 the Debtors stopped making contributions to the pension plan and the plan was terminated.  The Debtors are subject to a negotiated termination liability. The Debtors, however, do not seek to honor this liability in connection with the Wages Motion.

of the Petition Date, the Debtors estimate that they may hold approximately $45,000 in prepetition 401(k) withholdings and approximately $11,000 has accrued on account of prepetition matching obligations.

*Need for the Relief Requested*

100.    The Employees perform critical functions, including sales, customer service, information technology, purchasing, administrative, accounting, finance, and management-related tasks. Their skills and experience, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to effectively operate their businesses during these Chapter 11 Cases.

101.    The relief requested in the Wages Motion is necessary for the Debtors to be able to maintain morale and maximize value while effectuating the Debtors' chapter 11 goals. Absent the relief sought in the Wages Motion, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors. The loss of valuable Employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully maximize value for all stakeholders. Moreover, I believe the Debtors' failure to satisfy Employee Obligations would jeopardize Employee morale and loyalty at a time when Employee support is most critical to the Debtors' businesses, particularly during the current store optimization and restructuring period. Increased instability in the Debtors' workforce will undermine the Debtors' ability to operate effectively to complete the liquidation and maximize value for the Debtors and their estates.

102.    The majority of the Debtors' Employees rely exclusively on their compensation and benefits to satisfy their daily living expenses. These Employees would be exposed to significant

financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits, and reimbursable expenses. Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees may not receive health coverage and, thus, may become obligated to pay certain health care claims in the absence of insurance coverage. The loss of health insurance would result in considerable anxiety for Employees (and likely lead to attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as noted above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

103.　　Accordingly, for the reasons set forth herein and in the Wages Motion, I respectfully submit that the relief requested in the Wages Motion is necessary and critical to the Debtors' ability to preserve value for the benefit of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby maximizing the value for the estates. Absent the relief sought in the Wages Motion, the Debtors and their estates would suffer immediate and irreparable harm.

### E.　Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Interim and final Authority to (I) Maintain, Renew, and Continue Their Insurance Policies and Programs and (II) Honor All Insurance Obligations (the "<u>Insurance Motion</u>")

104.　　In the Insurance Motion, the Debtors seek (a) authority, but not direction to (i) continue to maintain, renew, or terminate, in their sole discretion, their Insurance Policies and Programs (including the Workers' Compensation Program and the Debtors' premium financing arrangements) and the Surety Bond Program (as defined herein), (ii) honor their Insurance and Surety Obligations (as defined herein) in the ordinary course of business during the administration

of these Chapter 11 Cases, (iii) pay any prepetition Insurance Obligations, including, without limitation, amounts owed under the Premium Financing Agreements and to the Insurance Service Providers (each as defined herein), and (b) modification of the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

105.    The aggregate annual cost of the Insurance Premiums is approximately $6.5 million. Many of the Debtors' policies renew in August and September.  Approximately $781,000 in Insurance Premiums on account of recently renewed and financed Insurance Policies for workers' compensation, general liability, and automobile policies will become due and owing in the first thirty days following the Petition Date.  By the Insurance Motion, the Debtors seek authority, but not direction, to pay such Insurance Premiums, any other Insurance Premiums that may become due and owing during these Chapter 11 Cases.

*Workers Compensation Program*

106.    The Debtors maintain workers' compensation insurance, as required by state statutes, that insures their employees in each of the states in which they operate (the "**Workers' Compensation Program**").  The Workers' Compensation Program is composed of two policies, provided by Everest and New York State Insurance Fund.  As of the Petition Date, there are approximately eighteen open claims under the Workers' Compensation Program.  The Debtors' workers' compensation policies provide first dollar coverage.  Accordingly, the Debtors do not anticipate any amounts to be owing postpetition with respect to workers' compensation claims.

107.    In addition, insurance carriers and self-insured employers are required to pay state assessments to cover the administrative costs of the state workers' compensation board, and insurance carriers pass through the cost to employers through a surcharge on annual premiums.

Assessments are billed by states in which the Debtors currently operate, as well as by states in which the Debtors previously operated, and for which workers' compensation claims remain pending. As of the Petition Date, the Debtors owe approximately $150,000 in state assessments

*Financing Agreements*

108.     Generally, the Debtors' Insurance Policies require annual premium payments to be made at the beginning of the applicable policy period. Because it is not always economically advantageous for the Debtors to pay premiums on a lump-sum basis, the Debtors finance certain of their Insurance Premiums, typically in the amount of approximately $2.75 million per year, including for policies relating to property and general liability. The Debtors finance such policies pursuant to premium financing agreements (the "**Premium Financing Agreements**"), with certain financiers (the "**Premium Financiers**").

109.     Under the Premium Financing Agreements, the Premium Financiers have agreed to pay the financed premium payments to the Debtors' respective Insurance Carriers when due. In exchange, the Debtors agreed to pay the Premium Financiers a down payment (currently approximately 20-55% of the total premium) followed by monthly installments of smaller payments. The amounts financed under the Premium Financing Agreements currently accrue interest at a rate of approximately 3.25%. As part of the Premium Financing Agreements, the Debtors granted the Premium Financiers a security interest in, among other things, any and all unearned premiums and dividends which may become payable for any reason under the financed Insurance Policies. If the Debtors do not satisfy their obligations under the Premium Financing Agreements, the Premium Financiers have the right, subject to the automatic stay, to, among other things, terminate covered Insurance Policies. As of the Petition Date, the Debtors are not aware of any outstanding prepetition amounts owed to the Premium Financiers under the

Premium Financing Agreements, but do anticipate payments will be made in the first twenty-one days of the Chapter 11 Cases.

*Insurance Service Providers*

110. In connection with the Insurance Policies and Programs, the Debtors employ certain insurance service providers (the "**Insurance Service Providers**") to help them procure, negotiate, and evaluate the Insurance Policies and Programs and process claims related thereto.

111. The Debtors utilize certain insurance brokers, such as MSG Consulting, Inc., Alliant, I. Dachs & Sons, and others, (the "**Insurance Brokers**"), to assist with the procurement and negotiation of certain Insurance Policies and, in certain circumstances, to remit payment to the Insurance Carriers on behalf of the Debtors for the relevant policy periods. The Insurance Brokers' fees (the "**Broker Fees**") are generally paid through the premium payments made on account of the Insurance Policies. In addition, the Debtors pay a consulting fee of approximately $200,000 annually to MSG Consulting. The Debtors estimate that they have no outstanding obligations owed to the Insurance Brokers for Broker Fees. Because of the Insurance Brokers' intimate familiarity with the Debtors and the Insurance Policies, and their ability to maintain coverage for the Debtors as required, the Debtors however request authority, but not direction, to pay any prepetition Broker Fees that may be owed to the Insurance Brokers.

*Historical Surety Bond Program*

112. Although the Debtors do not have any active surety bonds outstanding,[18] historically, the Debtors maintained a surety bond program (the "**Surety Bond Program**"). In the ordinary course of business, the Debtors have been required to provide surety bonds to certain

---

[18] Prior to the Petition Date, the Debtors maintained a customs bond, however, this bond has been cancelled.

third parties (the "**Obligees**"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with import customs duties, or other obligations as may arise in the ordinary course of business (the "**Surety Bonds**").

113. It may be necessary for the Debtors to renew or enter into new surety bonds in the ordinary course of business and consistent with past practice. Accordingly, the Debtors have requested authority to enter into or renew Surety Bonds with the consent of the Prepetition Agent.

*Importance of the Programs*

114. The Debtors' Insurance Policies and Programs are essential to the preservation of value of the Debtors' businesses, leasehold estates, and assets. I understand that, in many instances, the insurance coverage provided by the Insurance Policies and Programs, including the Workers' Compensation Programs, is required by the various regulations, laws, and contracts that govern the Debtors' commercial activities as well as by the Bankruptcy Code and the U.S. Trustee. Accordingly, failure to honor the Insurance Obligations could have a significant negative impact on the Debtors' operations.

115. The Insurance Policies and Programs are essential to preserving the value of the Debtors' business operations and assets. Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties-in-interest and will enable the Debtors to continue to operate their businesses and preserve the value of their estates. Absent the relief requested, the Debtors and their estates would suffer immediate and irreparable harm.

**F. Motion of Debtors Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment To Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service (the "<u>Utility Motion</u>")**

116. Pursuant to the Utility Motion, the Debtors seek entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing utility service on account of outstanding prepetition invoices.

117. In the ordinary course of their business, the Debtors incur utility expenses, including electricity, water, and telecommunications. Approximately 115 utility providers (collectively, the "**Utility Providers**") provide services to the Debtors.

118. On average, the Debtors spend approximately $630,000 each month on utility costs and estimate that, as of the Petition Date, approximately $900,000 worth of utility costs are outstanding.

119. The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that cash flows from operations and use of cash collateral will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.

120. Furthermore, the Debtors propose to deposit into a segregated, interest-bearing bank account (the "**Adequate Assurance Account**") a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider[19] based on the Debtors' estimate of their average usage for the months of April through July 2020 (collectively, the "**Adequate Assurance Deposit**"). As of the Petition Date, the Debtors estimate the Adequate Assurance Deposit to total approximately $315,726.32.

---

[19] To the extent any deposits with any Utility Provider is in excess of two weeks' worth of the average utility cost, the Debtors reserve their right to demand such excess amounts.

121.     Although the Adequate Assurance Deposit will be placed into a single bank account, two weeks' worth of estimated utility costs will be separately allocated for, and payable to, each Utility Provider.  Specifically, if the Debtors fail to pay a utility bill when due (including the passage of any cure period), the relevant Utility Provider shall provide notice of such default to the Debtors and counsel for the prepetition administrative agent.  If within five (5) business days of the Debtors' receipt of such notice, the bill is not paid, the Utility Provider may file an application with the Court certifying that payment has not been made and requesting the amount due up to an aggregate maximum equal to the Adequate Assurance Deposit allocable to such Utility Provider.

122.     I believe that the Adequate Assurance Deposit, in conjunction with the cash flow from operations and cash on hand demonstrate the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**") and constitute sufficient adequate assurance to the Utility Providers.

123.     Preserving utility services on an uninterrupted basis is essential to the Debtors' operations.  Any interruption in utility services, however brief, would seriously disrupt the Debtors' ability to maximize value for the benefit of their creditors.  Therefore, it is critical that utility services continue uninterrupted during these Chapter 11 Cases.  I am advised that if the Adequate Assurance Procedures are not approved, the Debtors may be (and I believe likely will be) confronted with and forced to address numerous requests by their Utility Providers at a critical point in their Chapter 11 Cases.  Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected and either making an exorbitant demand for payment to continue service or electing to discontinue

service to the Debtors altogether. Such an outcome could seriously jeopardize the Debtors' operations, asset values, and ability to maximize recoveries to their stakeholders.

124.     Accordingly, for the reasons set forth herein and in the Utilities Motion, I respectfully submit that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business and to safeguard the value of their estates.

### G. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder (the "<u>Store Closing Motion</u>")

125.     In the Store Closing Motion, the Debtors seek entry of the Interim and Final Orders: (a)(1) authorizing, upon entry of a Final Order, the Debtors to assume the agreement dated as of September 1, 2020, by and among Hilco Merchant Resources, LLC (together with Gordon Brothers Retail Partners, LLC, the "**Consultant**"),[20] on the one hand, and the Debtors, on the other (as amended, modified, or restated as of the date hereof, and together with all exhibits thereto, the "**Store Closing Agreement**") and (2) confirming, upon entry of the Interim Order, that the Store Closing Agreement is operative and effective until the Court considers the relief requested by the Motion on a final basis, (b) authorizing the Debtors to continue to conduct store closing sales (collectively, the "**Closing Sales**") at the store locations listed on <u>Exhibit A</u> to the Store Closing Agreement (the "**Closing Stores**") and, if requested by the Debtors, through the Debtors' e-commerce platform, in accordance with the proposed sale guidelines (the "**Sale Guidelines**"), with such sales to be free and clear of all liens, claims, encumbrances, and interests (collectively, the

---

[20]     Pursuant to Section N of the Store Closing Agreement, Hilco Merchant Resources, LLC ("**HMR**") was authorized to syndicate this transaction with a third party upon notice to the Debtors. In accordance with the Store Closing Agreement, after notice to the Debtors, HMR syndicated the transaction with Gordon Brothers Retail Partners, LLC ("**GBRP**").

"**Encumbrances**"), (c) approving the proposed dispute resolution procedures described herein to resolve any disputes with governmental units regarding certain applicable non-bankruptcy laws that regulate liquidation and similar-themed sales, (d) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the applicable Closing Sale (collectively, the "**Store Closing Bonuses**"), and (e) approving the Debtors' strategic plan in connection with the closure of each of their retail locations by giving effect to the above-referenced documents and implementing the above-referenced procedures (the "**Store Closing Plan**").

**Background**

126.    The Debtors reached out to two nationally-recognized liquidation firms so that such parties could provide proposals for the liquidation of the Debtors' inventory (as defined in the Store Closing Agreement, the "**Merchandise**") and the Debtors' furniture, fixtures, and equipment (collectively, the "**FF&E**"[21] and, together with the Merchandise, the "**Store Assets**"). The Debtors provided the liquidation firms with access to a data room with all of the relevant information necessary to build a liquidation model and for the liquidation firms to evaluate the potential transaction.  The Debtors obtained two proposals from liquidators.

127.    After evaluating the proposals, providing each of the liquidation firms with the opportunity to submit their best and final proposals and consulting with their senior secured lenders, the Debtors determined that the bid submitted by the Consultant was in the best interests of the Debtors and their estates.  The Debtors made this determination after considering numerous factors, including, but not limited to, (a) the Consultant's prior experience handling the liquidation

---

[21]    For the avoidance of doubt, the FF&E includes furniture, fixtures, and equipment (including owned furnishings, trade fixtures, equipment and improvements to real property) owned by the Debtors wherever those items may be located, including, for example, the Debtors' corporate offices, distribution centers, warehouses, and the Closing Stores.

of various similar retailers, (b) the amount and experience of supervisors designated by the Consultant to handle the project, (c) potential upside that could be realized under a "fee" based structure,[22] (d) the ability of the Consultant to supplement the Debtors' inventory with additional goods procured by the Consultant (referred to in the Store Closing Agreement as the "**Additional Agent Goods**"), and (e) overall economics.

128.    In short, the Debtors determined that entering into the Store Closing Agreement and commencing Closing Sales immediately was essential to ensure that the liquidation of the Store Assets is managed efficiently and effectively.

129.    The Debtors negotiated the terms and conditions of the Store Closing Agreement in good faith and at arms' length, and entered into the Store Closing Agreement on September 1, 2020.    In order to avoid, among other potential negative outcomes, a disorganized "self-liquidation" scenario, *i.e.*, a scenario in which more desirable items sell faster than items with a slower turnover, the Closing Sales began on September 3, 2020, immediately following entry into the Store Closing Agreement.

130.    The Debtors anticipate that the Closing Sales will take three months to complete. By moving expediently, the Debtors hope to maximize overall recovery for the estates while minimizing the Debtors' liabilities.

*Liquidation Laws*

131.    Certain Closing Stores may be subject to (a) liquidation laws, which include, but are not limited to, various federal, state, and local statutes, ordinances, rules, and licensing

---

[22]    A "fee" based structure generally provides for a commission or fee to the liquidation firm in exchange for assisting with the sale of particular asset(s) in addition to reimbursing the liquidation firm for its out-of-pocket expenses.  The "fee" based structure allows the company to retain a majority of the dollars realized for the asset(s) since the liquidation firms do not risk their own capital and also gives the Debtors the maximum amount of flexibility in the process.

requirements directed at regulating "going out of business," "store closing," "sale on everything," "everything must go," "liquidation sale," or similar themed sales, (b) bulk sale laws, laws restricting safe, professional, and non-deceptive customary advertising such as signs, banners, posting of signage, and use of sign-walkers in connection with the sale, including ordinances establishing license or permit requirements, waiting periods, time limits, or (c) bulk sale restrictions that would otherwise apply solely to the sale of the Store Assets (collectively, the "**Liquidation Laws**").  While many such Liquidation Laws do not apply to court-ordered sales, some Liquidation Laws may not expressly carve-out court-ordered sales.

*Fast Pay Laws*

132.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "**Fast Pay Laws**" and, together with the Liquidation Sale Laws, the "**Applicable State Laws**").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

133.    The nature of the Closing Sales contemplated by this Motion will result ultimately in each of the Store-level employees being terminated during the Closing Sales.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures.  However, the Debtors' payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.   Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by state law.  This process requires the Debtors' payroll department to calculate individual termination payments, prepare each termination payment check, obtain authorization for each such

check, and then prepare each such check for mailing.  Given the number of employees who will be terminated during the Closing Sales, this process could easily take several days, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.

*Return and Exchange Policies*

134.    Consistent with industry practice and to accommodate customers' needs, the Debtors maintain liberal return, exchange, and store credit policies with respect to both in-store and online purchases (collectively, the "**Return and Exchange Policies**").  For example, Century21.com provides for a forty-five-day return policy from the order date.  Similarly, the in-store return policy is forty-five days from the date of purchase with exceptions for certain items that have a shorter return policy.  As a result of the COVID-19 pandemic, the Debtors have allowed customers to return items purchased since February 4, 2020, and to return items purchased thirty days after store reopening.

135.    In order to maintain the goodwill of their customers, many of whom will likely purchase items during the Closing Sales, the Debtors propose to slightly amend their Return and Exchange Policies so to allow the Debtors to permit returns and exchanges for items purchased prior to the entry of the Interim Order until the earlier of (a) the applicable policy under the Return and Exchange Policies and (b) thirty days following the Petition Date (the "**Modified Return Policy**").

## Customer Programs

*Gift Cards*

136.    The Debtors maintain a program (the "**Gift Card Program**") through which their customers can purchase physical, non-expiring gift cards in various denominations (the "**Gift Cards**").  The Debtors historically sold the Gift Cards in their retail stores and through their

website.  On occasion, the Debtors also sell and distribute Gift Cards in connection with sales promotions, other special events or to members of their C21STATUS loyalty program described below.  All of the Debtors' Gift Cards can be redeemed in-store or online.

137.    As of the Petition Date, the Debtors have suspended the issuance of new Gift Cards and notified third-party vendors to cease selling the Gift Cards through other retailers and to pull any unsold Gift Cards from the shelves.  By this Motion, the Debtors propose to continue honoring all Gift Cards for thirty days following the Petition Date.

*Loyalty Program*

138.    The Debtors operate a customer loyalty program, "C21STATUS," whereby customers who sign up for "loyalty" accounts can accrue reward points for each dollar spent towards award certificates.  The Debtors also have "C21STATUS" branded credit cards with respect to which credit cardholders accrue reward points for all purchases made on the credit cards. However, as of the Petition Date, the Debtors have discontinued the C21STATUS program and are no longer honoring reward points or any other benefits accrued thereunder.  Accordingly, the Debtors do not seek authority to continue the C21STATUS program on a postpetition basis or to compensate loyalty members for benefits accrued prepetition.

139.    The credit cards are issued by Comenity Capital Bank ("**Comenity**"), which bears all credit risks associated with the cards.  While the primary purpose of offering the credit cards is to increase customer loyalty and drive sales, the Debtors also receive credit card revenue through a program agreement with Comenity, which provides the Debtors with certain financial benefits.

*Coupons and Sale Promotions*

140.    The Debtors occasionally have maintained a coupon redemption program pursuant to which they distribute and honor their own coupons (the "**Coupons**").  Further, in the ordinary

course of business, the Debtors have conducted sales promotions, either online or at selected stores (the "**Sales Promotions**"), which have included "buy one get one free" programs, cash off future purchases, seasonal discounts, online promotions and discount codes, and free shipping promotions. Although the Debtors propose do not believe that any unexpired Coupons or Sales Promotions are in circulation or pending, as of the Petition Date, the Debtors nonetheless do not intend to honor Coupons or Sales Promotions in light of discounts that will apply to the Closing Sales.

*Store Closing Plan*

141. Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay Store Closing Bonuses (the "**Store Closing Bonus Plan**") to Store-level non-insider employees, who remain in the employ of the Debtors during the Closing Sales. The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Closing Sales and will enable the Debtors to retain those employees necessary to successfully complete the Closing Sales. Payments under the Store Closing Bonus Plan, if any, are to be made exclusively to non-insiders and on the condition of employment through the date on which the respective employee's Store closes.

142. The amount of the Store Closing Bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the duration of his or her employment.

143. Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' workforce due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing

process. For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

144. In order to ensure a successful Store Closing and Closing Sale process and maximize revenues for the benefit of the Debtors' estates, the Store Closing Bonuses incentivize store management to provide uninterrupted leadership during this challenging period, and tie payment to maintaining employment with the Debtors through the conclusion of the Closing Sales. Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates.

*Importance of Relief*

145. The Debtors filed these Chapter 11 Cases to liquidate their assets and maximize distributions to their creditors. The Closing Sales further both of these goals: with the cooperation of their employees and the services of the Consultant, the Debtors will be able to liquidate Store Assets at the Closing Stores so that the Debtors can exit the Closing Stores quickly and efficiently, thereby monetizing their assets and eliminating related expenses.

146. The Closing Sales are a significant component of the Debtors' efforts to maximize value because these Closing Sales enable the Debtors to sell Store Assets at the Closing Stores in a manner that is designed to maximize efficiency and increase overall profitability. Allowing the Closing Sales – which commenced prepetition – to proceed in accordance with the Sale Guidelines will allow the Debtors to most efficiently and quickly monetize the Store Assets in a uniform and orderly process with the assistance of an experienced consultant.

147. Assumption of the Store Closing Agreement will allow the Debtors to engage the Consultant, on a postpetition basis, to manage the Closing Sales at the Closing Stores. The Consultant is experienced in facilitating processes such as the Closing Sales and will help the

Debtors maximize their recovery on the Store Assets located at all Closing Stores for the benefit of the Debtors' estates and their creditors.

148.    Given the complexity of the Closing Sales across various states and given the multitude of stores, the Consultant will provide invaluable strategic, managerial, and accounting services, allowing the Debtors to focus their efforts on other key aspects of their chapter 11 efforts. Therefore, efficient and effective liquidation sales and procedures, as contemplated by the Sale Guidelines, and the services to be provided by the Consultant will allow the Debtors to more quickly vacate those locations and avoid the accrual of unnecessary administrative expenses.

149.    On the other hand, if the Debtors do not assume the Store Closing Agreement and their obligations thereunder, the Debtors' estates will suffer significant and irreparable harm because they will likely lose the benefit of the Consultant's momentum initiated prior to the Petition Date.  As a result, the Debtors and their advisors will likely need to suspend the Closing Sales, which would then require the Debtors to devote substantial time and effort preparing for and managing the Closing Sales internally, or to once again seek bids from other advisors who could prepare for and run the Closing Sales, a process the Debtors have already undertaken prior to the Petition Date in connection with the selection of Consultant and commencement of the Closing Sales.  Ultimately, such disruption and delay would materially increase the Debtors' administrative expenses and overall losses, without any associated benefits of such delays to their estates.

150.    I believe Debtors' failure to continue conducting the Closing Sales would result in immediate and irreparable harm to the Debtors' estates.  Given that the sales began prepetition and are well underway, any unnecessary delay and expense will severely disrupt the Debtors' efforts in these Chapter 11 Cases and decrease the recovery to the Debtors' estates from the Closing Sales.

## VII. Information Required by Local Rule 1007-2

151. In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

a. Pursuant to Local Rule 1007-2(a)(3), Schedule 1 hereto lists the names and addresses of the members of, and attorneys for, any official committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

b. Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the holders of the Debtors' twenty (20) largest unsecured claims on a consolidated basis, excluding claims of insiders.

c. Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

d. Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

e. Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

f. Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

g. Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

h. Pursuant to Local Rule 1007-2(a)(10), Schedule 8 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

i. Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

j.  Pursuant to Local Rule 1007-2(a)(12), <u>Schedule 10</u> hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

k.  Pursuant to Local Rule 1007-2(b)(1)-(2)(A), <u>Schedule 11</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

l.  Pursuant to Local Rule 1007-2(b)(3), <u>Schedule 12</u> hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

*[Remainder of page intentionally left blank]*

**<u>CONCLUSION</u>**

41.     This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.


I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.


Executed this 10th day of September, 2020

                                                        /s/ *Norman R. Veit Jr.*

                                                        Norman R. Veit Jr.

## <u>Schedule 1</u>

## Committee

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no official committee has been organized prior to the Commencement Date.

# Schedule 2

## Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Commencement Date, the thirty (30) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed or Partially Secured |
|---|---|---|---|---|---|
| 1 | THE CIT GROUP | PO BOX 37998, CHARLOTTE, NC, 28237 | Trade | $5,935,975.31 | |
| 2 | PHILLIPS VAN HEUSEN CORP. | P.O. BOX 532513, ATLANTA, GA, 30353-2513 | Trade | $4,769,123.45 | |
| 3 | G-III LEATHER FASHIONS | PO BOX 29242, NEW YORK, NY, 10087 | Trade | $4,154,816.86 | |
| 4 | WELLS FARGO | PO BOX 842665, BOSTON, MA, 02284-2665 | Trade | $3,330,659.56 | |
| 5 | ROSENTHAL & ROSENTHAL | PO BOX 88926, CHICAGO, IL, 60695-1926 | Trade | $3,283,069.09 | |
| 6 | CENTURY REGO REALTY LLC | 22 Cortlandt Street, New York, NY, 10007 | Rent | $2,129,850.50 | |
| 7 | PEERLESS CLOTHING INT | PO BOX 840919, Dallas, TX, 75284-0919 | Trade | $1,429,291.90 | |
| 8 | ADIDAS AMERICA INC. | DEPT CH 19361, PALATINE, IL, 60055-9361 | Trade | $1,184,130.73 | |
| 9 | VORNADO BERGEN MALL LLC | PO Box 416391, Boston, MA, 02241-6391 | Rent | $1,176,901.35 | |
| 10 | DELTA GALIL USA | PO BOX 870014, KANSAS CITY, MO, 64187-0014 | Trade | $1,091,979.05 | |
| 11 | MICHAEL KORS USA | PO BOX 732670, DALLAS, TX, 75373-2670 | Trade | $1,038,396.66 | |
| 12 | Albee Development LLC | 411 Theodore Avenue, Suite 300, Rye, NY, 10580 | Rent | $964,413.32 | |
| 13 | ZARA USA INC | 500 5TH AVE SUITE #400, NEW YORK, NY, 10110 | Trade | $908,513.84 | |
| 14 | FITCH INC. | PO BOX 7247-6130, PHILADELPHIA, PA, 19170-6130 | Operating Expense | $853,960.38 | |
| 15 | Sunrise Mills (MLP) Limited Partnership | PO Box 277861, Atlanta, GA, 30384-7861 | Rent | $851,177.25 | |
| 16 | MILBERG FACTORS | 99 PARK AVENUE, NEW YORK, NY, 10016 | Trade | $790,176.46 | |
| 17 | STERLING NATIONAL | PO BOX 75359, CHICAGO, IL, 60675-5359 | Trade | $789,585.22 | |
| 18 | HANESBRANDS, INC. | 21692 NETWORK PLACE, CHICAGO, IL, 60673-1216 | Trade | $783,855.83 | |
| 19 | VALLEY STREAM GREEN ACRES LLC | 1175 Pittford-victor Road, Suite 220, Pittsford, NY, 14534 | Rent | $716,666.64 | |
| 20 | HADDAD BRANDS | 131 DOCKS CORNER ROAD, DAYTON, NJ, 8810 | Trade | $649,755.05 | |
| 21 | THEORY LLC | PO BOX 338, Hewlett, NY, 11557 | Trade | $570,447.40 | |
| 22 | GREAT AMERICAN BEAUTY, INC. | 124 N SWINTON AVENUE, DELRAY BEACH, FL, 33444 | Trade | $542,866.05 | |
| 23 | HILLDUN CORP. | 225 W. 35TH STREET, NEW YORK, NY, 10001 | Trade | $520,747.90 | |
| 24 | IMPACT TECH, INC. | 223 E. DE LA GUERRA STREET, SANTA BARBARA, CA, 93101 | Operating Expense | $512,598.67 | |
| 25 | PUMA NORTH AMERICA | PO BOX 74007020, CHICAGO, IL, 60674 | Trade | $455,572.62 | |
| 26 | 801-GALLERY C-3 MT, L.P. | 200 South Broad Street, Philadelphia, PA, 19102 | Rent | $454,029.03 | |
| 27 | LEVI'S, LEVI STRAUSS & CO. | ATLANTA, GA, 30384-8831 | Trade | $437,389.59 | |
| 28 | GI KBS CORPORATION | 1575 HENTHORNE DRIVE, MAUMEE, OH, 43537 | Operating Expense | $432,237.72 | |
| 29 | NIKE INC. | 7932 COLLECTIONS CENTER DR, CHICAGO, IL, 60693 | Trade | $431,046.35 | |
| 30 | COLE HAAN | P.O. BOX 6007, BOSTON, MA, 02212-6007 | Trade | $423,162.10 | |

# Schedule 3

## Consolidated List of Holders of Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent, or department | Nature of the claim | Amount of Claim | Contingent, Liquidated, Disputed or Partially Secured |
|---|---|---|---|---|---|
| 1 | JPMorgan Chase | JPMorgan Chase Bank, N.A. 277 Park Avenue, 22nd Floor New York, NY 10172 Attention: Credit Risk Manager – Century 21 Department Stores Facsimile No: 646.534.2274 | Credit Facility | $26,995,458.24[1] | |
| 2 | Bank of America | c/o JPMorgan Chase Bank, N.A., as administrative agent 277 Park Avenue, 22nd Floor New York, NY 10172 Attention: Credit Risk Manager – Century 21 Department Stores Facsimile No: 646.534.2274 | Credit Facility | $17,996,972.16[1] | |
| 3 | Bank Hapoalim | c/o JPMorgan Chase Bank, N.A., as administrative agent 277 Park Avenue, 22nd Floor New York, NY 10172 Attention: Credit Risk Manager – Century 21 Department Stores Facsimile No: 646.534.2274 | Credit Facility | $11,248,107.60[1] | |
| 4 | De Lage Landen Financial | P.O. Box 41602, Philadelphia, PA 19101-1602 | Equipment Lease | Not to exceed $50,000.00 | |
| 5 | Sumitomo Mitsui Finance and Leasing Company, Limited | P.O. Box 530023, Atlanta, GA 30353-0023 | Equipment Lease | Not to exceed $50,000.00 | |

*1 - Claim amount by institution for JPMorgan Chase, Bank of America, and Bank Hapoalim excludes $38,971.35 of accrued lender fees.*

## Schedule 4

**Condensed Consolidated Balance Sheet (Unaudited)**

|  | | As of 05/30/20 |
|---|---|---|
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents | $ | 9,159 |
| Inventories | | 139,773 |
| Other current assets | | 16,600 |
| Total current assets | | 165,532 |
| | | |
| Due From Related Parties | | 4,991 |
| Fixed Assets - Net | | 131,004 |
| Other Assets | | 24,919 |
| Deferred Financing Costs - Net | | 594 |
| **Total Assets** | $ | **327,040** |
| | | |
| **Liabilities and Equity** | | |
| Current Liabilities | | |
| Accounts payable | $ | 75,447 |
| Accrued liabilities and income taxes payable | | 24,305 |
| Due To Related Party - Current | | 5,223 |
| Total Current Liabilities | $ | 104,975 |
| | | |
| Loan payable - revolving credit facility | | 77,200 |
| Other long-term Liabilities | | 34,443 |
| Deferred rent and landlord contributions | | 40,764 |
| Due to related party | | 2,747 |
| Loan from related parties | | 12,350 |
| **Total Liabilities** | $ | **272,479** |
| Equity | | 54,561 |
| **Total Liabilities and Equity** | $ | **327,040** |

| Equity Reconciliation: | | |
|---|---|---|
| Capital Stock | | 2,000 |
| Retained Earnings | | 103,497 |
| Distributions/Dividends | | - |
| Net Income/(Loss) | | (50,936) |
| **Total Equity** | $ | **54,561** |

Giftco 21 LLC
Balance Sheet
As of May 30, 2020

| ASSETS | AMOUNT |
|---|---|
| CASH & CASH EQUIVALENTS | |
| CASH | 214,268 |
| TOTAL CASH & CASH EQIVALENTS | 214,268 |
| INTERCOMPANY RECEIVABLES | 8,869,417 |
| **TOTAL ASSETS** | **9,083,684** |
| | |
| **LIABILITIES** | |
| Accrued Liabilities | 2,300,652 |
| Income Taxes Payable | 16,198 |
| **TOTAL LIABILITIES** | **2,316,850** |
| **EQUITY** | |
| MEMBERS CAPITAL | 6,914,680 |
| NET INCOME/(LOSS) | (147,846) |
| **TOTAL EQUITY** | **6,766,834** |
| **TOTAL LIABILITIES & EQUITY** | **9,083,684** |

# Schedule 5

## Securities

Local Rule 1007-2(a)(7) requires the disclosure of shares of stock, debentures, and other securities ("**Securities**") of the Debtors that are publicly held.
There are no publicly held Securities.

Local Rule 1007-2(a)(7) also requires the disclosure of shares of Securities held by the Debtors' directors and officers as of the Petition Date.

| Debtor | Name of Director/Officer | Approximate Number of Shares |
|---|---|---|
| L.I. 2000, Inc. | Raymond Gindi – Co-Chief Executive Officer | 25% Class A Voting Common Stock and .25% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Raymond Gindi 2012 Generational Trust | 25% Class B Non-Voting Common Stock and 24.75% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Isaac A. Gindi – Co-Chief Executive officer | 25% Class A Voting Common Stock and .25% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | I.G. Gindi 2009 Generational Trust | 25% Class B Non-Voting Common Stock and 24.75 % total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Isaac S. Gindi – Executive Vice President, Assistant Treasurer and Secretary | 16.67% Class A Voting Common Stock and .16667% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Isaac S. Gindi 2010 Gift Trust | 16.67% Class B Non-Voting Common Stock and 16.5% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Edward Gindi – Executive Vice President, Treasurer and Assistant Secretary | 16.67% Class A Voting Common Stock and .16667% total ownership of L.I. 2000, Inc. |
| L.I. 2000, Inc. | Eddie Gindi Generational Trust | 16.67% Class B Non-Voting Common Stock and 16.5% total ownership of L.I. 2000, Inc. |
| C21 Department Stores Holdings LLC | Raymond Gindi 2012 Generational Trust | 25% Class B Units and 24.75% of total ownership of C21 Department Stores Holdings LLC |
| C21 Department Stores Holdings LLC | I.G. Gindi 2009 Generational Trust | 25% Class B Units and 24.75% of total ownership of C21 Department Stores Holdings LLC |
| C21 Department Stores Holdings LLC | Isaac S. Gindi 2010 Gift Trust | 16.67% Class B Units and 16.5% of total ownership of C21 Department Stores Holdings LLC |
| C21 Department Stores Holdings LLC | Eddie Gindi Generational Trust | 16.67% Class B Units and 16.5% of total ownership of C21 Department Stores Holdings LLC |

## Schedule 6

### Debtors' Property Not in the Debtors' Possession

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgage, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers, or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

<u>**Schedule 7**</u>

Pursuant to Local Rule 1007-2-(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

**Leased Property[1]**

| Store # | Location | Address |
|---|---|---|
| 7 | SAWGRASS | Sawgrass Mills, Sunrise FL |
| 10 | DOWNTOWN MANHATTAN | 10-12 Cortlandt Street, New York NY |
| 10 | DOWNTOWN MANHATTAN | 173 Broadway (sub-basement), New York NY |
| 10 | DOWNTOWN MANHATTAN | 175-177 Broadway, New York NY |
| 10 | DOWNTOWN MANHATTAN | 179 Broadway (2-6 floors), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (1st floor), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (25 Church Street), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (3rd Fl), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (4th, 5th and 6th floors), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (9th floor), New York NY |
| 10 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (Main), New York NY |
| 18 | LINCOLN SQUARE | 1972 Broadway, New York NY |
| 20 | BROOKLYN BAY RIDGE | 416-424, 426 87th Street & 415 88th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 423 88th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 434 86th Street, 412 87th Street, and 415 87th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 436-438 87th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 444-446 86th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 448 86th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 454, 458, 468, 474 86th Street & 439-449 87th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 456 86th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 460 86th Street, Brooklyn, NY |
| 20 | BROOKLYN BAY RIDGE | 472 86th Street, Brooklyn, NY |
| 22 | STATEN ISLAND | STATEN ISLAND MALL, STATEN ISLAND NY |
| 26 | CITY POINT | City Point Shopping Center, Brooklyn, NY |
| 30 | WESTBURY | 1085 Old Country Road, Westbury, NY |
| 32 | ROOSEVELT FIELD | Roosevelt Field Mall, Garden City NY |
| 36 | GREEN ACRES | Green Acres Mall, Valley Stream, NY |

---

[1]  The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| | | |
|---|---|---|
| 40 | MORRISTOWN | One North Park Place, Morristown, NJ |
| 42 | AMERICAN DREAM | Level 3 Court D, 1 American Dream Way, East Rutherford, NJ 07073 |
| 48 | JERSEY GARDENS | 651 Kapkowski Road, Elizabeth, NJ 07201 |
| 50 | PARAMUS | 200 Bergen Town Center, Paramus, NJ 07652 |
| 52 | CROSS COUNTY | 750 Central Park Ave, Yonkers, NY 10704 |
| 60 | REGO PARK | 61-35 Junction Blvd, Rego Park, NY 11374 |
| 76 | PHILADELPHIA | 821 Market St, Philadelphia, PA 19107 |
| 88 | ADC | 1 Emerson Lane, Secaucus, NJ |
| 95 | SDC | 70 Enterprise Avenue, Secaucus, NJ |
| 95 | EDC | 690 and 700 Secaucus Road, Secaucus, NJ |
| 95 | HDC | 21 Century Way, Secaucus, NJ |
| 99 | CORPORATE | 15 Maiden Lane, Suite 400 & 407 - New York, NY |
| 99 | DOWNTOWN MANHATTAN | 22 Cortlandt Street (2nd floor), New York NY |

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets
The Debtors' substantial assets are located in the locations specified in Schedule 7, which include the states of New York, New Jersey, Pennsylvania, and Florida.

### Books and Records
The Debtors' books and records are located at 22 Cortland Street New York, NY.

### Debtors' Assets Outside the United States

The Debtors do not have assets located outside the territorial limits of the United States.

## **Schedule 9**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

<u>**Schedule 10**</u>

**Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| NAME | TITLE | DIRECT REPORTS | FUNCTIONS |
|------|-------|----------------|-----------|
| Raymond Gindi | Co-CEO | Stores, E-Comm, Logistics, Marketing, Human Resources, Finance, IT, Asset Protection, Real Estate and Site Selection | Oversee the creation and implementation of the Company's strategy and business plan. Lead initiatives to drive top line sales, expense control and profitability. Oversee key business areas: Stores, E-Comm, Logistics, Marketing, Human Resources, Finance, IT, Asset Protection, Real Estate and Site Selection |
| IG Gindi | Co-CEO | Merchandising, Inventory Planning and Allocation, Business Intelligence | Develop and implement strategies to drive profitable sales Sales, Margin, Turn |
| Eddie Gindi | EVP Chief Culture Officer | n/a | Lead efforts to ensure company culture that recognizes and values employees to drive productivity and high performance |
| Isaac Gindi | EVP | n/a | Advise Marketing related to new concepts, collaborations and other sales driving initiatives |
| Michael Kustermann | Chief Marketing Officer | VP Marketing, VP Digital, Creative Director | Marketing, Branding, Creative, Digital Strategy, E-Comm P&L, Customer Relationship Management |
| Larry Mentzer | Chief Revenue Officer | Store General Managers, VP Merchandise Present, Manager of Facilities | Store Sales and Profitability, Store Operations & Maintenance, Customer Service, Visual Merchandising, New Store Opening |
| Nancy Straface | Chief Human Resources Officer | HR Directors in the following areas: Stores, Corporate DC & Training, Recruiting, Internal Communication | HR Strategy, Talent Acquisition & Retention, Performance Management, Succession Planning, Leadership Development, Training, Engagement, Comp & Benefits |
| Norm Veit | Chief Financial Officer | VP Finance, Director Accounts Payable, Director Procurement, Senior Manager Private Label Credit Card | Financial Strategy, Budgeting, Performance Analysis, Financial Reporting, Treasury, Accounting, Tax, Private Label Credit Card, Payroll, |
| Norm Veit | Chief IT Officer | VPs Enterprise Application, Development & Business Intelligence, VP Guest Services, Director of Tech Services | IT Strategy, Digital Customer and In Store Experience, Data Management Systems, Data Security, Tech Support |
| Bill Thayer | Chief Logistics Officer | VP Process Improvement, VP DC Operations, GM Transportation | Logistics Systems, Process and Infrastructure, DC E-Commerce Operations, Transportation |
| Jimmy Betesh | Vice President Asset Protection | Director Corp AP/Fraud, Director AP Stores and DC | Shrink, Asset Protection, Fraud Management, |
| Mike Adams | Director Construction Planning | Manager of Store Design, Project Manager | Store Design Process, Project Budgeting, Construction Management and Execution |

| Molly Taylor | Chief Merchandising Officer | VPs/Divisional Merchandise Managers | Merchandising Strategy, Assortment and Vendor Strategy, Sales, Margin, Turn |
|---|---|---|---|
| Melissa Baker | SVP, Merchandise Planning & Allocation | VPs/Divisional Planning Managers, VP Business Intelligence | Merchandise & Inventory Initiatives, Sales & GMROI optimization, Business Intelligence |

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payment to Employees** <br> **(Not Including Officers, Directors, and Stockholders)** | $5,830,000 |
| **Payment to Officers, Stockholders, and Directors** | $188,000 |
| **Payments to Financial and Business Consultants** | $1,808,000 |

Note: Payments to Financial and Business Consultants includes estimated Debtor, Creditor Committee, counsel, and other miscellaneous professional fees

# Schedule 12

## Cash Receipts and Disbursements,
## Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, new cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $51,781,000 |
| **Cash Disbursements** | $46,515,000 |
| **Net Cash Gain** | $5,266,000 |
| **Unpaid Obligations** | $7,575,000 |
| **Uncollected Receivables** | $6,645,000 |

Note: Cash disbursements include $24.1 million of Letter of Credit Cash Collateralization and ABL pay down