Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

Jeff J. Marwil (*pro hac vice* pending)
Brooke H. Blackwell (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

Peter J. Young (*pro hac vice* pending)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 557-2900
Facsimile: (310) 557-2193

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**CENTURY 21 DEPARTMENT STORES LLC,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 20-12097 (SCC)**<br><br>**(Joint Administration Requested)** |

## MEMORANDUM IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION

Century 21 Department Stores LLC, a debtor in possession in this chapter 11 case, by and through its undersigned counsel, hereby submits this Memorandum in Support of Debtors' Chapter 11 Petition.

---

[1] The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033). The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

In short, the filing of this bankruptcy proceeding is the direct and foreseeable result of the unreasonable delays and refusals to pay by Debtors' property and business interruption insurance carriers ("Insurers"). In response to claims by Debtors and its non-debtor affiliates ("Policyholders") for insurance coverage related to the COVID-19 pandemic, Insurers repeatedly requested duplicative and unnecessary information, refused partial payments that would keep Debtors afloat, and paid only a miniscule fraction of the covered losses, rejecting the vast majority of the claims totaling greater than $175 million (and counting).

Insurers' lack of good faith and fair dealing forced Policyholders to file suit in July 2020 in New York County Supreme Court (the "Insurance Action") seeking contract and consequential damages (Complaint ("Compl.") attached as Exhibit 1). Because the Insurance Action is a core and related proceeding,[2] Debtors are removing the Insurance Action to this District and are seeking a reference to this Court. Because recovery from the Insurers is the largest asset of the estates, prompt resolution of the removed Insurance Action is imperative. As such, Debtors are requesting by separate letter to chambers a telephonic scheduling conference to set pre-trial deadlines and a trial date in nine months.

***Background of Debtors' Business and Devastating Losses***

Policyholders have for nearly 60 years owned and operated the iconic Century 21 discount retail department stores in New York and the East Coast. (Exh. 2, *Declaration of Norman R. Veit*

---

[2] The Insurance Action constitutes a core proceeding because resolution of these claims relates to matters concerning the administration of Debtors' estates, counterclaims against persons filing claims against the Debtors' estates, orders to turn over property of the estates, proceedings affecting the liquidation of the Debtors' assets of the estates and the adjustment of the debtor-creditor relationship. *See* 28 U.S.C. §§ 157(b)(2)(A), (C), and (O). In addition, "litigation is 'related to' a bankruptcy proceeding 'if the action's outcome might have any conceivable effect on the bankruptcy estate.'" *Post Investors LLC v. Gribble,* 2012 WL 4466619, *3 (S.D.N.Y. Sept. 27, 2012) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992))). Much greater than a "conceivable" effect on the estates, resolution of the Insurance Action involves the single greatest asset of the estates.

*Jr. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof ("Decl.")),[3] The Century 21 Stores evolved from a small, discount department store into a must-see shopping destination, with its flagship store spanning six buildings in the Financial District. (*Id.*) As of the date hereof, Policyholders owned or operated 13 stores in four states. (*Id.*)

In late 2019, COVID-19 began to spread around the globe, and by February, the Center for Disease Control ("CDC") had warned that the world was on the brink of a global pandemic. COVID-19 is an extremely contagious disease with devastating health effects that currently has no cure and limited treatment options. While the science surrounding this virus and the resulting global pandemic continues to evolve, experts generally agree that COVID-19 is transmitted person to person through droplets of mucus or saliva[4] and can lead to hospitalization and death.[5] These droplets are expelled from infected persons as they cough, sneeze, laugh, speak, and even breathe.[6] COVID-19 can also be transmitted by touching a surface that is infected with viral droplets from an infected person.[7] Early studies stated that the virus can remain viable on surfaces for days, and surfaces have been found to contain the virus as many as seventeen days after being contacted by an infected person.[8]

---

[3] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Veit Declaration.

[4] Heather Murphy, "Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread," *The New York Times* (March 19, 2020), https://www.nytimes.com/article/coronavirus-how-it-spreads.html.

[5] "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020," MMWR Morb Mortal Wkly Rep 2020;69:343-346, http://dx.doi.org/10.15585/mmwr.mm6912e2.

[6] *Id.*

[7] *Id.*

[8] "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," *MMWR Morb Mortal Wkly Rep* 2020;69:347-352, http://dx.doi.org/10.15585/mmwr.mm6912e3.

More recent studies have focused on airborne transmission rather than on surfaces. For example, a recent open letter to the World Health Organization from 239 scientists in 32 countries warns of "potential for airborne spread of COVID-19"[9] and suggests that even exhalation and talking cause the release of the virus in microdroplets which "will travel tens of meters" at "typical indoor air velocities" before settling on the floor and other surfaces.[10] This airborne transmission is said to operate "in parallel with the large droplet and fomite [surface to human] routes . . . ."[11] Moreover, as people may transmit the virus even while asymptomatic,[12] it is impossible to identify every person transmitting the virus, and any place an infected person has been is contaminated by the virus.

Accordingly, COVID-19 became present at Policyholders' premises and other property in the vicinity, all of which were highly trafficked, thus causing loss or damage to Policyholders' property, loss of use, inability to access their premises, loss of customers, and other covered losses. (Exh. 1, Compl. at ¶¶45-47) In addition, beginning in March 2020, state and local authorities in jurisdictions where Policyholders' stores were located issued orders restricting or closing certain types of business, limiting the size of public gatherings, requiring residents to stay at home except for certain enumerated activities, and mandating other restrictions that caused Policyholders' significant revenue, rental income and other covered economic damage. (Exh. 2) For example, following Governor Cuomo's declaration of a State disaster emergency, New York City issued its

---

[9] Lidia Morawska, Donald K. Milton, It Is Time to Address Airborne Transmission of COVID-19, *Clinical Infectious Diseases*, July 6, 2020, https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa939/5867798.

[10] *Id.*

[11] *Id.*

[12] 42% of infected persons in Wuhan, China were reported to be asymptomatic. https://www.usnews.com/news/health-news/articles/2020-05-28/studies-detail-rates-of-asymptomatic-cases-of-coronavirus

order, "because of the propensity of the [COVID-19] virus to spread person to person and also because the virus physically is causing property loss and damage," limiting the size of gatherings to 50 people and ordered employers to reduce in-person work forces by 50%. (Exh. 1, Compl. at ¶54) Similarly, the Governor of Pennsylvania's executive order closed all non-essential businesses, as did an order by the Mayor of Philadelphia. (*Id.*)

*The Insurance Policies*

In order to protect their property and income, Policyholders paid millions of dollars in annual premium[13] for broad, "all-risk" insurance[14] designed to cover, among other things, loss or damage to insured property and attendant business interruption losses, as well as coverage extensions such as contingent business interruption, loss due to civil authority or ingress/egress restrictions, loss of rental value, extra expense to maintain the business during a loss, and contingent business interruption. (Exh. 1, Compl. at ¶¶63, 67, 71 *et seq.*) Policyholders also obtained coverage extensions tailored to their retail operations. For example, in the event of business interruption due to damage caused directly by a peril not otherwise excluded to the property utilized by the Policyholders, loss can be computed at 35% of gross sales at location. (*Id.,* Compl. at ¶76) Moreover, in the event of orders of civil authority like those quoted above, Policyholders are entitled to "Business Interruption loss reimbursement including Extra Expense and Rental Coverages as defined hereunder during the period of time not exceeding 60 consecutive days, when, as a result of a peril not otherwise excluded, access to the vicinity is restricted by order

---

[13] Since 2007, Policyholders paid $20,778,964 in premium for its property damage/business interruption coverage and $16.9 million over the past ten years alone. (Exh. 2)

[14] All-risk insurance covers all risks of loss unless expressly excluded.

5

of civil authority, regardless of whether any property insured by this policy shall have been damaged."[15] (*Id.*, Compl. at ¶¶90, 91).

Such insurance policies are designed to afford policyholders peace of mind that when catastrophe occurs, they would be able weather the storm with the assistance of their insurers in the form of good faith adjustment and payment of claims and interim payments[16] for on-going losses. Unfortunately, the Policyholders were afforded no such peace of mind.

***The Insurers' Delays and Denials***

When disaster struck, Policyholders provided notice to the Insurers in March 2020 and within two weeks provided documentation and a partial proof of loss for $5 million under one of the coverages. (Exh. 2) The Insurers initially ignored this request, made a first payment of a mere $840,000, and have still not paid the full $5 million on this small portion of the loss. (*Id.*) Over the course of three months from April to June 2020, the Insurers demanded that the Policyholders answer largely irrelevant and duplicative "questionnaires," to which prompt responses were nonetheless given. (*Id.*) On or about May 26, the Policyholders provided Insurers with a second partial proof of loss and accompanying documentation, this time for $175,586,799 in additional covered losses incurred from March through May 2020, and requested a modest $20 million partial payment to stave off, at least temporarily, financial ruin. (*Id.*) In what had unfortunately become

---

[15]   *See, e.g.,* Starr policy Coverage VII.L. The policy issued by Allianz provides similar coverage in the event an order of civil authority prohibits access to insured locations and the order is caused by physical loss or damage not otherwise excluded to any property.

[16]   The policy issued by Defendant-Insurer Allianz, for example, provides:

> In the event of a loss occurring which has been ascertained by the Company to be recoverable under this "policy", the Company <u>will advance mutually agreed upon partial payments</u> for such loss, subject to the provisions of this "policy". To obtain such partial payments, the Insured will submit a signed and sworn to proof of loss as described in this "policy" with adequate supporting documentation. (emphasis added)

As described below, Policyholders provided the necessary documentation and proof of loss, yet Allianz wrongfully rejected the proof of loss and no payment was forthcoming. (Exh. 2)

6

their all too expected responses, three weeks later, one insurer "rejected" the proof of loss and the others asked for more unnecessary information. (*Id.*)

### *The Insurance Action*

Pushed to the brink and in desperate need of the contracted-for insurance payments, the Policyholders initiated the Insurance Action in New York County Supreme Court on July 8, 2020. (Exh 1, Compl.) No defendant appeared, no responsive pleadings have been filed, and no judge has been assigned. Debtors are removing the Insurance Action from state court to this District, and anticipate it will be given an Adversary Number upon coordination of the clerks' offices.

The Insurance Action seeks damages for the Insurers' breach of contract in the amount of more than $175 million plus continuing losses, consequential damages in an amount to be determined, and attorneys' fees and costs resulting from Insurers' breach of the covenant of good faith and fair dealing.[17] (*Id.*) Debtors request the Insurance Action be promptly resolved by this Court and firmly believe they will prevail at trial.

While a full analysis of the case law is beyond the scope of this Memorandum, it is clear that losses were incurred and are covered by the broad, all-risk policies issued by the Insurers. For example, civil authority coverage quoted above, which expressly applies "regardless of whether any property insured by this policy have been damaged," covers 60 days of business interruption loss, extra expense and rental coverage. Policyholders provided a partial proof of loss and supporting documentation of more than $175 million for the period mid-March through May, 2020. (Exh. 2).

---

[17] It is beyond debate that the Insurers owe the Policyholders a covenant of good faith and fair dealing that is implicit in the insurance contracts. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("parties to an express contract are bound by an implied duty of good faith").

For other coverages, in the event physical loss or damage to some property is required, there is ample authority that the presence of substances or conditions like COVID-19[18] at or in the vicinity of insureds' premises constitutes direct physical loss or damage to that property, thus triggering insurance coverage. The presence of smoke, odors, toxic gases, and other conditions fulfill this requirement.

For example, some courts rely on the consequent loss of use of the insured property, others focus on the fact that the condition renders the insured property unfit for its intended purpose, and still others find a physical alteration that occurs as a result of the presence of the foreign substance. There should be no doubt that Policyholders suffered loss of use of their stores, that the presence of COVID-19 made the stores and other properties unfit for occupancy, and that the surfaces and inside air was damaged. *See, e.g. Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F3d 399 (1st Cir 2009) ("we are persuaded both that odor can constitute physical injury to property … and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed"); *Matzner v. Seaco Ins. Co.,* No. 96-0498-B, 1998 WL 566658 at *3–4 (Mass. Super. Aug. 26, 1998) (holding the loss of use of apartment building, rendered uninhabitable by carbon

---

[18] Only one reported decision has to date addressed whether the presence of COVID-19 at an insured's premises constitutes physical loss or damage. In *Studio 417, Inc. v. The Cincinnati Ins. Co.*, No. 20-cv-03127-SRB (W.D. Mo., Aug. 12, 2020), the Court denied the insurance carriers' motion to dismiss where the complaint alleged COVID-19 likely entered the policyholders' premises. In the handful of other COVID-19 trial court rulings, the presence of the virus was not alleged, thus allowing insurers' dispositive motions to prevail. *See Malaube, LLC v. Greenwich Ins. Co.,* Case No. 20-22615-Civ *Magistrate Recommendation* (S.D. Fla. Aug. 26, 2020) ("This case is materially different [from *Studio* 417] because Plaintiff has not alleged any physical harm"); *Gavrilides Management Co. et al. vs. Michigan Ins. Co.*, Case No. 20-000258-CB (Circuit Court of Ingham County, Michigan) (policyholder's pleading and affidavit confirmed that the COVID-19 virus never entered the shuttered restaurant); *Social Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.*, Case No. 20 Civ. 3311 (VEC) (S.D.N.Y. May 14, 2020), *vacated* (no evidence presented of the virus being present on any property in the vicinity); *Rose's 1, LLC, et al. v. Erie Ins. Exchange*, 2020 D.C. Super LEXIS 10 at *6, No. 2020 CA 002424 B (D.C. Super, Aug. 6, 2020) (plaintiffs offered "no evidence that COVID-19 was actually present on their insured properties at the time they were closed"). *See also Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-CV-461-DAE (W.D. Tex., Aug. 13, 2020) (policyholders did not argue in briefing that virus present on premises).

monoxide, constituted a direct physical loss); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) (offgassing from improperly manufactured drywall caused "direct physical loss" because the insured home was rendered uninhabitable by the toxic gases); *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016) (wildfire smoke, soot and ash resulted in poor air quality, thus rendering outdoor theater unusable for its intended purpose, constituted "direct physical loss of or damage to" property, even though theatre experienced no permanent structural damage and seats and stage could be quickly cleaned with water; rejecting argument that air is not physical – "[c]ertainly air is not mental or emotional, nor is it theoretical") *vacated*, No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017) (based on joint stipulated request from the parties); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 24 A.D.3d 743, 744 (1st Dep't 2005) (contamination of soft drinks that caused an "off-taste," rendering them unmerchantable, was "physical damage"); *Gregory Packaging, Inc. v. Travelers Property Cas. Co. of Am.*, 2014 WL 6675934 (D.N.J. Nov. 25, 2014), (ammonia release, though dissipated within a week, "physically transformed the air within [the insured's] facility"; property can "sustain physical loss or damage without experiencing structural alteration"); *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3rd Cir. 2002) (when sufficient quantities of asbestos become friable, rendering buildings "uninhabitable and unusable," the structure suffers "physical loss"); *Schlamm Stone & Dolan LLP v. Seneca Ins. Co.,* 6 Misc.3d 1037(A) (Sup. Ct. N.Y. County 2005) (where insured offices contained dust and noxious particles in the air and on surfaces as a result of 9/11, court interpreted policy to "include, under the definition of property damage, particles both on surfaces and in the air in the insured premises").

Applicable law also fully supports the Policyholders' demand for consequential damages. New York law, as confirmed in a pair of insurance coverage cases decided by New York's highest court, permits an insured to recover "foreseeable damages, beyond the limits of its policy, for breach of a duty to investigate, bargain for and settle claims in good faith." *See Panasia Estates, Inc. v. Hudson Ins. Co.*, 886 N.E.2d 135, 137 (2008) *and Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York,* 886 N.E.2d 127, 130 (2008). Limiting damages to the amount of covered claims plus interest is insufficient to place Policyholders in the position they would have been in had Insurers not breached the contracts of insurance. *Bi-Econ. Mkt., Inc., supra,* at 195. Indeed, "the purpose of the [business interruption insurance] contract was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event, as Bi-Economy experienced here, the business could avoid collapse and get back on its feet as soon as possible. *Id.* Accordingly, the Insurers here should "stand liable" for additional damages suffered as a result of their delays and denials. *Id.*

Century 21's bankruptcy was certainly foreseeable[19] by Insurers because "the purpose served by business interruption coverage cannot be clearer – to ensure that [the policyholder] had the financial support necessary to sustain its business operations in the event disaster occurred. *Id.* at 194. *See also Sabbeth Indus. Ltd. v. Pennsylvania Lumbermens Mut. Ins. Co.,* 656 N.Y.S.2d 475, 477 (1997) ("the very purpose of business interruption coverage would make defendant aware that if it breached the policy it would be liable to plaintiffs for damages for the loss of their business as a consequence of its breach or made it possible for plaintiffs reasonably to suppose that

---

[19] In order to establish foreseeability for consequential damages, "the policyholder need not point to an express contract provision or specific language permitting the recovery of consequential damages." *Roman Catholic Diocese of Rockville Ctr. v. Gen. Reinsurance Corp.,* No. 16 CIV. 02063 (CM), 2016 WL 5793996, at *5 (S.D.N.Y. Sept. 23, 2016) (quoting *United Specialty Ins. Co. v. Fisk Fine Art Servs., LLC,* No. 15CV2802-LTS-JCF, 2016 WL 1268273, at *4 (S.D.N.Y. Mar. 31, 2016)). Instead, "the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject." *Id.*; *see also Kenford Co. v. Erie Cty.,* 67 N.Y.2d 257 (1986).

defendant assume such damages when the contract was made."). In *Sabbeth*, the Appellate Division found that the insured's damages were foreseeable when the insured was forced to lay off its entire workforce and shut down its business because the insurers refused to pay the insured's claim and continue interim payments. *Id.* Similarly, in *Bi-Econ. Mkt., supra,* at 191, the Court of Appeals upheld denial of insurer-defendants' motion for summary judgment, holding that liability for such consequential damages was reasonably foreseeable and contemplated by the parties at the time of contracting where the insured's business collapsed as a result of a the insurers' breach of contract and refusal to timely pay the full amount of the insured's lost business income claim after a fire destroyed the business. *See also Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (2008) (denying insurer's motion for summary judgment on consequential damages where insurer allegedly breached the covenant of good faith and fair dealing by failing to properly investigate loss occurring when insured's building suffered water damage during renovations and denied coverage for the loss).

There can be no question that Policyholders are entitled in the Insurance Action to consequential damages as a result of Insurers' refusal to timely provide continuing interim payments and rejection of the documented claims. By providing business interruption insurance, the Insurers understood that proceeds of the policies were expected to sustain the business while it could not operate at full capacity. As a direct result of the Insurers' determination to delay and reject the Plaintiffs' claims, Debtors were forced to file Chapter 11. The Policyholders bargained for a service and dutifully paid their premiums in the expectation that there would be a lifeline in times of trouble, but when the worst happened, the Insurers chose not to fulfill their end of the bargain, knowing what the likely result would be. As such, the Policyholders will be entitled to

consequential damages "not to punish the insurer, but to give the insured its bargained-for-benefit." *Bi-Econ. Mkt., Inc., supra*, at 195.

### *Conclusion*

The Insurance Action, being removed to this District and awaiting reference to this Court, must be resolved promptly. The Insurers' delay tactics should come to an end, the amounts of coverage and damages quantified, and amounts due from Insurers paid to the estates for the benefit of creditors.

| | |
|---|---|
| Dated: September 10, 2020<br>New York, New York | Respectfully submitted,<br><br>/s/ *Lucy F. Kweskin*<br><br>Lucy F. Kweskin<br>Matthew A. Skrzynski<br>**PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900<br>Email: lkweskin@proskauer.com<br>Email: mskrzynski@proskauer.com<br><br>-and-<br><br>Jeff J. Marwil (*pro hac vice* pending)<br>Brooke H. Blackwell (*pro hac vice* pending)<br>**PROSKAUER ROSE LLP**<br>70 West Madison, Ste. 3800<br>Chicago, IL 60602-4342<br>Telephone: (962) 962-3550<br>Facsimile: (962) 962-3551<br><br>-and-<br><br>Peter J. Young (*pro hac vice* pending)<br>**PROSKAUER ROSE LLP**<br>2029 Century Park East, Ste. 2400<br>Los Angeles, CA 90067<br>Telephone: (310) 557-2900<br>Facsimile: (310) 577-2193<br>Email: pyoung@proskauer.com<br><br>*Proposed Attorneys for Debtor*<br>*and Debtor in Possession Century 21*<br>*Department Stores LLC* |