Hearing Date: December 28, 2020, at 10:30 a.m. (Prevailing Eastern Time)
Objections Due: December 23, 2020, at 4:00 p.m. (Prevailing Eastern Time)

Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Jeff J. Marwil (admitted *pro hac vice*)
Jordan E. Sazant (admitted *pro hac vice*)
Brooke H. Blackwell (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

Peter J. Young (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:  (310) 557-2900
Facsimile:  (310) 557-2193

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br><br>**CENTURY 21 DEPARTMENT STORES LLC,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 20-12097 (SCC)**<br><br>**(Jointly Administered)** |

### MOTION OF DEBTORS FOR AN ORDER AUTHORIZING AND APPROVING (A) SALE OF INSURANCE ACTION INTEREST FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (B) SETTLEMENT WITH GINDI PARTIES

Century 21 Department Stores LLC and its affiliated debtors in possession (collectively,

the "Debtors") hereby move (the "Motion"), under sections 105(a), 363 and 503 of title 11 of the

---

[1]     The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033).  The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9008, 9014 and 9019(a) of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order substantially in

the form attached hereto as **Exhibit A** ("Proposed Order") authorizing (i) the sale of the Insurance

Action Interest (as defined below) (the "Sale") and (ii) the settlement of claims by and between

the Debtors and the Official Committee of Unsecured Creditors (the "Committee"), on the one

hand, and certain of the Debtors' affiliates and equity holders, on the other hand, each pursuant to

(i) the Participation Agreement (the "Participation Agreement"),[2] a copy of which is annexed to

the Proposed Order as **Exhibit 1**, among the Debtors, including C21 Department Stores LLC, and

C21 Blue Insurance LLC (the "Participant") and (ii) the Global Settlement Agreement (the

"Settlement Agreement" and, together with the Participation Agreement and their respective

exhibits and ancillary documents, the "Sale Documents"), a copy of which is annexed to the

Proposed Order as **Exhibit 2**, by and among the Debtors, the Committee, and the "Gindi Parties,"[3]

and in support thereof, by and through their undersigned counsel, respectfully state as follows:

### Preliminary Statement

1.     The Debtors previously filed a motion to approve the sale of their interest in the

Insurance Action (as defined below), which, as stated in the Initial Sale Motion,[4] would monetize

the Debtors' largest asset, promptly deliver liquidity to the Debtors' estates, and provide the

opportunity for tangible distributable value to creditors.   Now, the Debtors have a unique

---

[2]     Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Participation Agreement.

[3]     The "Gindi Parties" are (a) Raymond Gindi, (b) Isaac A. Gindi, (c) Isaac S. Gindi, (d) Eddie Gindi, (e) Jack Gindi, (f) I.G. Gindi 2009 Generational Trust, (g) Raymond Gindi 2012 Generational Trust, (h) Eddie Gindi Generational Trust, (i) Isaac S. Gindi 2010 Gift Trust, (j) 10-12 Cortlandt Blue LLC, (k) 173 Bway Blue LLC, (l) 175-177 Bway Blue LLC, (m) Blue Millennium Realty LLC, (n) C21 BK Home LLC, (o) Strike Enterprises LLC, (p) 86 Blue LLC, (q) C21 Bay Ridge Blue LLC, (r) CCC Partners, (s) ASG Equities Secaucus LLC, (t) C21 SDC Blue LLC, (u) Secaucus Blue LLC, (v) ADC Blue LLC, (w) Century Rego Realty and (x) C21 Property Management Partners.

[4]     Motion of Debtors for an Order Authorizing and Approving Sale of Insurance Action Interest [Dkt. No. 273] (the "Initial Sale Motion").

opportunity to further enhance the value of Insurance Action and deliver even greater value to their estates and, in turn, to creditors. The transactions proposed hereunder will provide to the Debtors' estates, among other things, (i) at least $59 million in cash, representing a substantial premium over the price offered for the Insurance Action under the transaction contemplated in the Initial Sale Motion, on substantially similar terms and for the same asset, (ii) a release of all claims – including tens of millions of dollars in unpaid rent and on account of lease rejection damages – that the Gindi Parties hold against the Debtors and the Debtors' estates,[5] (iii) indemnification for the Debtors' estates provided by the Gindi Parties and (iv) a lower recovery threshold at which the Debtors will share in the proceeds of the Insurance Action, in exchange for the settlement of claims against the Gindi Parties. The combined sale and settlement of which the Debtors respectfully request approval by this Motion deliver greater value, greater certainty, and greater consensus than any alternative with which the Debtors have been presented. The Committee has calculated "base"[6] recovery ranges for unsecured creditors at 15.7% under the transaction contemplated in the Initial Sale Motion and at 36% under the Sale.[7] In short, the Debtors have a superior offer in hand.

2.    In addition to reflecting an economically-superior deal, the Sale Documents are, in all respects, in the best interests of the Debtors' estates. The Sale Documents are the product of the Committee's thorough and independent investigation and analysis of the estates' claims and causes of action against the Gindi Parties and, in consultation with the Debtors, the Committee's

---

[5]    The claims that the Gindi Parties hold against the Debtors and the Debtors' estates are worth between approximately $63.2 million, including $1.1 million in so-called "stub" rent, as calculated by the Committee, and $74 million, including $6.5 million in stub rent and other administrative expenses, as calculated by the Gindi Parties. Committee Objection (as defined herein) ¶ 23.

[6]    The "base" recoveries do not take into account any upside sharing of the proceeds of the Insurance Action, which will be greater under the formula proposed by the Sale.

[7]    *See* Committee Objection ¶ 24.

arm's length and good faith negotiations with the Gindi Parties.  The Debtors' for their part, solely

through their independent director, determined that in accordance with their fiduciary duties, the

Debtors should terminate the Participation Agreement dated as of November 23, 2020, of which

the Debtors had previously sought approval in the Initial Sale Motion (the "<u>Initial Agreement</u>"),

and instead enter into the Participation Agreement attached to the Proposed Order as **<u>Exhibit 1</u>**.

3.      The Participant under the Participation Agreement – which is owned by certain of

the Gindi Parties represented by independent counsel – negotiated on an arms' length basis with

the Committee and the Debtors' independent director, ultimately agreeing to enter into the Sale

Documents and consummate the Sale, of which the Debtors now seek approval.

4.      The Debtors believe the Sale and the proceeds thereof will not only allow the

Debtors to satisfy their prepetition secured credit facility (the "<u>ABL Facility</u>") in full, to make

meaningful distributions to general unsecured creditors without having to wait for the conclusion

of the Insurance Action, and to allow general unsecured creditors to receive additional distributions

in the event that the proceeds of the Insurance Action exceed the threshold set forth in the

Participation Agreement, but furthermore to monetize and create certainty with regard to the

estates' claims against the Gindi Parties.

5.      The Debtors have determined that the transactions memorialized in the Sale

Documents, including the settlement, (a) are in the best interests of the Debtors' estates, (b) provide

fair consideration to the Debtors' estates, (c) represent appropriate exercises of the Debtors'

business judgment and fiduciary duties and (d) are, in all respects, reasonable and equitable.

Accordingly, the Debtors respectfully submit the Proposed Order approving the Sale and

settlement and authorizing the Debtors to enter into Sale Documents should be approved.

6.      On December 9, 2020, the Committee filed its *Objection to the Motion of Debtors for an Order Authorizing and Approving [the Initial Sale Motion]* [Dkt. No. 315] (the "Committee Objection"), to which the Committee attached the *Declaration of Richard A. Collura in Support of the Objection of the Official Committee of Unsecured Creditors to the Motion of Debtors for an Order Authorizing and Approving [the Initial Sale Motion]* [Dkt. No. 315-1] (the "Collura Declaration"), and in which the Committee expressed its support for the relief requested in this Motion.

### Debtors' Business and Bankruptcy Cases

7.      On September 10, 2020 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On September 16, 2020, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Committee.  No trustee or examiner has been appointed in these Chapter 11 Cases.

9.      The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Norman R. Veit Jr. Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* (the "First Day Declaration") and the *Memorandum in Support of Debtors' Chapter 11 Petition*, each filed with the Court at Dkt. Nos. 13 and 15, respectively, and incorporated by reference herein.

11.     In support of this Motion, the Debtors submit the *Declaration of Brian M. Cashman* (the "Cashman Declaration"), attached as **Exhibit B** hereto, and incorporated by reference herein.

## Jurisdiction and Venue

12.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

13.     The statutory predicates for the relief requested herein are sections 363, 503, and 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9008, 9014, and 9019(a), Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Sale Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York Pursuant to General Order* M-383 (the "SDNY Sale Guidelines").

## The Insurance Action

14.     As described in greater detail in the First Day Declaration, the Initial Sale Motion and in pleadings filed in the Insurance Action (as defined below), the Debtors were reasonably positioned to weather the effects of the global COVID-19 pandemic as a result of their careful insurance planning.  Debtor Century 21 Department Stores LLC and other non-debtor parties (the "Policyholders") are named insureds under various insurance policies (collectively, the "Insurance Policies") that, in the aggregate, provide for up to $350 million of insurance coverage, including for property damage, business interruption and other situations in which access to the vicinity of the Debtors' stores is restricted.  In exchange for the protection afforded by the Insurance Policies, the Policyholders paid in excess of $1.4 million annually in premiums to their property and

business interruption insurance carriers (collectively, the "Insurers" or "Defendants")[8]. However, despite the Policyholders' repeated requests, with one exception, the Insurers refused to honor their obligations under the Insurance Policies to reimburse the Policyholders for their losses as a result of the COVID-19 pandemic and ensuing government-ordered store closures.

15.     On July 8, 2020, Debtor Century 21 Department Stores LLC and the other Policyholders commenced against the Defendants a suit (the "Insurance Action") in the Supreme Court of the State of New York (the "State Court") (a) alleging breach of the relevant Insurance Policies as a result of the Defendants' failure to compensate the Policyholders for their losses under the Insurance Policies, (b) seeking damages of over $175 million for the period March 2020 through May 31, 2020 and reserving their right to seek additional amounts for subsequent time periods, and (c) seeking consequential damages in an amount to be determined.

16.     On September 11, 2020, the Plaintiffs removed the Insurance Action from State Court to the United States District Court for the Southern District of New York (the "District Court"). Following referral of the Insurance Action from the District Court to this Court, docketed at Adversary Proceeding No. 20-1222 (SCC), on October 16, 2020, the Court entered a *Case Management and Scheduling Order* [Dkt. No. 54] (the "Scheduling Order") in the Insurance Action. The Scheduling Order provides deadlines for: (a) the parties' exchange of written discovery requests, responses, and objections thereto, meet and confer, and production of documents and privilege logs; (b) submission of a protective order; (c) scheduling litigation related

---

[8]     The Insurers are comprised of the following: Starr Surplus Lines Insurance Co., Allianz Global Risks US Insurance Co., Axis Surplus Lines Insurance Co., Liberty Mutual Fire Insurance Co., Steadfast Insurance Co., Endurance American Specialty Insurance Co., Evanston Insurance Co., Landmark American Insurance Co., QBE Specialty Insurance Co., Great American Fidelity Insurance Co., and certain Underwriters at Lloyds subscribing to Policy Nos. PG1902704, PG1902346, PG1902696, PG1902698, PG1902707, PG1902702, and PG1902712.

to the Defendants' remand motion; (d) filing of responsive pleadings and cross-claims, counter-claims and third party claims; and (e) filing motions to compel.

**The Related Party Claims**

17.     The Participant is owned by certain of the Gindi Parties.   The Participant is independently represented by counsel.

18.     Shortly after being retained, the Committee's professionals commenced an independent investigation into claims related to prepetition transactions, including, but not limited to, the 2017 reorganization of the Debtors and its affiliates that resulted in the retail operations and intellectual property being housed exclusively in the Debtors and real estate and other assets being housed exclusively in non-debtors Century 21, Inc. and its affiliates ("2017 Reorganization"), director and officer compensation, related party transactions, and insider transactions.  (Collura Decl. ¶ 10.)

19.     The Committee's investigation included multiple document requests and, over the course of weeks starting in September 2020, review of over 4,000 documents and factual and legal analyses regarding the prepetition transactions, including evaluating the viability of potential claims and causes of action.  (*Id.* ¶ 11–13.)  The claims considered by the Committee include, *inter alia*, actual and/or fraudulent conveyance, breach of fiduciary duty, corporate waste, alter ego, piercing the corporate veil, loan recharacterization, and equitable subordination against certain of the Gindi Parties (the "Related Party Claims"). (*Id.*)

20.     The majority of the Committee's investigation was devoted to potential claims arising out of the 2017 Reorganization and although the Committee asserts that colorable claims against the Gindi Parties exist, so do counterbalancing factors, including: (a) that litigation would not be without risk and would require the expenditure of significant legal and expert fees on issues such as solvency and valuation; (b) potential claims relating to the 2017 Reorganization would be

subject to a fair consideration defense, as the intellectual property transferred to the Debtors in the transaction had potentially significant value, as evidenced by an appraisal conducted at the time; (c) determining whether the Debtors were solvent or insolvent at the time of the 2017 Reorganization will be a question of fact to be determined by this Court, at no small cost to the Debtors' estates; and (d) at all times, the Gindi Parties disputed these potential claims and/or asserted that they had defenses thereto.  Committee Objection ¶ 14–19.

21.     Having thoroughly investigated potential claims and causes of action against the Gindi Parties, and considering the benefits and drawbacks of litigating those claims, including the uncertainty of results, assertion of available defenses, the time it would take to achieve a positive outcome, and the costs to do so, the Committee has determined that the Sale represents an equitable resolution of the potential claims without the risks associated with litigation.  *Id.* ¶ 2.

### The Sale Documents

22.     Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), the Debtors are pursuing hereby a simultaneous sale of the Insurance Action Interest (as defined below), under the terms and conditions set forth in the Participation Agreement, and settlement of the Related Party Claims, under the terms and conditions of the Settlement Agreement.

### A.  Principal Economic Terms of the Sale and Settlement

23.     The principal terms of the Sale and settlement are summarized as follows:

   a.     Price.  $59 million (the "Participation Price"), composed of:

      (i)     $50 million payment at closing of the Participation Agreement; and

      (ii)    $9 million payment by no later than January 31, 2021 (the "Deferred Portion").

   b.     Good Faith Deposit.  $10 million, made by the Participant on December 9, 2020 (the "Deposit").

c.  Proceeds Sharing: 10% of proceeds actually received in excess of $75 million of that portion of the cash gross Proceeds received by any or all Plaintiffs pursuant to a damages award by a court of competent jurisdiction after exhaustion of all appeals (or the time for such appeal having expired), or pursuant to a binding settlement agreement pursuant to the following schedule (the "Proceeds Sharing").

d.  Insurance Action Interest: Subject to the terms and conditions of the Participation Agreement, the Issuer, on behalf of all the Debtors, shall sell to Participant, and Participant shall receive, an undivided one hundred percent (100%) participation interest in the Issuer's or other Debtors' interests in the Proceeds (other than the Infectious Disease Payment (as defined in the Participation Agreement) of the Insurance Action (the "Insurance Action Interest").  The "Proceeds" are any cash, interest, penalties, legal fees, fees, damages, settlements, reimbursements, costs, expenses, sanctions, penalties, monetary award or other amounts or property paid or distributed by, or on behalf of the Insurers at any point in time in satisfaction, settlement or resolution of policy claims (other than the Infectious Disease Payment) to which any one or more of the Plaintiffs (regardless of whether such Plaintiff is a Debtor or not) are entitled.

e.  Free and Clear.  The Insurance Action Interest is to be transferred free and clear of all mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind pursuant to section 363(f) of the Bankruptcy Code.  The Prepetition Agent has agreed that, upon Closing, it will release any liens, claims, and interests it has on the Insurance Action, the Insurance Action Interest, or the Proceeds, with such liens, claims and interests to attach to the Participation Price (and any and all other consideration paid by the Participant in consideration for the Sale of the Insurance Action Interest) received by the Debtors.

## B.  **Other Settlement Terms**

24.  Other principal terms of the Settlement Agreement are as follows:

a.  Security: As security for the Deferred Portion, (i) Raymond Gindi, (ii) Isaac A. Gindi, (iii) Isaac S. Gindi, (iv) Eddie Gindi, and (v) Jack Gindi shall each confess to a judgment in favor of the Committee in the amount of $15 million by executing a Confession of Judgment.

b.  Release by Gindi Parties: The Gindi Parties release the Debtors, the Debtors' estates, and the Committee from any and all claims, including all claims for rent, whether arising prior to, or after the Petition Date.

     c.     <u>Releases by Debtors and Committee</u>: The Debtors and the Committee, on behalf of the Debtors' estates, release each of the Gindi Parties from any and all claims through the date the Order is entered.

     d.     <u>Indemnification</u>: The Debtors and the Committee shall be indemnified and held harmless by the Gindi Parties from and against any and all claims, demands, suits, obligations, costs, damages, losses, claims for sums of money, controversies, judgments, liabilities, rights, actions, and cause of action of any nature, known or unknown, suspected or unsuspected, fixed or contingent in law or equity, arising out of or relating to, asserted against, imposed upon or incurred by the Debtors and/ or the Committee as a result of any breach by any of the Gindi Parties of a representation, warranty and/ or covenant contained in the Settlement Agreement.

     e.     <u>"Fiduciary Out" Clause</u>: Debtors are permitted to terminate the Settlement Agreement if, based upon a determination of their Independent Director in good faith and based upon the advice of their outside counsel, proceeding with the Settlement Agreement would be inconsistent with the Debtors' fiduciary obligations under applicable law.

## C. <u>Independent Review</u>

25.     As stated in the First Day Declaration, the governing board of each of the Debtors (collectively, the "<u>Boards</u>") includes Lawrence Meyer, an independent director (the "<u>Independent Director</u>") appointed in August 2020. Each of the Boards has delegated to Mr. Meyer, as independent director, sole authority to review and approve, reject or negotiate, as the case may be, any transaction in which the Gindi family members or senior management have a conflict.

26.     At the same time as appointing the Independent Director, the Boards appointed Brian Cashman as Chief Restructuring Officer the Debtors. Pursuant to the *Order Approving Application of Debtors, Pursuant to Sections 105 and 363 of the Bankruptcy Code, Authorizing Retention of Berkeley Research Group, LLC to Provide Brian M. Cashman as Chief Restructuring Officer and Certain Additional Personnel for Debtors Effective as of the Petition Date* [Dkt. No. 282] ("<u>BRG Retention</u>"), Mr. Cashman is authorized, among other things, to:

     (a) . . . report to the Board of Directors or, when appropriate with respect to conflict matters delegated to the [I]ndependent [D]irector, to the [I]ndependent [D]irector; (b) In consultation with

> management of the Debtors and subject to the approval of . . . the
> [I]ndependent [D]irector, where applicable . . . develop and
> implement a chosen course of action to preserve asset value and
> maximize recoveries to stakeholders; [and] (c) Oversee the activities
> of the Debtors in consultation with other advisors and the
> management team to effectuate the selected course of action,
> including the disposition of assets as applicable . . . .

27.     As discussed above, the Settlement Agreement was negotiated primarily by the

Committee, which conducted its own investigation and evaluation of the Related Party Claims, on

the one hand, and the Gindi Parties, on the other hand.  The Settlement Agreement reached by the

parties, which includes the Gindi Parties' entry into the Participation Agreement, represents the

"highest, best and most expeditious resolution of the claims the Committee believes the Debtors'

estates hold against the Gindi Parties and, in turn, the most expeditious manner in which to provide

a distribution to creditors."   Settlement Agreement Recitals; *id.* ¶ 1 (incorporating recitals).

Specifically, the Committee notes that the settlement represents a higher and better offer for the

Insurance Action Interest than the Initial Agreement and also allows the estates to benefit from

any potential recovery in the Insurance Action above $75 million.  Committee Objection ¶ 28.  The

potential estate claims against the Gindi Parties have been analyzed by the Committee, an

independent estate fiduciary, and it concluded that the value of the settlement represents a

reasonable resolution of any potential claims that the estates may have against the Gindi Parties,

taking into account litigation risks and costs and the potential value of any such claims.  *Id.*

28.     On December 9, 2020, the Independent Director reviewed the filed Committee

Objection, to which the Sale Documents were attached.  (Cashman Decl. ¶ 12.) On December 10,

2020, the Independent Director heard from the Committee's professionals directly the

Committee's views on the estates' claims against the Gindi Parties.  (*Id.*)  Based on his review of

the Committee's presentation and analysis, discussions with the Debtors' professionals and review

of the Sale Documents, the Independent Director determined that (a) the Sale Documents' terms were better for the estates than those provided under the Initial Agreement, (b) in light thereof, proceeding under the Initial Agreement would be inconsistent with the Debtors' fiduciary obligations under applicable law and (c) the terms therein settling the Related Party Claims were in the best interests of the Debtors' estates.  (*Id.*)  Accordingly, the Independent Director ultimately approved the Debtors' termination of the Initial Agreement and the entry into the Sale Documents.  (*Id.*)

## The Sale Documents Should Be Approved

29.    For the reasons set forth below, the Debtors respectfully submit that the Sale, settlement, and entry into the Sale Documents should be approved.

### A.    The Private Sale of the Insurance Action Interest is Within the Debtors' Sound Business Judgment.

30.    "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a)

31.    A sale of a debtor's property outside the ordinary course of business should be approved by the Court if the debtor can demonstrate a sound business justification for the proposed transaction. *See, e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989); *In re Magnesium Corp. of America*, Case No. 01-14312 (MKV) (Bankr. S.D.N.Y. Aug. 24, 2016), [Dkt. No. 745].  In *In re Magnesium Corp. of America*, the trustee sought to sell a debtor's litigation interest against its owners for their alleged part in looting the company and forcing it into bankruptcy.  The court approved the sale of the litigation interest finding that the sale was in the

"best interests of the Debtors, their creditors and respective estates" and that the trustee had "demonstrated good and sufficient business justification for the sale of the [insurance interest] pursuant to Section 363(b) of the Bankruptcy Code." *Id.* at ¶ 11.

32.     Here, more than adequate business justification exists to pursue the Sale proposed herein.  At present, the Debtors have insufficient funds to repay the ABL Facility, let alone to fund the expected significant litigation costs to be incurred in the Insurance Action, particularly against well-funded adversaries, which are intent on delaying payout under the Insurance Policies and the litigation of the Insurance Action. (Cashman Decl. ¶ 7.)

33.     The Insurers' refusal to honor their obligations under the Insurance Policies forced the Policyholders to commence the Insurance Action and ultimately caused the Debtors to commence the Chapter 11 Cases.  Despite exploring strategic alternatives, the Debtors' lack of liquidity and mounting expenses forced the Debtors to liquidate their assets for the benefit of their creditors. (*Id*. ¶ 5.)

34.     As part of those liquidation efforts, the Debtors have sought to monetize their largest asset, their claim against the Insurers under the Insurance Policies, which the Debtors (and other non-debtor Plaintiffs) are prosecuting in an adversary proceeding pending before this Court. (*Id*. ¶ 6.)  As discussed in the Initial Sale Motion, litigation is inherently fraught with risk.  (*Id*.) Further, the Defendants are well-funded and intend to defend vigorously the Insurance Action, which means prosecuting the Insurance Action likely will be costly and protracted.   (*Id*.) Therefore, the Debtors continue to believe that a sale of the Insurance Action Interest now, which is supported by the Committee and required by the Prepetition Agent under the terms of the Cash Collateral Order (defined herein), is in the best interests of the Debtors' estates in that it (a) maximizes the value of a contingent asset, (b) provides means to satisfy the ABL Facility and other

secured debts in full, (c) provides means to satisfy chapter 11 administrative expenses and priority claims in full and (d) provides an immediate and meaningful distribution to the Debtors' general unsecured creditors, while at the same time preserving their ability – without risk to the Debtors – to receive additional consideration through the Proceeds Sharing if the Proceeds of the Insurance Action exceed a certain threshold.  (*Id.*)

35.    The Committee and the Debtors have determined that the terms of the Sale Documents are superior to the terms of the Initial Agreement and represent the highest or otherwise best offer for the asset.  (*See id.* ¶ 9.)

**B.    The Sale Reflects a Proper Exercise of the Debtors' Fiduciary Duties.**

36.    Should the Court determine that a higher standard of scrutiny is applicable on account that the Participant is owned by insiders of the Debtors – which the Court need not, as the decision to enter into the Sale Documents was solely that of the Independent Director, who has no prior affiliation to the Gindi Parties, and, therefore, the business judgment standard should apply – the Debtors have met that standard.  "'In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.'"  *In re Residential Capital, LLC,* No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (quoting *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).

37.    Here, entry into the Sale Documents is in the best interests of the Debtors' estates, as evidenced by the fact that the Committee negotiated their terms, provides fair consideration to the Debtors' estates and is the product of a process in which the Debtors' fiduciary duties were properly taken into consideration.  A competitive process emerged through the submission of competing offers for the same asset, amounting effectively to a market test.  At the time the Initial

Motion was filed, the Initial Agreement represented the highest or best offer available for the Insurance Action Interest, which the Committee supported. *See* Committee Objection ¶ 1. The Sale Documents reflect a deal better for the Debtors' estates than that proposed in the Initial Agreement. They deliver *at least* $59 million – millions of dollars more than the Initial Agreement – in cash to the Debtors' estates, resolve claims against the Gindi Parties (providing certainty for recovery on those claims), provide the Debtors' estates with releases of all claims – including millions of dollars in unpaid rent and lease rejection damages – and indemnification by the Gindi Parties, and have greater upside potential for the estates in the event that proceeds from the Insurance Action exceed $75 million. (Cashman Decl. ¶ 10.) Notwithstanding that the Debtors' intention to sell the Insurance Action Interest has been public for months, no higher or better offer has materialized despite numerous inbound indications of interest by market players. (*Id.*) Accordingly, the price is fair and the Sale is in the best interests of the Debtors' estates.

38.    The process also has been entirely fair because it has been negotiated and approved exclusively by independent fiduciaries, at arm's length, and in good faith. The Committee independently negotiated the terms of the Sale Documents with the Gindi Parties, each separately represented by counsel. For their part, the Debtors' evaluation of the Sale Documents was done through an independent process in which the Gindi Parties played no part. (*Id*. ¶ 11.) The Independent Director, to whom the sole authority to approve and negotiate the Sale Documents was delegated by each Debtor's board, reviewed and approved, in consultation with the Debtors' advisors, the Debtors' entry into, and the Chief Restructuring Officer's execution of, the Sale Documents. (*Id.*) Accordingly, even a heightened standard of review has been met.

**C.      The Proposed Sale Is Appropriate Pursuant to Bankruptcy Rule 6004(f) and Local Rule 6004-1.**

39.      Courts in this district permit private sales upon showing of a sound business purpose.  *See, e.g.*, *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. July 17, 2019), [Dkt. No. 869]; *In re Frontier Commc'ns Corp.*, Case No. 20-22476 (RDD) (Bankr. S.D.N.Y. Jan. 8, 2019), [Dkt. No. 811]; *In re Firestar Diamond, Inc.*, Case No. 18-10509 (SHL) (Bankr. S.D.N.Y. Dec. 6, 2018), [Dkt. No. 617].

40.      Bankruptcy Rule 6004(f) expressly authorizes a debtor to sell estate property outside of the ordinary course of business by private sale.  A court-approved auction process is not required to prove value under the Bankruptcy Code, Bankruptcy Rules, or Local Rules.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a [public auction] requirement, which does not appear in the Bankruptcy Code or Bankruptcy Rules.").  The SDNY Sale Guidelines state that the Court does not express a preference for public sales over private sales as a means to maximize the sale price.  The SDNY Sale Guidelines simply require an explanation as to why the private sale is likely to maximize the sale price.  SDNY Sale Guidelines at I.A. n. 2.

41.      All creditors and parties in interest will receive adequate notice of the proposed Sale as proposed herein.  Such notice is (a) reasonably calculated to provide timely and adequate notice to the Debtors' creditor constituencies, those parties most interested in these Chapter 11 Cases, the Defendants and others whose interests are potentially implicated by the proposed Sale, (b) sufficient for entry of the Sale Order and (c) satisfies requisite notice conditions for approval of the Sale under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 2002(c).  With respect the notice required in connection with a private sale, Bankruptcy Rule 2002(c)(1) states, in pertinent part, that:

> Subject to Rule 6004, the notice of a proposed use, **sale**, or lease of
> property required by subdivision (a)(2) of this rule shall include …
> the terms and conditions of any **private sale** and the time fixed for
> filing objections. The notice of a proposed …sale… is sufficient if
> it generally describes the property. The notice of a proposed sale or
> lease of personally identifiable information under § 363(b)(1) of the
> Code shall state whether the sale is consistent with any policy
> prohibiting the transfer of the information.

Fed. R. Bankr. P. 2002(c)(1).

42.     Here, the Debtors are contemporaneously requesting a slightly-expedited hearing on the Motion on or before December 28, 2020 to avoid the risk of possible termination. The Committee and Prepetition Agent have imposed upon the Debtors and the Gindi Parties the requirement that the approval and consummation of the Sale occur by December 31, 2020. Consequently, (a) the Sale Documents permit the Committee to terminate if the order approving the Sale Documents does not occur on or before December 31, 2020 (as may be extended based on the Court's availability)[9] and (b) the *Interim Order (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Dkt. No. 32] (the "Cash Collateral Order") entered by this Court in these Chapter 11 Cases requires consummation of the Sale by December 31, 2020, at the insistence of the Prepetition Agent.[10]

43.     Pursuant to the Sale Documents, the closing may occur as early as three business days following approval of the Motion (should the Court grant it). Accordingly a hearing on this Motion is requested on or before December 28, 2020. Otherwise, the Debtors are concerned the

---

[9]     *See* Settlement Agreement ¶ 2(ii).

[10]    The Prepetition Agent consented to the extension of the deadline for consummation of the sale pursuant to paragraph 6(b)(vi) of the Cash Collateral Order, originally set for ninety days after the Petition Date, to December 31, 2020, which was read into the record at the hearing before the Court on December 1, 2020.

Committee may terminate the Sale Documents, potentially risking the evaporation of the benefits of the Sale.

44.      The expedited nature of notice, however, nonetheless will be adequate because the same parties in interest have already been notified of the Initial Motion weeks ago.  On November 23, 2020, the Debtors filed the Initial Motion, and on November 24, 2020, the Debtors filed a *Notice of Hearing* [Dkt. No. 276] on the Initial Motion, setting the hearing for December 16, 2020. As the issues in this Motion with respect to the Sale are substantially similar to the Initial Motion and the asset to be sold is the same, notice parties will already be familiar with the Debtors' general plans regarding the Sale, and will have had the full opportunity to develop a response to the Sale in general.  Parties in interest will have an additional 12 days to formulate a response to the incremental relief requested herein.

45.      The Debtors believe that the private Sale to the Participant maximizes the value that the Debtors' estates can realize from the Insurance Action Interest.  Courts have held that a debtor has broad discretion to determine the manner in which its assets are sold. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).  A private sale to the Participant is in the best interests of the Debtors given the Participation Price offered by the Participant.  The costs of running an auction or pursuing a robust marketing process for the Insurance Action Interest likely would exceed any incremental price increase the Debtors would realize from such process, if at all, particularly where the prospect of the Debtors selling this asset has been in the public record since the first days of these Chapter 11 Cases.

46.      In any event, as discussed above, a competitive process has emerged through the submission of competing offers for the same asset, amounting to effectively market-testing that

asset. The Committee not only supports, but negotiated the primary terms of, the relief requested. Therefore, the Debtors submit that a private sale to the Participant of the Insurance Action Interest on an expedited basis is appropriate under the circumstances.

**D.    The Participant is Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

47.    The Participation Agreement between the Debtors and the Participant was negotiated at arms' length and in good faith and, thus, the Participant is entitled to the protections of section 363(m) of the Bankruptcy Code.  The Second Circuit has indicated that a party would have to show fraud or collusion between the Participant and the Debtors to demonstrate a lack of good faith.  *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, "collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Rock Indus., Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); *In re Bakalis*, at 537.

48.    Here, arms-length negotiations are evidenced by the independent review and approval by the Committee and the Debtors' Independent Director, each of whom are represented by counsel and financial advisors, and the separate representation of the Gindi Parties by their own counsel.

49.    Accordingly, the Debtors request that the Court find that the Participation Agreement is entitled to the protections of section 363(m) of the Bankruptcy Code.

**E.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Claims.**

50.    The Debtors may sell the Insurance Action Interest free and clear of any interest in such property of an entity other than the estates only if, among other things:

> a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> b.    such entity consents;
>
> c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> d.    such interest is in bona fide dispute; or
>
> e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *In re Dewey & Leboeuf LLP*, No. 12-12321 MG, 2012 WL 5386276, at *5 (Bankr. S.D.N.Y. Nov. 1, 2012) (citing *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met)).

51.    To the Debtors' knowledge, there is no entity that can assert a claim to or against the Insurance Action Interest other than the Prepetition Agent, whose consent to the Sale the Debtors have sought and anticipate receiving, and the Prepetition Agent agreed that it will release its liens upon Closing so long as the Proceeds of the Sale (or the Deposit if forfeited if the Sale does not close) are first used to repay the ABL Facility.  Even if some claim other than the claim of the Prepetition Agent were to exist, any such entity could be compelled to accept a money satisfaction of such interest, satisfying section 363(f) of the Bankruptcy Code.

F.      **The Settlement Agreement Satisfies Bankruptcy Rule 9019(a).**

52.      The Debtors have determined, with the approval of the Independent Director, and in consultation with the Debtors' advisors and the Committee that the settlement of the Related Party Claims is reasonable, fair and equitable, and in the best interests of the Debtors' estates. Accordingly, the Settlement Agreement should be approved under Bankruptcy Rule 9019(a).

53.      Settlements are favored in Bankruptcy "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994), 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

54.      Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Accordingly, the Court is authorized to approve the proposed settlement between the parties on the terms set forth in the Settlement Agreement.

55.      In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable, reasonable, and in the best interests of the debtor's estates and creditors. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). A decision to approve a particular compromise or settlement is within the sound discretion of the bankruptcy court. *Drexel Burnham*, 134 B.R. at

505. It is appropriate for the court to consider the opinions of the debtor in possession that a settlement is fair and equitable. *Shugrue*, 165 B.R. at 122.

56.     In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits).  "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

57.     Relying on the guiding language of *TMT Trailer Ferry*, courts in this Circuit have set forth the following factors to be considered in evaluating the reasonableness of settlement:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*In re K.G. IM, LLC,* 620 B.R. 469, 483–84 (Bankr. S.D.N.Y. 2020) (quoting *Iridium*, 478 F.3d at 462).

58.     In this case, weighing the reasonableness factors for purposes of Bankruptcy Rule
9019, the Debtors, acting through their Independent Director, Chief Restructuring Officer, and
their advisors, and with the support of the Committee, have concluded that the settlement is in the
best interests of the Debtors' estates and, thus, should be approved. (*See* Cashman Decl. ¶ 13.)

59.     ***First***, the proposed settlement, once effective, will result in the near-immediate (as
soon as three business days after Court approval) transfer to the Debtors of $50 million in cash and
another $9 million in cash roughly thirty days later.  The Debtors cannot be certain, on the other
hand, of the outcome of litigation and the settlement mitigates that uncertainty.

60.     The Committee has thoroughly investigated the Related Party Claims.   The
Committee's investigation included review of over 4,000 documents, and assessing claims of, *inter
alia*, actual and/or fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary
duty, corporate waste, alter ego, piercing the corporate veil, loan recharacterization, and equitable
subordination against certain of the Gindi Parties.

61.     As discussed in detail above, the Committee's investigation of the 2017
Reorganization involved analyzing a number of transactions.  While the Committee's investigation
found that potential claims relating to the 2017 Reorganization existed, so did several drawbacks,
chief amount them:  uncertainty of results, potential defenses, the time it would take to achieve a
positive outcome, and the costs to do so.  Committee Objection ¶ 19.  Weighing the potential
benefits to the Debtors' estates of litigating claims and the potential risks, the Committee
concluded – and the Debtors agree – that the settlement represents an equitable resolution of the
estates' and the Gindi Parties' claims, without the risks associated with litigation, and a
meaningfully higher distribution to unsecured creditors.  On balance, the benefits of settlement
outweigh the prospective benefits of uncertain litigation.

62.     *Second*, the Committee conducted a thorough investigation and analyzed each of the potential claims, noting that litigation would involve a complex myriad of issues that would require the engagement of multiple experts on topics such as solvency, valuation, and damages. Committee Objection ¶ 32.  Given the potential of appeals, as well as the uncertainties inherent in any litigation, the Debtors cannot be certain of their ability to collect (or when they would collect) on any judgment awarded against the Gindi Parties.  By fully and finally resolving the Related Party Claims, the settlement eliminates the not inconsiderable risk of loss (or, at the very least, delay) associated with continued litigation of those disputes and, rather, monetizes claims and provides the Debtors' estates with a significant infusion of cash now.

63.     *Third*, the Committee's role in negotiating the settlement and its affirmative support therefor speaks volumes with respect to the paramount interests of creditors.

64.     *Fourth*, the proposed settlement is also expected to be supported by the Prepetition Agent, on the conditions set forth in the Proposed Order, because it will permit the Debtors to repay the ABL Facility and ultimately result in sufficient excess proceeds to provide for a meaningful distribution to unsecured creditors under the Debtors' chapter 11 plan of liquidation.

65.     *Fifth*, the Parties are represented by sophisticated and experienced professionals – highly regarded law firms and financial advisors with significant restructuring, litigation, and other relevant experience. The Committee's professionals understand the difficulties of successfully prosecuting a litigation of this size and complexity and, indeed, have been analyzing, discussing, and negotiating these issues with the Gindi Parties and their professionals.  The Debtors' professionals, for their part, have independently reviewed potential estate causes of action. Accordingly, the Debtors' professionals fully understand the potential consequences to creditors

of the estates if the Sale Documents are not consummated and ultimately recommended that the Debtors enter into the Sale Documents.

66.     **Sixth**, the releases are appropriate.  The Committee has thoroughly evaluated the scope of claims that may be asserted by the Debtors' estates through their review of 4,000 documents and determined that the release of such claims is appropriate, reasonable and in the best interests of the Debtors' estates, given the consideration that will inure to the benefit of the estates on account of the transactions proposed for approval herein.  Furthermore, the releases are mutual and, in addition, the Gindi Parties have granted indemnification to the Debtors.

67.     **Finally**, the Sale Documents are the product of arm's length negotiations between the Committee, the Debtors, and the Participant and Gindi Parties, as well as the reasoned judgment of the Independent Director and Chief Restructuring Officer, and are expected to be supported by the Prepetition Agent.

68.     Accordingly, the Debtors submit that the settlement and compromise embodied in the Settlement Agreement is reasonable in light of the relevant factors, is in the best interests of the Debtors' estates, is fair and equitable, and should be approved.

## <u>Notice</u>

69.     The Debtors will serve copies of this Motion, the Sale Documents, the proposed Sale Order and all exhibits:  (a) by email upon all entities known to have expressed an interest in a transaction with respect to the Insurance Action at any time since the Petition Date; and (b) by first class mail, postage prepaid, upon (i) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Insurance Action Interest; (ii) the United States Trustee for Region 2; (iii) counsel to the Committee, Jeffrey Cohen (JCohen@lowenstein.com) and Brent Weisenberg (BWeisenberg@lowenstein.com); (iv) the United States Attorney's Office for the Southern District of New York; (v) counsel to the Prepetition Agent, Julia Frost-Davies

(julia.frost-davies@morganlewis.com) and David Riley (david.riley@morganlewis.com); (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (vii) counsel to the Defendants.

70.     The Debtors submit that such notice, together with the other notice described herein, is good, adequate, sufficient and proper notice to interested parties.  Accordingly, the Debtors request that the Court find that notice in this manner is sufficient and that no further notice is required.

### Modification of Time for Notice and Effectiveness
### Under Bankruptcy Rules 6004(a) and 6004(h)

71.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

72.     Under Bankruptcy Rule 2002(a)(2), the Court may shorten the time required for notice of a proposed use, sale, or lease of property of the estate other than in the ordinary course of business.  As explained above, the Debtors request an expedited hearing to consider the Motion to be set for the week of December 28, 2020, to avoid the risk of a termination of the Sale Documents, which can occur if the order approving the Sale does not occur on or before December 31, 2020 (as will be extended based on the Court's availability), and in order to comply with the Cash Collateral Order.[11]  The expedited nature of notice, however, nonetheless will be adequate because the same parties in interest have already been notified of a proposed Sale of the same asset weeks ago by virtue of the Initial Motion.  As the issues in this Motion with respect to the Sale are

---

[11] The Participant has agreed that the closing will take place on or before December 31, 2020, notwithstanding anything to the contrary in the Sale Documents.

substantially similar to the Initial Motion and the assets to be sold are the same, notice parties will already be familiar with the Debtors' plans regarding the Sale, and will have had the full opportunity to develop a response to the Sale.  Parties in interest will have an additional 12 days to formulate a response to the incremental relief requested herein.

73.      The Debtors also respectfully request the stay imposed by Bankruptcy Rule 6004(h) be waived so that the closing of the Sale and the Gindi Parties' obligation to pay $50 million in cash to the Debtors' estates – a condition precedent to which is the entry of an order approving the Sale – can promptly occur.  *See* Participation Agreement ¶ 10(a)(vi).

74.      Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **No Prior Request**

75.      No prior request for the relief requested herein has been made to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

## **Conclusion**

WHEREFORE, the Debtors respectfully request this Court enter the Order, and grant such

other and further relief as may be just and proper.

Dated: December 11, 2020
      New York, New York

Respectfully submitted,

/s/ *Lucy F. Kweskin*

Lucy F. Kweskin
Matthew A. Skrzynski
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email: lkweskin@proskauer.com
Email: mskrzynski@proskauer.com

-and-

Jeff J. Marwil (admitted *pro hac vice*)
Jordan E. Sazant (admitted *pro hac vice*)
Brooke H. Blackwell (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Email: jmarwil@proskauer.com
Email: jsazant@proskauer.com
Email: bblackwell@proskauer.com

-and-

Peter J. Young (admitted *pro hac vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 557-2900
Facsimile: (310) 577-2193
Email: pyoung@proskauer.com
*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | **Chapter 11** |
| **CENTURY 21 DEPARTMENT STORES LLC,** *et al.*, | **Case No. 20-12097 (SCC)** |
| Debtors.[1] | **(Jointly Administered)** |

## ORDER AUTHORIZING AND APPROVING (A) SALE OF INSURANCE ACTION INTEREST FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (B) SETTLEMENT WITH GINDI PARTIES

Upon the motion [Docket No. [●]] (the "Motion") of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") for the entry of an order (this "Order") pursuant to sections 105(a), 363 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9008, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the *Sale Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York Pursuant to General Order* M-383 (the "SDNY Sale Guidelines"):

(i)     approving the private sale (the "Sale") of a participation interest in the Proceeds that now exist or may arise on account of the Insurance Action (the "Insurance Action Interest") to the Participant, pursuant to that certain Participation Agreement dated as of December 10, 2020 by and between C21 Department Stores LLC, on behalf of itself and all of the other Debtors (in such capacity, the "Issuer"), and C21 Blue Insurance LLC, a Delaware limited liability company ("Participant") (attached hereto as **Exhibit 1**, and as amended from time to time, including all schedules, exhibits, and ancillary documents, the "Participation Agreement"), free and clear of all liens, claims, and encumbrances, to the fullest extent permitted by law;

---

[1]     The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033). The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

(ii)    approving the Global Settlement Agreement, dated as of December 10, 2020, by and among (i) Century 21 Department Stores LLC and its affiliated debtors in possession, (ii) the Committee of Unsecured Creditors (the "Committee") of the Debtors and (iii) (a) Raymond Gindi, (b) Isaac A. Gindi, (c) Isaac S. Gindi, (d) Eddie Gindi, (e) Jack Gindi, (f) I.G. Gindi 2009 Generational Trust, (g) Raymond Gindi 2012 Generational Trust, (h) Eddie Gindi Generational Trust, (i) Isaac S. Gindi 2010 Gift Trust, (j) 10-12 Cortlandt Blue LLC, (k) 173 Bway Blue LLC, (l) 175-177 Bway Blue LLC, (m) Blue Millennium Realty LLC, (n) C21 BK Home LLC, (o) Strike Enterprises LLC, (p) 86 Blue LLC, (q) C21 Bay Ridge Blue LLC, (r) CCC Partners, (s) ASG Equities Secaucus LLC, (t) C21 SDC Blue LLC, (u) Secaucus Blue LLC, (v) ADC Blue LLC, (w) Century Rego Realty and (x) C21 Property Management Partners (collectively, the "Gindi Parties"), (attached hereto as Exhibit 2, and as amended from time to time, including all schedules, exhibits, and ancillary documents, the "Settlement Agreement" and, together with the Participation Agreement and each of the respective exhibits and ancillary documents, the "Sale Documents");[2] and

(iii)    granting certain related relief;

and the Court having held a hearing to approve the Sale Documents on [_____], 2020, at which time all interested parties were offered an opportunity to be heard with respect to the Motion (the "Sale Hearing"); and the Court having reviewed and considered the Motion, the Declaration of Brian Cashman filed in support of the Motion, any objections to the Motion, and any replies in further support of the Motion; and upon the record of the Sale Hearing; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue of these cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having entered an *Order Shortening Notice with Respect to* the Motion [Dkt. No. [  ]] finding that cause existed to schedule the Sale Hearing and the deadlines for responsive pleadings as ordered therein; and due and sufficient notice having been given; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Motion or the Settlement Agreement, as applicable.

best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor; it is hereby

**FOUND AND DETERMINED THAT**:

A.    **Legal Predicates.**  The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 503 of the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004, 9008, 9014 and 9019, and the SDNY Sale Guidelines.  The consummation of the transactions contemplated by the Motion, this Order, and the Sale Documents is legal, valid, and properly authorized under all such provisions of the Bankruptcy Code, the Bankruptcy Rules and the SDNY Sale Guidelines.

B.    **Notice.**  As evidenced by the affidavits of service filed with the Court and all the proceedings before the Court, proper, timely, adequate, and sufficient notice of the Motion, the Sale, the Sale Documents, the Sale Hearing, all transactions contemplated therein or in connection therewith, and all deadlines related thereto, has been provided to all interested persons and entities and in accordance with the Bankruptcy Code, the Bankruptcy Rules and the SDNY Sale Guidelines.  The aforementioned notices are good, sufficient, and appropriate under the circumstances, and no other or further notice of any of the foregoing is required for entry of this Order.  All interested persons and entities have been provided a reasonable opportunity to object or be heard regarding the relief requested in the Motion, and [no objections have been filed or heard] [all objections have been rejected or overruled for the reasons stated on the record].

C.    **Business Justification.**  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for entering into the Participation Agreement, which provides for the private sale of the Insurance Action Interest to the Participant.  The Debtors have, among other things, determined in their business judgment that,

under current circumstances, the benefits of consummating a prompt private sale of the Insurance

Action Interest on the terms and conditions embodied in the Participation Agreement outweigh

any potential benefits of conducting a further marketing and overbid process for the Insurance

Action Interest.   In light of the circumstances of these cases, time is of the essence in

(i) consummating the Sale and all related transactions, and (ii) maximizing the value of the

Insurance Action Interest and the Proceeds.

       **D.**    **Fair Price and Fair Process.**  The Sale achieved a fair price and employed a fair

process that properly accounted for fiduciary duties and is in the best interest of the Debtors'

estates.

       **E.**    **Settlement.**   The settlement of claims under the Settlement Agreement is

reasonable, fair and equitable and satisfies the requirements of Bankruptcy Rule 9019(a).

       **F.**    **Sale in Best Interests.**  Approval of the Sale Documents, the Sale, and all related

transactions at this time, and the actions to be taken by the Debtors and the Participant, are

appropriate under the circumstances of these cases and are in the best interests of the Debtors, their

estates and creditors, and all other parties in interest.   The Debtors have demonstrated good,

sufficient and sound business reasons and justifications for entry into the Sale and the performance

of their obligations under the Participation Agreement.

       **G.**    **Good Faith Purchaser.**  The Sale and the transactions contemplated by the Sale

Documents are undertaken by the Participant without collusion, at arm's length and in good faith,

within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or

modification on appeal of the authorization provided herein to consummate the Sale shall not affect

the validity of the Sale, unless such authorization and consummation of the Sale are duly and

properly stayed pending such appeal.   The Participant will be acting in good faith within the

meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Sale Documents and is a good faith purchaser for value within the meaning of section 363(m) of the Bankruptcy Code.  As such, the Participant is entitled to all of the protections and immunities afforded under section 363(m) of the Bankruptcy Code.  There has been no showing that the Debtors or the Participant engaged in any action or inaction that would cause or permit the transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

H.    **Corporate Authority.**  The Issuer, on behalf of itself and all of the other Debtors: (i) has full corporate power and authority to execute the Participation Agreement and all other documents contemplated thereby; (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Participation Agreement; (iii) has taken all corporate action necessary to authorize and approve the Participation Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (iv) needs no consents or approvals, other than those expressly provided for in the Participation Agreement, which may be waived in accordance with the terms therewith.  The Sale of the Insurance Action Interest has been duly and validly authorized by all necessary corporate action of the Debtors.

I.    **Free and Clear Findings Required by the Participant.**  The Debtors would not have entered into the Participation Agreement and would not consummate the Sale if the sale of the Insurance Action Interest to the Participant was not, pursuant to section 363(f) of the Bankruptcy Code, free and clear, to the extent permitted by law, of (i) all liens (statutory or otherwise), mortgages, pledges, security interests, charges, and other encumbrances (collectively, the "**Liens**"), and (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), obligations, rights of setoff, demands,

restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or

any other person prior to the Closing Date (collectively, the "**Claims**").  To the fullest extent

permitted by law, the Sale shall be free and clear of, and the Participant shall not be responsible

for, any Liens or Claims.  Upon Closing of the Sale, all Liens and Claims of the Prepetition

Agent and Prepetition Lenders shall attach to the Participation Price (and any and all other

consideration paid by the Participant in consideration for the Sale of the Insurance Action

Interest) with the same validity, seniority, and priority as those Liens and Claims had against the

Insurance Action Interest.

      **J.**      **No Fraudulent Transfer.**  The Participation Agreement was not entered into with

the intent of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the

laws of the United States, any state, territory, possession or the District of Columbia or the laws

of any foreign jurisdiction.  The consideration provided by the Participant for the Insurance Action

Interest pursuant to the Participation Agreement (i) is fair and reasonable; (ii) is the highest and

best offer for the Insurance Action Interest; (iii) will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative; and (iv) constitutes

reasonably equivalent value and fair consideration for the Insurance Action Interest.

      **K.**      **Binding and Valid Transfer.**  The Sale of the Insurance Action Interest  to the

Participant will be a legal, valid, and effective transfer of the Insurance Action Interest, and will

vest the Participant with all right, title, and interest of the Debtors to the Insurance Action

Interest and, subject to the Debtors' right under the Participation Agreement to the Proceeds

Sharing, the beneficial interest in the Proceeds free and clear, to the fullest extent permitted by

law, of all Liens and Claims, as set forth in the Participation Agreement (with all such Liens and

Claims attaching to the Participation Price and any and all other consideration paid by the

Participant in consideration for the Sale of the Insurance Action Interest).  Immediately prior to consummating the Sale, the Insurance Action Interest, the Proceeds and the other Policy Claim Rights constitute property of the Debtors' estates, good title was vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code, and the Debtors were the sole and rightful owner of the Insurance Action Interest, the Proceeds and the other Policy Claim Rights. Upon payment of the Participation Price and following the consummation of the Sale, the Participant shall be vested with good and marketable title to the Insurance Action Interest and shall be the sole and rightful owners of the Insurance Action Interest and, subject to the Proceeds Sharing, any and all Proceeds held or received by the Debtors shall constitute property of the Participant to which the Participant has an absolute right, and the Debtors shall not have any equitable or beneficial interest in such Proceeds (other than any amounts in respect of the Proceeds Sharing, if any) after the Closing, and such Proceeds (other than any amounts in respect of the Proceeds Sharing, if any) shall not be deemed to be property of the Debtors' estates pursuant to section 541(d) of the Bankruptcy Code.

L.    **Satisfaction of 363(f) Standards.**  The Debtors may sell the Insurance Action Interest, to the fullest extent permitted by law, free and clear of all Liens and Claims because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  The Prepetition Agent and Prepetition Lenders, who hold senior, valid, and prior Liens and Claims against the Insurance Action Interest, have consented to the Sale upon the conditions that (a) those Liens and Claims attach upon the Sale to the Participation Price (and any and all other consideration paid by the Participant in consideration for the Sale of the Insurance Action Interest, including, without limitation, the Deposit if forfeited) with the same validity, extent, and priority as they had against the Insurance Action Interest immediately prior to

consummation of the Sale and (b) that the Participation Price (and any and all other consideration paid by the Participant in consideration for the Sale of the Insurance Action Interest) be used first to indefeasibly pay in full, in cash, the secured obligations of the Prepetition Agent and Prepetition Lenders. Any other holders of Liens or Claims, who did not object, or who withdrew their objections, or whose objections were overruled, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. In all cases, subject to and conditioned upon the Closing and the payment by the Participant of the Participation Price, each such person with a Lien or Claim against the Insurance Action Interest, the Proceeds or other Policy Claim Rights is enjoined from taking any action against the Participant, the Participant's affiliates, or any agent of the foregoing to recover any such Lien or Claim.

M.    **Necessity of Order.**    The Participant would not have entered into the Participation Agreement and would not consummate the transactions without all of the relief provided for in this Order. The consummation of the transactions pursuant to this Order and the Participation Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of the Debtors, their estates and creditors, and all other parties in interest.

N.    **Final Order.**    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

O.      **Legal and Factual Bases.**  The legal and factual bases set forth in the Motion and

at the Sale Hearing establish just cause for the relief granted herein and entry of this Order is in

the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      **Motion is Granted.**  The Motion is granted as set forth herein.

2.      **Objections Overruled.**  Any objections to the entry of this Order or to the relief

granted herein or the relief requested in the Motion (as may be modified herein), that have not

been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any,

are hereby denied and overruled on the merits with prejudice.

3.      **Approval.**  The Sale Documents, and all the terms and conditions thereof, are

approved.  Pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule

9019(a), the Issuer and the other Debtors are authorized to perform their obligations under, and

comply with the terms of, the Sale Documents and consummate the Sale and the related

transactions pursuant to, and in accordance with, the terms and conditions of the Sale Documents

and this Order.  The Issuer, on behalf of itself and all of the other Debtors, is authorized to execute

and deliver, and empowered to perform under, consummate, and implement, the Sale Documents,

together with all additional instruments and documents that are necessary or appropriate to

implement the Sale Documents and effectuate the transactions contemplated therein, and to take

all further actions as may reasonably be required by the Participant for the purpose of transferring,

granting, conveying, and conferring to the Participant or reducing to Participant's possession the

Insurance Action Interest or as may be necessary or appropriate to the performance of the

obligations as contemplated by the Sale Documents.

4.      **Binding Effect of Order.**  This Order and the Sale Documents shall be binding in all respects upon all creditors of, and holders of equity security interests in, any Debtor (including any holders of Liens or Claims), all counterparties to the Policies, the Participant, all successors and assigns of the Participant, each Debtor and its affiliates and subsidiaries, and any trustees appointed in the Debtors' cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code.  This Order and the Sale Documents shall not be subject to rejection.  Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Sale Documents or this Order.

5.      **General Assignment.**  On and after the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Insurance Action Interest and a bill of sale transferring good and marketable title in the Insurance Action Interest to the Participant free and clear (to the extent permitted by law) of all Liens and Claims, *provided that* all Liens and Claims shall attach to the Participation Price (and any and all other consideration paid by the Participant in consideration for the Sale of the Insurance Action Interest) with the same validity, extent, and priority as they had against the Insurance Action Interest immediately prior to consummation of the Sale.  On and after the Closing Date, the Debtors shall hold all Proceeds (other than any amounts in respect of the Proceeds Sharing, if any) in trust for the benefit of the Participant and any Proceeds (other than any amounts in respect of the Proceeds Sharing, if any) held or received by the Debtors shall constitute property of Participant to which Participant has an absolute right, and the Debtors shall not have any equitable or beneficial interest in such Proceeds after the Closing, and such Proceeds shall not be deemed to be property of the Debtors' estates pursuant to section 541(d) of the Bankruptcy Code.

6.      **Transfer Free and Clear.**    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon payment of the Participation Price and Closing of the Sale, the Insurance Action Interest shall be transferred to the Participant as required under the Sale Documents, and such transfer shall be, to the fullest extent permitted by law, free and clear of all Liens or Claims of any Person.  Upon Closing of the Sale and payment by the Participant of the Participation Price, the Liens and Claims of the Prepetition Agent and Prepetition Lenders against the Insurance Action Interest shall attach to the Participation Price to the same extent and with the same validity, seniority, and priority as such Liens and Claims had immediately prior to the Closing of the Sale.

7.      **Application of Proceeds of the Sale**.  The Participation Price (and any and all other consideration paid by the Participant in consideration for the Sale of the Insurance Action Interest) shall be used to pay, indefeasibly in full in cash, the secured obligations of the Prepetition Agent and Prepetition Lenders secured by (among other things) the Insurance Action Interest.

8.      **Application of the Deposit**.  If the Closing of the Sale does not occur and the Debtors retain the Deposit pursuant to the Sale Documents, the Deposit shall be used to pay, indefeasibly in full in cash, the secured obligations of the Prepetition Agent and Prepetition Lenders secured by (among other things) the Insurance Action Interest.

9.      **Valid Transfer.**    The transfer of the Insurance Action Interest to the Participant pursuant to the Sale Documents constitutes a legal, valid, and effective transfer of the Insurance Action Interest in the Proceeds and shall vest the Participant with all right, title, and interest of the Debtors in and to the Insurance Action Interest and, subject to the Proceeds Sharing, the beneficial interest in the Proceeds free and clear to the fullest extent permitted by law of all Liens or Claims.

10.     **Direction to Release Interests.**    Upon payment of the Participation Price and the occurrence of the Closing Date, each of the Debtors' creditors and any other holder of a Lien or

Claim shall be deemed to have released its Lien or Claim in the Insurance Action Interest and/or the Proceeds, if any, as such Lien or Claim may have been recorded or may otherwise exist, with all such Liens and Claims attaching to the Participation Price and any and all other consideration paid by the Participant in connection with the Sale. If any person or entity that has filed financing statements, mortgages, mechanics' liens, *lis pendens*, or other documents or agreements evidencing a Lien or Claim in the Insurance Action Interest and/or the Proceeds shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens or Claims that the person or entity has or may assert with respect to any of the Insurance Action Interest and/or the Proceeds, (i) the Debtors and/or the Participant are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Insurance Action Interest or the Proceeds, and (ii) the Participant is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens or Claims in the Insurance Action Interest and/or the Proceeds.

11.    **Fair Consideration.**    The consideration provided by the Participant for the Insurance Action Interest under the Sale Documents shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Sale may not be avoided under section 363(n) of the Bankruptcy Code. The Sale Documents were not entered into, and the Sale is not being consummated, with the intent of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any

state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors, nor the Participant has entered into the Sale Documents or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose.  No other person or entity or group of persons or entities has offered to purchase the Insurance Action Interest for an amount that would provide greater value to the Debtors and their estates than the Participant.  The Court's approval of the Motion and the Sale Documents is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

12.    **Good Faith Purchaser.**  The transactions contemplated by the Sale Documents are undertaken by the Participant in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale shall not affect the validity of the sale of the Insurance Action Interest to the Participant.  The Participant is a purchaser in good faith of the Insurance Action Interest, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  As a good faith purchaser of the Insurance Action Interest, the Participant has not entered into an agreement with any potential bidders, and has not colluded with any potential bidders or any other parties interested in the Insurance Action Interest and the Proceeds, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Participant on any such grounds, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

13.    **Failure to Specify Provisions.**  The failure to specifically include any particular provisions of the Sale Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Documents be authorized and approved in its entirety.

13

14.     **Amendment.**  The Sale Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, *provided that* any such modifications, amendments, or supplements are not inconsistent with this Order.

15.     **No Stay or Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Participant are authorized to close the transactions immediately upon entry of this Order and have agreed to do so.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Participant intend to close the transactions as soon as practicable, no later than December 31, 2020.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

16.     **Appointment of Trustee or Dismissal.**  The provisions of the Sale Documents and this Order may be specifically enforced in accordance with the Sale Documents notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing Date or dismissal of the Chapter 11 Cases after the Closing Date.

17.     **Time Calculations.**  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

18.     **Provisions Nonseverable.**  The provisions of this Order are nonseverable and mutually dependent.

19.     **Retention of Jurisdiction.**  This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Sale Documents, all amendments thereto, any waivers and consents thereunder, and of each of the

agreements executed in connection therewith in all respects, and to adjudicate, if necessary, all disputes concerning or relating in any way to the Sale.

20.     **Inconsistencies with Prior Orders, Pleadings or Agreements.**  To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Documents, the terms of this Order shall govern and control.

Dated: _____, 2020
New York, New York

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 (to Order)**

**Participation Agreement**

**EXECUTION VERSION**
**CONFIDENTIAL**

# PARTICIPATION AGREEMENT

This PARTICIPATION AGREEMENT (this "Agreement") is dated as of December 10, 2020 by and between Century 21 Department Stores LLC, a New York limited liability company, on behalf of itself and all of the other Debtors (as defined below) ("Issuer"), and C21 Blue Insurance LLC, a Delaware limited liability company ("Participant"). Issuer and Participant are referred to herein collectively as the "Parties" and individually as a "Party".

## RECITALS

A. On September 10, 2020, Issuer and the other Debtors filed petitions commencing voluntary cases jointly administered as Case No. 20-12097 (SCC) (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

B. Issuer and each of the other Plaintiffs has in place policies of insurance or risk transfer contracts (issued by commercial, captive or industry-specific insurers or reinsurers) providing coverage to the insured thereunder for certain damages or losses suffered by Issuer or the other Debtors, set forth on Schedule 1.1-P (the "Policies") and in respect of which the Plaintiffs have and may assert or seek indemnity for certain Policy Claims (as defined below);

C. On July 8, 2020, the Plaintiffs filed in the Supreme Court of the State of New York a suit, captioned *Century 21 Department Stores, LLC* v. *Starr Surplus Lines Insurance Co*., 652975/2020) (the "Litigation"), against the Insurers (as defined below) (a) alleging breach of the relevant Policies as a result of the Insurers' failure to compensate Plaintiffs for their losses under the Policies and (b) seeking damages of over $175 million for the period March 2020 through May 31, 2020 and reserving their right to seek additional amounts for later time periods, as their losses mount. On or around September 10, 2020, the Litigation was removed to the United States District Court for the Southern District of New York and then to the Bankruptcy Court and as of the date hereof is pending in the Bankruptcy Court at Adv. Pro. No. 20-1222 (SCC).

D. Any cash, interest, penalties, legal fees, fees, damages, settlements, reimbursements, costs, expenses, sanctions, penalties, monetary award or other amounts or property paid or distributed by, or on behalf of the Insurers at any point in time in satisfaction, settlement or resolution of Policy Claims (other than the Infectious Disease Payment (as defined below)) are proceeds to which any one or more of the Plaintiffs (regardless of whether such Plaintiff is a Debtor or not) are entitled (the "Proceeds");

E. Issuer, on behalf of all the Debtors, desires to sell to Participant an undivided one hundred percent (100%) participation interest in the Issuer's and other Debtors' interests in the Proceeds that now exist or may hereafter arise in exchange for the Participation Price (as defined below) on the terms and conditions herein set forth; and

F. The Parties desire to cooperate for the purpose of recovering Proceeds (whether by settlement, litigation or otherwise) pursuant to the terms, and in the manner, set forth in this Agreement.

CONFIDENTIAL

G. Contemporaneously herewith, the Parties, the Committee of Unsecured Creditors, and certain affiliates of the Debtors, Plaintiffs and/or Participant are entering into the Global Settlement Agreement (the "Settlement Agreement").

AGREEMENT

In consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    Interpretation.  Certain capitalized terms are used in this Agreement with the specific meanings set forth in Appendix A.

2.    Participation.

(a)    Subject to the terms and conditions of this Agreement, at the Closing, (i) Issuer, on behalf of all the Debtors, shall sell to Participant, and Participant shall receive, an undivided one hundred percent (100%) participation interest in the Issuer's or other Debtors' interests in the Proceeds (other than the Infectious Disease Payment) that now exist (including, for the avoidance of doubt, any Proceeds that have been received by the Issuer or other Debtors (other than the Infectious Disease Payment) prior to the date of this Agreement or may hereafter arise (the "Participation") (which Participation for the avoidance of doubt will not be an assignment of the Policies or Policy Claims) and (ii) Participant shall pay the Participation Price for the Participation. The Participation shall not include any interests held by the Issuer or other Debtors (x) related to insurance policies other than the Policies, (y) for amounts recovered or recoverable other than the Proceeds, or (z) under or in connection with the Policies for claims other than Policy Claims.  For avoidance of doubt, the Participation shall not include those claims of any non-Debtor Plaintiffs.

(b)    The conveyance of the Participation and the consummation of the transactions contemplated under this Agreement (the "Closing", and the date on which the Closing occurs, the "Closing Date") shall take place at the offices of Klestadt Winters Jureller Southard & Stevens LLP, 200 West 41st Street, 17th Floor, New York, New York 10036 (which may take place via the electronic exchange of documents and signature pages) three (3) Business Days following the satisfaction or waiver of each of the conditions set forth in Section 10 (except for such conditions that by their nature will be satisfied at the Closing, but subject to the fulfillment or waiver of such conditions), or at such other time and place or via such other method as may be agreed to by the Parties.  At the Closing, Participant shall deliver or cause to be delivered an amount in cash equal to $50,000,000 plus a promissory note in the amount of $9,000,000 payable on or before January 31, 2021 (the "Participation Price") by wire transfer of immediately available funds to Issuer's account set forth on Schedule 11(g).  Issuer agrees that Participant shall have no responsibility for, and incur no liability with respect to, the allocation of the Participation Price among the Issuer and the other Debtors.  For the avoidance of doubt, the Participation Price shall not be reduced by and the Proceeds shall not include the $3,834,000 that Issuer has received prior to the date hereof in respect of the $5,000,000 sub-limited Murder, Suicide and Infectious Disease Endorsement to the Policies (the "Infectious Disease Payment").

2

CONFIDENTIAL

(c)     Upon execution of this Agreement, Participant shall deliver to Issuer a good faith deposit of $10.0 million in cash (the "Deposit") to be held by Issuer in escrow pending the Closing. The Deposit shall be retained by Issuer at the Closing (and deducted from the Purchase Price due and payable at the Closing).  If the Agreement is terminated pursuant to Section 11(c)(v), the Deposit (including, for the avoidance of doubt, all interests and other earnings accrued and earned thereon) shall be retained by Issuer as damages specifically.  If the Agreement is terminated pursuant to any other provision of Section 11(c), the Deposit shall be returned to Participant.

3.     Payments of Proceeds.

(a)     Issuer and the other Debtors, as applicable, shall direct the Person issuing each Policy to deposit any Proceeds under such Policy due and owing or otherwise payable to Issuer or the other Debtors into the account of Participant set forth on Schedule 11(g) specified by Participant to Issuer hereafter by notice in writing (the "Account").

(b)     If at any time after the date hereof, Issuer or the other Debtors holds funds that constitute Proceeds, Issuer or the other Debtors shall hold such funds in trust, and after the Closing, except as set forth in section 7(b) hereof, such Proceeds shall constitute property of Participant to which Participant has an absolute right, and Issuer shall not have any equitable or beneficial interest in such Proceeds after the Closing, and such Proceeds shall not be deemed to be property of Issuer's estate under Bankruptcy Code section 541(d).  Except as set forth in section 7(b) hereof, following the Closing, Issuer and the other Debtors shall hold such Proceeds in trust and will, at its own expense, deliver to Participant, any such Proceeds to the Account, free of any recoupment or setoff or other Encumbrance or reduction, together with any endorsements or documents necessary to transfer such Proceeds to Participant within three (3) Business Days of receipt of such Proceeds.

(c)     Issuer and the other Debtors shall maintain records of all payments made by the Persons issuing the Policies in respect of Policy Claims. Such records shall be available for inspection and copying by Participant from time to time upon reasonable prior notice to Issuer during regular business hours.

4.     Mutual Representations of the Parties.  Subject to entry of the Approval Order, each Party hereby represents and warrants to the other Party that:

(a)     it is duly organized and validly existing under the laws of its jurisdiction of organization, in good standing under such laws, and has full power and authority and has taken all action necessary to execute and deliver each Transaction Document to which it is a party and to perform its obligations under each such Transaction Document and to consummate the transactions contemplated by each such Transaction Document;

(b)     the making and performance by it of each Transaction Document to which it is a party does not and will not (i) violate in any material respect any law or regulation applicable to it or (ii) other than with respect to the Approval Motion and the Approval Order, require notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Person for it to execute, deliver, and perform its obligations under, the Transaction Documents to which it is a party;

3

(c)    other than the Chapter 11 Cases, no proceedings are pending against it or to the knowledge of such Party, threatened against it, in each case, before any Governmental Authority or other Person that challenge the transactions contemplated by the Transaction Documents or that are reasonably likely to have a material effect on the ability of such Party to perform its obligations under the Transaction Documents to which it is a party;

(d)    each Transaction Document to which it is a party has been duly and validly authorized, executed and delivered by it and is legal, valid, binding and enforceable against it in accordance with its terms;

(e)    except as expressly stated in this Agreement, it makes no representations or warranties, express or implied, with respect to the transactions contemplated hereunder, and the Parties acknowledge that the transactions contemplated by the Transaction Documents are on an "as-is, where-is" basis; and

(f)    it is a sophisticated entity with respect to the entry into the Participation at the Closing, and has adequate information concerning the Participation, the Policies and the Policy Claim Rights in order to make an informed decision regarding the entry into the Participation at the Closing, and has independently and without reliance on the other Party, and based on such information as such Party has deemed appropriate, made such Party's own analysis and decision to enter into this Agreement except that each Party has relied upon the other Party's express representations, warranties, covenants and agreements contained in this Agreement, and each Party has not received from the other Party any investment advice, legal advice, credit information or opinion on whether the sale of the Participation is prudent.

5.    <u>Additional Representations and Warranties of Issuer</u>.    Issuer hereby represents and warrants to Participant that, except for the interest in the Policies, and any rights, interests, claims or proceeds related thereto, held by the non-Debtor Plaintiffs:

(a)    Issuer and the other Plaintiffs are the sole legal and beneficial owners of and have good and marketable title to all rights arising under the Policies to the Policy Claim Rights and the Proceeds, in each case, free and clear of any and all liens (including any attorney's liens), legal or equitable claims, security interests, participations, setoffs, Encumbrances or adverse claims against title of any kind or nature whatsoever (including any amounts owed to any counsel) other than the liens on the Policies, Policy Claim Rights and Proceeds that the Prepetition Agent may have or assert on behalf of the lenders under the Prepetition Credit Agreement; <u>provided however</u>, that the Prepetition Agent shall release any such liens upon Closing and receipt by the Issuer of the Purchase Price, and Issuer and the other Debtors are not party to or bound by any agreement with respect to any direct or indirect transfer of the Policies or Policy Claim Rights in any Policies other than this Agreement, and except as provided herein, Issuer has not assigned, waived, released, transferred, sold, or subjected to any Encumbrance, or relinquished any interest or right in the Policies or Policy Claim Rights, constructively or otherwise;

(b)    subject to satisfaction of the condition set forth in <u>Section 10(a)(vi)</u>, Issuer, on behalf of itself and the other Debtors, has the full right, power and authority to transfer and deliver the Participation to Participant;

CONFIDENTIAL

(c)      the making and performance by it of each Transaction Document to which it is a party does not and will not result in a breach of any material agreement to which it is a party or by which it is bound;

(d)      except as set forth on Schedule 5(d), no litigation, proceeding, claim, action or other dispute has been asserted by Issuer or the other Debtors against any Person with respect to the Policies or Policy Claims;

(e)      each Policy set forth in Schedule 1.1-P was in force at the time of the loss giving rise to such Policy Claim (other than Policy Claims described in clause (ii) of the definition of Policy Claims);

(f)      there are no Persons or entities that are insured under the Policies or other Persons that have any right or interest in the Policy Claim Rights or the Proceeds except for Issuer and the other Debtors (and the non-Debtor Plaintiffs);

(g)      As of Closing, Issuer has provided Participant a true, correct, and complete copy of each of the Policies, in each case, as amended or otherwise modified and in effect as of the date hereof, setting forth the entirety of the arrangements between Issuer and the Insurers under the Policies, and no Debtor or any of their respective Affiliates has entered into any agreement, arrangement or other relationship providing for risk transfer between any Debtor or any of their respective Affiliates, as the case may be, and a third party other than as set forth in the Policies listed on Schedule 1.1-P and there are no other documents, arrangements or understandings to which any Debtor or any of their respective Affiliates, as the case may be, is a party or bound by or of which Issuer has knowledge that would reasonably be expected to materially adversely affect or diminish the Participant's rights arising hereunder;

(h)      To the best of Issuer's knowledge, Issuer has provided Participant true, correct and complete copies of (i) any correspondence (including electronic mail) with the Insurers issuing, and the brokers for, the Policies to the extent directly related to the Litigation or the Policy Claims, and (ii) existing summaries (if any were prepared by Issuer prior to the date hereof) of any telephone conversations with the Insurers issuing, and the brokers for, the Policies to the extent related to Policy Claims;

(i)      Other than with respect to the reservation of rights and rejections of the Policy Claims by the Insurers or their agents (and the Litigation relating thereto), there are no pending or asserted or, to Issuer's knowledge, threatened actions against Issuer and the other Debtors with respect to the Policies, Policy Claim Rights or otherwise by or on behalf of any Person that could invalidate, reduce the amount of or subordinate the Policy Claims to the Debtors and Issuer has not received any written or oral notice that any legal or equitable defenses, counterclaims or offsets, reductions, recoupments, objections, impairments, avoidances, disallowances or subordinations have been or may be asserted against Issuer with respect to the Policy Claims or otherwise by or on behalf of any Person to invalidate, to reduce the amount of or to subordinate the Policy Claims;

(j)      Issuer has paid or caused to be paid all premiums or other amounts owing or due and payable by any of the Debtors or their respective Affiliates under any Policy, and there are no

CONFIDENTIAL

premiums or other amounts owing or due and payable, or that in the future could be due and payable, by any Debtor or any of their respective Affiliates under any Policy or to any broker in respect of any Policy;

(k)    with respect to the Policies: (A) each Policy is correctly identified and listed on Schedule 1.1-P, together with the applicable limits and deductibles existing under each Policy and the current status of such limits and deductibles and a list of all claims (other than the Policy Claims) that have been made under or in respect of the Policies on or prior to the date hereof; (B) there are no endorsements to any Policy other than those attached that could limit or otherwise reduce the potential recovery under any Policy or under the Participation; and (C) no payment or other distribution has been received by or on behalf of any Debtor or any of their respective Affiliates in respect of any of the Policy Claims except for the Infectious Disease Payment; and

(l)    Issuer has prepared and maintained the Claim Documents with respect to each Policy Claim in the ordinary course of business consistent with past practice;

(m)    it acknowledges that:

(i)    Participant may have, and later may come into possession of, information relating to the Policy or the Policy Claims that is not known to Issuer and that may be material to a decision to buy or sell the Participation and all related rights hereunder at the Closing (the "Excluded Information");

(ii)    Issuer has agreed to proceed with the entry into the Participation and all of the other Transaction Documents at the Closing (or, in the case of the Common Interest Agreement, promptly thereafter) and granting all related rights hereunder and thereunder without receiving the Excluded Information; and

(iii)    Participant is assuming no liability to Issuer, and Issuer waives and releases any claims that Issuer might have against Participant or Participant's officers, directors, employees, attorneys, agents and controlling Persons and their respective successors, assigns, heirs and personal representatives, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information;

(n)    all estimates of losses incurred under or in respect of the Policy Claims and provided to Participant by Issuer have been determined in good faith by Issuer;

(o)    no representation, warranty or statement contained or made by Issuer in this Agreement or any schedule furnished by Issuer pursuant to this Agreement contains or will contain at Closing any untrue statement of material fact or omits or will omit at Closing to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(p)    (i) no broker, finder, agent or other Person under the authority of Issuer or the Debtors is entitled to any commission or other fee (including any attorney's contingency fees) in connection with the transactions contemplated hereby for which the other Party could be responsible, and (ii) neither the Issuer nor any of the Debtors has converted its engagement with Weg & Myers, P.C. as legal counsel ("W&M") to a contingency fee arrangement of any nature.

CONFIDENTIAL

Notwithstanding anything in this Agreement, the interests in the Policies, Policy Claims and Proceeds are sold on an "as is where is" basis, and Issuer makes no express or implied representations, warranties or guaranties, in each case, whether written or oral, concerning: (a) the validity or viability of the Litigation and Policy Claims and the likelihood of succeeding in and/or collecting on the Litigation, Policy Claims, or Proceeds (b) the validity of the Common Interest Agreement, or other Transaction Documents; or (c) any claims or defenses that may be asserted by the Insurers.

6.    Additional Representations and Warranties of Participant.

Participant hereby represents and warrants to Issuer that:

(a)    Participant is an "accredited investor" as such term is defined in Regulation D under the Securities Act of 1933, as amended;

(b)    the making and performance by it of each Transaction Document to which it is a party does not and will not result in a breach of any material agreement to which it is a party or by which it is bound;

(c)    Participant is a sophisticated entity with respect to the entry into the Participation at the Closing, and it has adequate information concerning the Participation, the Policies and the Policy Claim Rights in order to make an informed decision regarding the entry into the Participation at the Closing, and it has independently and without reliance on Issuer, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement except that Participant has relied upon Issuer's express representations, warranties, covenants and agreements contained in this Agreement, and it has not received from Issuer any investment advice, credit information or opinion on whether the sale of the Participation is prudent;

(d)    the Participation to be received by Participant will be acquired for investment for Participant's own account, not as a nominee or agent, and not with a view to the distribution of any part thereof, that Participant has no present intention of selling, granting any participation in, or otherwise distributing the same, and that Participant does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to any of the Participation;

(e)    Participant has or will have sufficient cash available to pay the Participation Price at Closing; and

(f)    No broker, finder, agent or other Person under the authority of Participant, is entitled to any commission or other fee (including any attorney's contingency fees) in connection with the transactions contemplated hereby for which the other Party could be responsible.

7.    Cooperation; Proceeds Sharing; Attorney-In-Fact; Further Actions.

(a)    Issuer will share in advance with Participant any material pleadings and filings related to any litigation concerning the Policy Claims and will make available, at Participant's sole cost and expense, its attorneys as reasonably requested by Participant to meet and confer regarding the conduct of any litigation concerning the Policy Claims, potential settlements and the Policies

CONFIDENTIAL

("Regular Conferences"), and Participant will at all times be entitled to control and pursue any recovery, settlement, strategy or litigation, including any Claim Dispute, concerning the Policy Claims in its sole discretion.  Participant will designate a Person to respond promptly to any specific concerns raised by Issuer at times between the Regular Conferences.  Notwithstanding any other term of this Agreement, neither Party shall be required to share any information with the other Party or engage in, or refrain from engaging in, any other action that would result in the waiver of legal privilege or limit the applicability of the work product doctrine.  Each of the Parties acknowledges that it will have a common interest in the subject matter of any litigation in respect of the Policy Claims (other than any litigation between the Parties or their respective Affiliates).

(b)    Participant shall pay to Issuer a portion of the cash gross Proceeds received by any and all Plaintiffs pursuant to a damages award by a court of competent jurisdiction after exhaustion of all appeals (or the time for such appeal having expired), or pursuant to a binding settlement agreement pursuant to the following schedule (the "Proceeds Sharing"):

　　　i.    10% of Proceeds actually received in excess of $75 million.

　　　For example, if any or all of the Plaintiffs actually receives Proceeds of $100 million, then it will pay Issuer $2.5 million consisting of (i)10% X $25 million = $2.5 million.

(c)    Issuer shall follow Participant's reasonable instructions in connection with any action concerning the Policy Claims.  Issuer shall exercise or refrain from exercising its rights under the Policy Claims, and to make any elections or determinations permitted under the terms of the Policies, solely in accordance with the reasonable directions of Participant.  Participant shall have the unilateral right to direct the litigation and recovery strategy with respect to the Policy Claims, including the selection, supervision and establishment of compensation for legal and other advisors and the entry into settlement discussions or settlement agreements with respect to the Policy Claims, in each case at Participant's sole cost and expense, provided, however, that Participant shall not be responsible for any cost and expense arising from Issuer's breach of this Agreement or Issuer's gross negligence or willful misconduct.  Issuer or its successor shall be and remain a plaintiff in any litigation with respect to the Policy Claims unless otherwise directed by Participant in writing.

(d)    Issuer shall reasonably cooperate with Participant at Participant's sole cost and expense in prosecuting the Policy Claims and, at Participant's direction, negotiate for the admission, resolution and settlement of the Policy Claims, including the giving of notices of claim and executions of proof of loss.

(e)    Issuer shall reasonably cooperate with Participant and, at Participant's direction, investigate and/or respond to any objection, dispute, arbitration, appraisal proceeding or litigation that may be filed or commenced against Issuer in respect of the Policy Claims (a "Claim Dispute") at Participant's sole cost and expense (clauses (c), (d) and (e) together, "Issuer's Defense Obligations").

(f)    Issuer shall notify Participant, and forward to Participant promptly, and in any event within five (5) Business Days of receipt, any and all written or electronic communication,

8

CONFIDENTIAL

correspondence and notices received by Issuer from any Person with respect to the Policies, the Policy Claims or any litigation related thereto, including any Claim Dispute in respect thereof. Issuer shall provide to Participant summaries of any material telephone conversations relating to the Policies that occur after the execution of this Agreement with any Insurer, any claim adjuster or expert or consultant acting on behalf of such an Insurer, or counsel for such an Insurer with respect to or brokers for the Policies, the Policy Claims or any litigation related thereto, including any Claim Dispute in respect thereof.

(g)    Participant may elect at any time to assume certain of Issuer's Defense Obligations, with counsel satisfactory to Participant in its sole discretion, whereupon Issuer shall appoint Participant as its true and lawful attorney-in-fact and authorizes Participant to act in Issuer's name, place and stead, to demand, sue for, compromise, settle and recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Policy Claims and to allow Participant to do all things necessary to enforce the Policy Claims or any portion thereof and Issuer's rights thereunder or related thereto including the filing of lawsuits or arbitrations in Issuer's name; and Issuer agrees that notwithstanding anything in this Agreement to the contrary, the powers granted to Participant by this Section 7(g) are discretionary, that Participant may exercise or decline to exercise such powers at Participant's sole option, that Participant shall have no obligation to take any action to prove, defend, demand or take any action with respect to proving the validity, amount or nature of the Policy Claims, and that such powers shall apply to all Policy Claims; provided, however, that Participant's decision to decline to exercise such powers shall not result in any additional obligations to Issuer or reduce any rights of Issuer under this Agreement.

(h)    Issuer shall cause its counsel in any litigation, including any Claim Dispute, with respect to the Policy Claims to meet, cooperate and confer with and take direction from Participant concerning such litigation and any Policy Claims.

(i)    Issuer shall reasonably cooperate with Participant in the substitution or addition of counsel in any litigation, including any Claim Dispute, concerning the Policy Claims upon Participant's request and will agree to waive conflicts of interest so that Participant's counsel can represent both Issuer and Participant in connection with the pursuit of insurance coverage in any Claim Dispute concerning the Policy Claims.  Issuer shall provide to Participant all necessary information reasonably requested by Participant and work in good faith and reasonably cooperate with and assist Participant and its counsel, consultants, and experts in Participant's efforts in respect of the Policy Claims and any related Claim Dispute at the reasonable direction of Participant, including, for example, in Participant's discretion, interacting with Insurers or their representatives, adjusters, consultants, or counsel at the reasonable direction of Participant, joining or remaining as a party in any Claim Dispute, executing documents and pleadings, searching for and producing documents, responding to and verifying under oath responses to written discovery, cooperating in any discovery process, and making its personnel available with reasonable prior notice from Participant to assist with the Litigation and any Claim Dispute and testify as deponents or at any proceeding or trial; all such cooperation and assistance to be at Participant's sole cost and expense.  From and after the Closing, Issuer shall not (i) take any action to enforce the Policy Claims or exercise any other rights or remedies in respect of the Policies with respect to the Policy Claims, on behalf of itself or any other Person, (ii) commence any legal action in its own name in respect of the Policy Claims, or (iii) or otherwise knowingly interfere with Participant's prosecution or right of prosecution of the Policy Claims, except in the case of each of subsections

9

CONFIDENTIAL

(i), (ii) and (iii) above, at the direction of and in cooperation with Participant in accordance with this Section 7.

(j)     Except as expressly set forth herein, (i) Participant shall be responsible for all of Participant's and its Affiliates', and each of their respective attorneys' and other advisors', fees, costs and expenses incurred prior to Closing including in connection with the transactions contemplated herein, and (ii) Issuer, on behalf of itself and the other Debtors, shall be responsible for their own and their respective Affiliates', and each of their respective attorneys' and other advisors', fees, costs and expenses incurred prior to Closing including in connection with the negotiation, preparation and execution of any Transaction Document (or amendments, modifications or waivers thereto), or any disputes under any Transaction Document.  Following Closing, any fees (including legal fees), costs, expenses or other amounts to be incurred, advanced or paid by Issuer under this Agreement in order to comply with its obligations hereunder or as specifically directed by Participant shall be borne solely by Participant and where possible, provided by Participant in advance; provided, that Participant shall have pre-approved any such fees, costs, expenses or other amounts in advance of their incurrence by Issuer and Issuer shall not be required to incur any such fees, costs expenses or other amounts until Participant has approved them.

(k)     Issuer shall not, and shall cause each of the other Debtors and their respective Affiliates not to, take any action or omit to take any action, of which the result of such action or omission would reasonably be expected to materially impede or frustrate the ability to demand, sue for, compromise, settle or recover all such amounts as now are, or may hereafter become, due and payable for or on account of the Policy Claims.  Issuer shall not transfer the Policies, the Policy Claims or, in each case, any rights thereunder, except as expressly contemplated by the Transaction Documents.  Issuer shall notify Participant promptly, and in any event within three (3) Business Days of the date that Issuer becomes aware of any material breach, default or non-performance under the Policies or the Transaction Documents.

(l)     The Parties acknowledge and agree that time is of the essence with respect to each party's performance of its obligations under this Agreement.

(m)     Issuer shall (i) provide to Participant, on an ongoing basis, access to all Claim Documents and other documents that may be reasonably requested by Participant related to the Policy Claims, and such documents shall be available for inspection by Participant from time to time upon reasonable prior notice to Issuer during regular business hours; and (ii) make available to Participant any current directors, officers, employees, agents, consultants, professional advisers, representatives, members, equityholders, partners, lenders or prospective members or equityholders (together, "Representatives") who have information concerning the Policy Claims.  Except for the interest in the Policies, and any rights, interests, claims or proceeds related thereto, held by the non-Debtor Plaintiffs, Issuer hereby grants to Participant an exclusive right to enforce and collect on the Policy Claims, in each case in accordance with this Agreement.  Participant shall, and shall cause its Representatives to, reasonably cooperate with Issuer and its Representatives in making available all information and documentation relevant to all such litigation at Participant's sole cost and expense including by sharing work product developed by Participant's Representatives, to the extent reasonably necessary for Issuer or any of the other Debtors or any of their respective Representatives or Affiliates to accurately and completely

10

respond to any regulatory inquiry or demand, or any deposition, interrogatory, request for information or documents, subpoena, civil investigative demand, governmental agency action or similar legal, judicial or regulatory process; provided, however, Issuer shall request such inquiry, demand, interrogatory, request, subpoena or demand be narrowed or made more specific in the event Participant determines that it is overly broad in Participant's sole discretion.

(n)    Issuer shall cooperate with Participant in identifying any employee of any Debtor that has knowledge of the Policies, Policy Claims, the operations of the Debtors (including the Debtors' historical and projected financial performance) and other information relevant for the pursuit of the Policy Claims (the "Key Employees"), and Issuer shall facilitate introductions to and meetings between the Key Employees and Participant for purposes of assisting with Participant's pursuit of the Policy Claims. Participant shall be entitled to enter into an agreement with any such Key Employee to make himself or herself available to participate in litigation, including any Claim Dispute, or meeting concerning the Policies or the Policy Claims, and Issuer shall use commercially reasonable efforts to assist Participant in obtaining such agreement. Issuer shall provide to any former employee access to all Claim Documents and other documents, information and other Issuer personnel, employees, advisors and similar personnel requested by Participant in connection with such former employee's participation in litigation, including any Claim Dispute, or other action concerning the Policies or Policy Claims. Participant and its representatives shall not, without the prior written consent of the Issuer, contact any director, officer, employee, representative or other agent of Issuer or the other Debtors, except for those persons listed on Schedule 7(n); provided, however, if the persons listed on Schedule 7(n) cannot be reached after reasonable efforts or are unable to assist as requested by Participant, Participant may contact other directors, officers, employees, representatives or other agents identified by Issuer.

(o)    Issuer agrees to remain responsible for, and agrees to perform and comply with its obligations as the First Named Insured (as defined in the Policies) under the Policies and any obligations, including payment of any further premiums owing under the terms of the Policies and providing notice of claim and sworn proof(s) of loss, and cooperating with the insurer(s) in their investigation of the Policy Claims and their pursuit of subrogation, as well as any obligations Issuer may have with respect to the counterparties and/or its attorneys or brokers thereunder arising out of the Policy Claim Rights; provided, that any costs incurred under this provision (including for payment of any premiums or other amounts) shall be borne solely by Participant and where possible, provided by Participant in advance; provided, further, that Participant shall have pre-approved any such costs in advance of their incurrence by Issuer and Issuer shall not be required to incur any such costs until Participant has approved them. Any plan of liquidation confirmed in the Chapter 11 Cases will include a provision requiring the Debtors to transfer the foregoing obligations to an appropriate Person selected by the Debtors, but reasonably acceptable to Participant, so that such obligations will continue to be performed.

(p)    As soon as reasonably practicable after the Parties execute this Agreement, but in any event no later than five (5) Business Days following the date hereof, Issuer shall file an Approval Motion (as defined below) with the Bankruptcy Court for obtaining the Approval Order (as defined below), together with required supporting papers and required notices. Issuer shall use reasonable best efforts to obtain the Approval Order as soon as reasonably practicable.

CONFIDENTIAL

(q)    Issuer shall direct its bankruptcy counsel in the Chapter 11 Cases to reasonably cooperate with Participant and Participant's legal counsel, consultants and experts to the extent such cooperation relates to the Chapter 11 Cases, the Approval Motion, the Approval Order or the consummation of the transactions contemplated hereby.

(r)    Issuer and the Debtors shall not convert their engagement with W&M to a contingency fee arrangement of any nature.

(s)    Notwithstanding anything herein, the Parties acknowledge, agree and understand that the Debtors are liquidating their assets and shall not be continuing operations in any form whatsoever.  Any failure of the Issuer to perform any act required hereunder as a result of such liquidation shall not be considered a breach of this Agreement.

8.    <u>Assignment after Emergence from Bankruptcy</u>.

(a)    If Century 21 Department Stores LLC's Chapter 11 Case is closed or terminated for any reason, whether by means of a confirmed plan of liquidation or reorganization or otherwise, Issuer shall provide Participant with at least ten (10) Business Days' notice prior to such closing or termination.  If Participant, in its sole discretion, elects in writing within ten (10) Business Days of receipt of such notice, Issuer, on behalf of all the Debtors, shall irrevocably transfer, assign, grant and convey to a post-emergence litigation trust or other structure acceptable to Participant (the "<u>Litigation Trust</u>"), of which Participant shall be the sole beneficiary (except to the extent of the Proceeds Sharing) and shall appoint the trustee, all of the Policy Claim Rights not already held by Participant indirectly through the Participation (the "<u>Assignment</u>").  Upon the effectiveness of the Assignment, the Litigation Trust shall become the assignee and successor of the Issuer for all purposes under this Agreement.

(b)    Notwithstanding any other term of this Agreement, the Assignment shall be deemed an absolute and unconditional assignment of the applicable Policy Claim Rights to the Litigation Trust for the purpose of collection and satisfaction, and not an assignment or transfer to, or assumption by, Participant of any obligation or liability of any of the Debtors or any of their respective Affiliates to any other Person including under any contract or Policy between Issuer and any Insurer, or in connection with the Policy Claims, any and all of which obligations and liabilities are, and shall remain, the obligations and liabilities of Issuer or its applicable one or more Affiliate(s).

9.    <u>Records</u>.

(a)    Participant acknowledges and agrees that Issuer shall retain the exclusive ownership of all documents furnished pursuant to this Agreement (including the Claim Documents), <u>provided</u>, <u>however</u>, that Issuer shall grant Participant a non-exclusive, fully-paid, worldwide, irrevocable perpetual license to use and copy such documents (including the Claim Documents) in connection with the transactions contemplated under this Agreement.

(b)    Issuer shall maintain records of all payments made by third parties under the Policies.

CONFIDENTIAL

10.    <u>Conditions Precedent</u>.

(a)    Participant's obligations to pay the Participation Price to Issuer and to acquire the Participation at the Closing and to consummate the transactions contemplated hereby shall be subject to Issuer's satisfaction or Participant's waiver (such waiver to be in Participant's sole and absolute discretion) of the following conditions:

(i)    Issuer's and the other Debtors' representations and warranties in this Agreement shall be true and correct in all material respects both when made and as of the Closing with the same force and effect as if made as of the Closing;

(ii)    Issuer and the other Debtors shall have complied with or performed in all material respects all covenants required by this Agreement to be complied with or performed on or before the Closing;

(iii)    there have been no material adverse ruling or orders in the Litigation; <u>provided that</u> it shall not be a material adverse ruling or order in the event the Court or District Court remands or transfers the Litigation to another Court or withdraws the reference to the Bankruptcy Court;

(iv)    Issuer shall have delivered a certificate, signed by an officer of Issuer, dated as of the Closing Date, that the conditions specified in <u>Section 10(a)(i)</u>, <u>Section 10(a)(ii)</u> and <u>Section 10(a)(iii)</u> are satisfied;

(v)    Participant shall have received a counterpart of each Transaction Document executed on behalf of Issuer; and

(vi)    the Approval Order shall have been entered and shall be a Final Order, and no stay thereof shall be in effect.

(b)    Issuer's and the other Debtors' obligations to transfer and deliver the Participation to Participant at the Closing and to consummate the transactions contemplated hereby shall be subject to Participant's satisfaction or Issuer's waiver (such waiver to be in Issuer's sole and absolute discretion) of the following conditions:

(i)    Participant's representations and warranties in this Agreement shall be true and correct in all material respects both when made and as of the Closing with the same force and effect as if made as of the Closing;

(ii)    Participant shall have complied with or performed in all material respects all covenants required by this Agreement to be complied with or performed on or before the Closing;

(iii)    Participant shall have delivered a certificate, signed by an officer of Participant, dated as of the Closing Date, to the effect that the conditions specified in <u>Section 10(b)(i)</u> and <u>Section 10(b)(ii)</u> are satisfied; and

CONFIDENTIAL

(iv)    Issuer shall have received a counterpart of each Transaction Document executed on behalf of Participant.

11.    <u>Miscellaneous</u>.

(a)    <u>Further Assurances</u>. Each Party agrees to execute and deliver, or cause to be executed and delivered, all such instruments and documents (including in the case of Issuer, any supporting documents evidencing the conveyance of the Participation to Participant), and to take all such action as the other Party may reasonably request, promptly upon such request, in order to effectuate the intent and purpose of, and to carry out the terms of, this Agreement and the other Transaction Documents.  Issuer agrees to execute and deliver, or cause to be executed and delivered, all such instruments and documents, and to take all such actions as Participant may reasonably request, promptly upon such request, in order to effect an alternative transaction structure for the transactions contemplated under the Transaction Documents only to the extent that such alternative transaction structure (i) is not adverse to the economic interests of Issuer or (ii) does not adversely modify any rights or remedies of the Issuer or any of its Affiliates as are provided hereunder.  Any effectuation of an alternative transaction pursuant to this <u>Section 11(a)</u> shall be at Participant's sole cost and expense.

(b)    <u>No Survival</u>.  The representations and warranties made by the Parties in this Agreement are only made as of the Closing and shall not survive the Closing.

(c)    <u>Termination</u>.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(i)    by the written agreement of Issuer and Participant;

(ii)    by Participant if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code at any time prior to the Closing Date;

(iii)    by the Issuer, upon a determination of its Independent Director in good faith and based upon the advice of its outside counsel, that proceeding with the Participation would be inconsistent with the Debtors' fiduciary obligations under applicable law;

(iv)    by either Participant or Issuer by giving written notice to Issuer if the Bankruptcy Court has rejected the Approval Motion or not entered the Approval Order as a Final Order by December 31, 2020 (which date shall be extended based upon the Bankruptcy Court's availability); or

(v)    Issuer may terminate this Agreement in the event of any breach by Participant, and the failure of Participant to cure such breach by the earlier of (A) the Outside Date and (B) the date that is three (3) days after receipt of a written notice from Issuer to Participant (the "<u>Issuer Termination Notice</u>") of Issuer's intention to exercise Issuer's rights as a result of the breach, which Issuer Termination Notice shall specify the representation, warranty, covenant or agreement contained herein of which Participant is allegedly in breach; <u>provided</u>, <u>however</u>, that Issuer can only terminate the Agreement under this <u>Section 11(c)(v)</u>  if it is not itself in material breach of any of Issuer's representations, warranties, covenants or agreements contained herein.

CONFIDENTIAL

(vi)    In the event of termination of this Agreement as provided in <u>Section 11(c)</u>, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of Participant or Issuer or their respective officers, directors, securityholders or Affiliates, other than for a breach of this Agreement prior to termination.

(d)    <u>Applicable Law; Jurisdiction and Venue</u>.  This Agreement and any disputes or actions (whether in contract or tort) that may be based upon, arise out of or relate to this agreement, any related Agreement, or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding.

(e)    <u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION, SUIT OR PROCEEDING REFERRED TO ABOVE IN <u>SECTION 11(d)</u>.

(f)    <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement contemplated to be performed following the date hereof are not performed in accordance with their specific terms or otherwise are breached or violated.  Accordingly, each Party agrees that, without posting a bond or other undertaking, the other Party will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof and thereof in any arbitration administered by the American Arbitration Association in addition to any other remedy to which it may be entitled (including with respect to the Deposit hereunder), at law or in equity.  Each Party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert the defense that a remedy at law would be adequate.

(g)    <u>Notices</u>.  All demands, notices, consents and communications hereunder shall be in writing and shall be deemed to have been duly given when hand-delivered or duly deposited in the mails, by certified or registered mail, postage prepaid-return-receipt requested or electronic mail to the addresses set forth on <u>Schedule 11(g)</u> hereto, or such other address as may be furnished hereafter by notice in writing.  In the case of notices delivered by electronic mail, for such notices to be deemed effective, each such notice must (i) not be promptly followed by an electronic mail notice of undeliverable message and (ii) be followed by delivery by the receiving party of written confirmation of receipt of such notice by return electronic mail.  All payments by Issuer to Participant and by Participant to Issuer under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Issuer or Participant, as applicable, in accordance with the wire instructions specified in <u>Schedule 11(g)</u>.

CONFIDENTIAL

(h)    Integration.  This Agreement and the other Transaction Documents, together with any schedules and exhibits hereto or thereto, constitute the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersede all prior agreements, understandings or representations pertaining to the subject matter hereof, whether oral or written. There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as specifically and expressly set forth herein or in the other Transaction Documents.

(i)    Interpretation.  The captions and headings in this Agreement are for convenience only and are not intended to be full or accurate descriptions of the contents thereof.  Such captions and headings shall not be deemed to be part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Capitalized terms shall have the meanings as defined herein, and the meaning of defined terms shall be equally applicable to both the singular and plural forms of the terms defined.  Except as otherwise explicitly specified to the contrary or unless the context clearly requires otherwise, for purposes of this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive, (iii) the words "herein," "hereof," "hereby," "hereto," "hereunder" and words of similar import refer to this Agreement as a whole, (iv) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding" and (v) the words "to the extent" shall mean the degree to which a subject or other thing extends, and shall not simply mean "if."  Unless the context otherwise requires, references herein: (A) to a Section, an Appendix, a Schedule or an Exhibit mean a Section, an Appendix, a Schedule or an Exhibit of, or attached to, this Agreement, and references to a particular Section include all subsections thereof; (B) to agreements, instruments and other documents shall be deemed to include all subsequent amendments, supplements and other modifications thereto; (C) to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation referred to, in each case as from time to time in effect; (D) to any Person includes such Person's successors, heirs and assigns, but, if applicable, only if such successors, heirs and assigns are not prohibited by this Agreement; (E) to any gender includes each other gender and (F) words in this Agreement using the singular or plural number also include the plural or singular number, respectively.

(j)    Severability.  If any provision of this Agreement is partially or completely invalid or unenforceable in any jurisdiction, then that provision shall be ineffective in that jurisdiction to the extent of its invalidity or unenforceability, but the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall be construed and enforced as if that invalid or unenforceable provision were omitted, nor shall the invalidity or unenforceability of that provision in one jurisdiction affect its validity or enforceability in any other jurisdiction.

(k)    Amendments; Waivers.  No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

CONFIDENTIAL

No failure on the part of either Party to exercise, and no delay in exercising, any right hereunder or under any related document shall operate as a waiver thereof by such Party, nor shall any single or partial exercise of any right hereunder or under any other related document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of each Party provided herein and in other related documents (A) are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law and (B) are not conditional or contingent on any attempt by such Party to exercise any of its rights under any other related documents against the other Party or any other entity.

(l)    Successors and Assigns.    The provisions of this Agreement, including all representations, warranties, covenants and agreements, shall be binding upon and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs and personal representatives.    Neither Party may assign, sell or pledge its rights and obligations hereunder without the written consent of the other Party, and any assignment or deemed assignment without such consent shall be null and void ab initio; provided that such an assignment by Participant shall not require such consent if it is to an Affiliate and the Assignment by Issuer to the Litigation Trust shall not require such consent.  No assignment by a Party will relieve such Party of its obligations hereunder, and such Party will be responsible for any breach of this Agreement and the other Transaction Documents by any assignee as if such breach were the act or omission of such Party directly.

(m)    Accounting and Tax Treatment.  The Parties understand and agree that Participant will review the appropriate treatment of the Participation for U.S. federal income tax purposes with it accounting and tax advisors.  The Parties further agree that if Participant concludes after such review that Participant can take the position that the Participation is "a right or obligation with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer," within the meaning of Section 1234A(1) of the Internal Revenue Code of 1986, as amended, each Party will treat the Participation as such a right or obligation for all financial reporting and tax purposes, and no Party shall take any position to the contrary.

(n)    Counterpart Execution.  This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which, together, constitute one and the same instrument.    Transmission by electronic mail at the appropriate email address listed in Schedule 11(g) of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

(o)    Relationship Between Participant and Issuer.  The relationship between Issuer and Participant shall be that of issuer and participant and the Parties acknowledge and agree that Issuer is transferring all beneficial ownership in the Participation to Participant as of the date hereof. Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other. This Agreement shall not be construed to create a partnership, joint venture, or legal entity of any type between Participant and Issuer, and Participant and Issuer agree not to construe this Agreement, or any of the transactions contemplated hereby, as a partnership for tax purposes.  In no event shall the Participation be construed as a loan from Participant to Issuer.

(p)    Mutual Drafting.  Each Party has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties.  Neither

17

CONFIDENTIAL

Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any provision.

(q)    No Third-Party Beneficiaries. Except as expressly set forth in Section 11(s), this Agreement is solely for the benefit of the Parties and their successors and assigns permitted under this Agreement, and no provisions of this Agreement shall be deemed to confer upon any other Persons any remedy, claim, liability, reimbursement, cause of action or other right except as expressly provided herein.

(r)    Schedules. The Schedules and the information and disclosures contained therein relate to and qualify certain of the representations, warranties, covenants and obligations made by the Issuer in this Agreement and shall not be construed or otherwise deemed to constitute, any representation, warranty, covenant or obligation of such Parties or any other Person except to the extent explicitly provided in this Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties, covenants or obligations. No disclosure in the Schedules relating to any possible breach or violation of, or non-compliance with, any agreement, law or regulation, in and of itself, shall be construed as an admission or indication that any such breach, violation or non-compliance exists or has actually occurred, and nothing in the Schedules shall constitute an admission of any liability or obligation of any Person to any other Person or shall confer or give any third party any remedy, claim, liability, reimbursement, cause of action or any other right whatsoever.

(s)    No Recourse. All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or the other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or the other Transaction Documents or as an inducement to enter into this Agreement or the other Transaction Documents), may be made only against the entities that are expressly identified as parties hereto and thereto. No Person who is not a Party to this Agreement or the other Transaction Documents, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of any named party to this Agreement or the other Transaction Documents ("Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity Party against its owners or Affiliates or beneficiaries) for any obligations or liabilities arising under, in connection with or related to this Agreement or such other Transaction Documents (as the case may be) or for any claim based on, in respect of, or by reason of this Agreement or such other Transaction Document (as the case may be) or the negotiation or execution hereof or thereof; and each Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third party beneficiaries of this provision of this Agreement.

*[Remainder of page intentionally left blank; signatures follow on next page]*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first stated above.

**ISSUER:**

CENTURY 21 DEPARTMENT STORES LLC

By: _____
Name: Brian Cashman
Title: CEO

**PARTICIPANT:**

C21 BLUE INSURANCE LLC


By: _____
Name:   Raymond Gindi
Title:     Authorized Signatory

CONFIDENTIAL

## Appendix A

**Definitions**

"Affiliate" shall mean, with respect to any specified Person, a Person that, directly or indirectly, through one or more intermediaries controls, or is controlled by, or is under common control with, the Person specified. For the avoidance of doubt, Affiliates of Issuer shall include the other Debtors. For further avoidance of doubt, Affiliates of Issuer shall not include the other named Plaintiffs.

"Approval Motion" means one or more motions, in form and substance satisfactory to Participant, filed by Issuer pursuant to, *inter alia*, Section 363 of the Bankruptcy Code to secure entry of the Approval Order by the Bankruptcy Court.

"Approval Order" means one or more Orders of the Bankruptcy Court in a form and substance reasonably acceptable to Participant and substantially in the form annexed hereto as Exhibit A, pursuant to, *inter alia*, (A) Sections 105 and 363 of the Bankruptcy Code (i) approving a private sale of the Participation pursuant to this Agreement and the terms and conditions hereof, and (ii) containing certain findings of facts, including a finding that Participant is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code and (B) Bankruptcy Rule 9019 approving of the settlement set forth in the Settlement Agreement.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts or New York, New York are authorized or required by applicable law to close; provided that banks shall not be deemed to be authorized or required to be closed due to a "shelter in place," "non-essential employee" or similar closure of physical branch locations at the direction of any Governmental Authority if such banks' electronic funds transfer systems (including for wire transfers) are open for use by customers on such day.

"Claim Documents" means, all documents, data, summaries, information, instruments and agreements in any Debtor's or any of their respective Affiliates' or advisors' possession or control that Participant reasonably requests, from time to time, for the purpose of pursuing the Policy Claims, including (a) a complete copy of each Policy; (b) applications for insurance, business interruption values, and underwriting communications and documents; and (c) all documents, summaries, data, information, instruments and agreements related to coverage thereunder, including all communications with or from any Insurer, broker, or third party (including counsel for Issuer) concerning the Policy Claims (including communications between brokers and Insurers in respect of the Policies).

"Common Interest Agreement" means the Common Interest Agreement, in a form to be reasonably acceptable to Participant, Issuer and other non-debtor Plaintiffs.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof, and the related or associated epidemics, pandemic or disease outbreaks.

"Debtors" means C21 Department Stores Holdings LLC, Century 21 Department Stores LLC, L.I. 2000, Inc., Giftco 21 LLC, Century 21 Fulton LLC, C21 Philadelphia LLC, Century 21

CONFIDENTIAL

Department Stores of New Jersey, L.L.C., Century 21 Gardens of Jersey, LLC, C21 Sawgrass Blue, LLC, C21 GA Blue LLC and Century Paramus Realty LLC.

"Encumbrance" means any ownership interest, charge, encumbrance, proprietary or security interest, right of retention, retention of title, lien (statutory or other), privilege or other adverse claim of any kind or nature whatsoever.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Governmental Authority" means any United States federal, state or local or any supranational or non-U.S. government, political subdivision, governmental, legislative, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization, arbitral body (whether governmental, private or otherwise) and any insurance regulatory authority, domestic or foreign, having jurisdiction over a Person.

"Insurers" means the issuers under the Policies.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Person" means an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"Plaintiffs" means each of the holders of the Policies set forth in schedule Schedule 1.1-P.

"Policy Claim Rights" means, all of Issuer's right, title and interest in, to and under the Policy Claims, including the Proceeds.

"Policy Claims" means (i) all claims arising prior to, on or after the Closing under or in connection with the Policies relating to any damages or losses suffered or alleged to have been suffered by any Debtor or other Plaintiff directly arising from or directly related to (a) any property damage, business interruption, extra expense or disruption alleged to be the result of COVID-19, whether due to mandated closures by any Governmental Authority or otherwise, including those claims set forth in the Litigation or (b) claims for losses or damages (including any consequential or punitive damages) related to or arising from an actual or alleged breach by an Insurer of the implied covenant of good faith and fair dealing with respect to such claims in clause (i)(a) of this definition, and (ii) any claim by Issuer related to, arising from or derivative of the Policies against any third party (other than the Insurer issuing such Policy), including any broker involved in the

**CONFIDENTIAL**

procurement of any such Policy, with respect to the claims covered by clause (i)(a) of this definition.

"Prepetition Agent" means JPMorgan Chase Bank, N.A., as administrative agent, under the Prepetition Credit Agreement.

"Prepetition Credit Agreement" means that certain Credit Agreement, dated January 4, 2017 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, by and among the Debtors, the Prepetition Agent, and the lenders party thereto from time to time).

"Schedules" means the disclosure schedule attached to this Agreement.

"Transaction Documents" means (A) this Agreement, (B) Common Interest Agreement and (C) any certificates, documents or instruments of transfer delivered at the Closing.

"Transfer" means any direct or indirect assignment, sale, conveyance, offer to sell, pledge, mortgage, hypothecation, Encumbrance, disposition of or any other like transfer or encumbering of the Participation (or any interest therein or rights thereto).

CONFIDENTIAL

# Exhibit A

**Approval Order**

CONFIDENTIAL

Schedule 1.1 – P

**Policies**

| Insurer | Policy No. | Layer | % Participation | Total Limits of Liability |
|---|---|---|---|---|
| Certain Underwriters at Lloyds (AGR) | PG1902704 | Primary - $10M | 6.00% | $ 600,000.00 |
| Certain Underwriters at Lloyds (LIB) | PG1902712 | $10M - $25M | 6.00% | $ 900,000.00 |
| Endurance American Specialty Insurance Company | ARP10011564202 | $10M - $25M | 15.00% | $ 2,250,000.00 |
| Starr Surplus Lines Insurance Company | SLSTPTY11215019 | Primary - $25M | 10.00% | $ 2,500,000.00 |
| Liberty Mutual Fire Insurance Company | YS2-L9L-464440-019 | Primary - $10M | 15.00% | $ 1,500,000.00 |
| Certain Underwriters at Lloyds (APL/HCC) | PG1902346 | Primary - $25M | 12.60% | $ 3,150,000.00 |
| Certain Underwriters at Lloyds (NEO) | PG1902696 | Primary - $25M | 9.00% | $ 2,250,000.00 |
| Certain Underwriters at Lloyds (ATL) | PG1902698 | Primary - $25M | 6.00% | $ 1,500,000.00 |
| Certain Underwriters at Lloyds (HDU) | PG1902702 | Primary - $25M | 3.00% | $ 750,000.00 |
| Certain Underwriters at Lloyds (CHN) | PG1902707 | Primary-$25M | 3.00% | $ 750,000.00 |
| Steadfast Insurance Company (Zurich) | XPP-5492113-06 | Primary - $25M | 5.40% | $ 1,350,000.00 |
| Allianz Global Risks US Insurance Company | USP00080719 | Primary - $250M | 20.00% | $ 50,000,000.00 |
| Axis Surplus Lines Insurance Company | EAF624722-19 | Primary - $25M | 10.00% | $ 2,500,000.00 |
| Evanston Insurance Company | MKLV10XP003501 | $25M - $100M | 13.33% | $ 9,997,500.00 |
| Liberty Mutual Fire Insurance Company | MQ2-L9L-464440-029 | $25M - $100M | 11.67% | $ 8,752,500.00 |
| Landmark American Insurance Company (RSUI) | LHT909485 | $25M - $100M | 40.00% | $ 30,000,000.00 |
| QBE Specialty Insurance Company | CFE1317141 | $25M-$250M | 15.00% | $ 33,750,000.00 |
| Great American Fidelity Insurance Company | CPP 863-59-89-12 | $100M - 250M | 50.00% | $ 75,000,000.00 |
| Landmark American Insurance Company (RSUI) | LHT909486 | $100M-$250M | 5.00% | $ 7,500,000.00 |
| Axis Surplus Lines Insurance Company | EAF632184-19 | $100M-$250M | 10.00% | $ 15,000,000.00 |
| OneBeacon | 795010502 | $250M – 350M | 85.00% | $85,000,000.00 |
| QBE Specialty Insurance Company | CFE1317141 | $250-$350M | 15.00% | $ 15,000,000.00 |

A-2

CONFIDENTIAL

**Schedule 5(d)**

**Litigation and Disputes**

None

CONFIDENTIAL

## Schedule 7(n)

### Agents

Lawrence Meyer

Brian Cashman

CONFIDENTIAL

## Schedule 11(g)

## Wire Transfer Instructions and Notice Details

**Issuer wire instructions:**

**Century 21 Department Stores LLC**

Account #:                955242552

Beneficiary Bank:       JP Morgan Chase Bank, N.A.
                                270 Park Avenue, 41st Floor
                                New York, NY 10017

Type:                         Other Receipts

ABA #:                     021000021

**Issuer address for notices:**

Century 21 Department Stores LLC
22 Cortlandt Street
New York, NY 10007

With a copy to:

Proskauer Rose LLP
Attn:  Jeff J. Marwil
70 West Madison
Suite 3800
Chicago, Illinois  60602-4342
Email: jmarwil@proskauer.com

-and-

Proskauer Rose LLP
Attn: Jeffrey Horwitz, Lucy F. Kweskin
Eleven Times Square
New York, NY 10036
Email: jhorwitz@proskauer.com
lkweskin@proskauer.com

CONFIDENTIAL

**Participant wire instructions:**

    HSBC Bank USA
    ASG Equities LLC
    Acct 610784404
    ABA 021001088

**Participant address for notices:**

    C21 Blue Insurance LLC
    c/o Raymond Gindi
    21 Dey Street, 5th Floor
    New York, New York 10007
    rgindi@asgequities.com

    With a copy to:

    Tracy L. Klestadt
    Klestadt Winters Jureller Southard & Stevens LLP
    200 West 41st Street, 17th Floor
    New York, New York 10036
    212-972-3000
    tklestadt@klestadt.com

    and

    John Jureller
    Klestadt Winters Jureller Southard & Stevens LLP
    200 West 41st Street, 17th Floor
    New York, New York 10036
    212-972-3000
    jjureller@klestadt.com

**<u>Exhibit 2 to Order</u>**

**Settlement Agreement**

EXECUTION VERSION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| CENTURY 21 DEPARTMENT STORES LLC, *et al.*, | Case No. 20-12097 (SCC) |
| Debtors.[1] | (Jointly Administered) |

## GLOBAL SETTLEMENT AGREEMENT

This Global Settlement Agreement (this "**Agreement**") is hereby entered into this 10th day of December, 2020 (the "**Execution Date**"), by and among (i) Century 21 Department Stores LLC and its affiliated debtors in possession (collectively, the "**Debtors**"), (ii) the Official Committee of Unsecured Creditors (the "**Committee**") of the Debtors and (iii) (a) Raymond Gindi, (b) Isaac A. Gindi, (c) Isaac S. Gindi, (d) Eddie Gindi, (e) Jack Gindi, (f) I.G. Gindi 2009 Generational Trust, (g) Raymond Gindi 2012 Generational Trust, (h) Eddie Gindi Generational Trust, (i) Isaac S. Gindi 2010 Gift Trust, (j) 10-12 Cortlandt Blue LLC, (k) 173 Bway Blue LLC, (l) 175-177 Bway Blue LLC, (m) Blue Millennium Realty LLC, (n) C21 BK Home LLC, (o) Strike Enterprises LLC, (p) 86 Blue LLC, (q) C21 Bay Ridge Blue LLC, (r) CCC Partners, (s) ASG Equities Secaucus LLC, (t) C21 SDC Blue LLC, (u) Secaucus Blue LLC, (v) ADC Blue LLC, (w) Century Rego Realty and (x) C21 Property Management Partners (collectively, the "**Gindi Parties**"). Each of the Debtors, the Committee and the Gindi Parties shall be referred to singularly as a "**Party**," and collectively as the "**Parties**."

Attached hereto as **Exhibit A** is the Participation Agreement by and among the Issuer (defined therein) and Participant (defined therein) (the "**Participation Agreement**"). All capitalized terms not defined herein shall have the meaning ascribed to such term in the Participation Agreement.

## RECITALS

**WHEREAS,** the Debtors, and certain other non-Debtor entities, have in place policies of insurance or risk transfer contracts (issued by commercial, captive or industry-specific insurers or reinsurers) providing coverage to the insured thereunder for certain damages or losses suffered by the Debtors or the other insured.

---

[1]    The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033). The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

EXECUTION VERSION

**WHEREAS,** on July 8, 2020, the Plaintiffs filed in the Supreme Court of the State of New York a suit captioned *Century 21 Department Stores, LLC et al. v. Starr Surplus Lines Insurance Co. et al.*, Index No. 652975/2020) (the "**Litigation**") against the Insurers (a) alleging breach of the relevant Policies as a result of the Insurers' failure to compensate Plaintiffs for their losses under the Policies and (b) seeking damages of over $175 million for the period March 2020 through May 31, 2020 and reserving their right to seek additional amounts for later time periods as their losses mount.

**WHEREAS,** on September 10, 2020 (the "**Petition Date**"), the Debtors each commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

**WHEREAS,** on or around September 10, 2020, the Litigation was removed to the United States District Court for the Southern District of New York and then to the Court and as of the date hereof is pending in the Court at Adv. Pro. No. 20-1222 (SCC).

**WHEREAS,** on September 16, 2020, the United States Trustee for Region 2 appointed the Committee.

**WHEREAS,** subsequent to the Committee's retention of counsel and financial advisors, it directed its professionals to investigate all transactions by and among the Gindi Parties and the Debtors to determine if any such transactions were unlawful or otherwise subject to challenge by the Debtors' estates under state or federal law.

**WHEREAS,** after an extensive investigation, the Committee concluded that the Debtor's estates held colorable claims for, *inter alia*, fraudulent conveyance, breach of fiduciary duty, corporate waste, alter ego, piercing the corporate veil, loan recharacterization and/ or equitable subordination against certain of the Gindi Parties.

**WHEREAS,** the Gindi Parties deny and dispute each of the Committee's allegations asserted and allege certain defenses and counterclaims against the Debtors.

**WHEREAS,** on November 23, 2020, the Debtors filed the *Motion of Debtors for an Order Authorizing and Approving Sale of Insurance Action Interest* [ECF No. 273] (the "**Sale Motion**").

**WHEREAS,** pursuant to the Sale Motion, the Debtors sought Court authorization for the sale to the proposed purchaser (the "**Proposed Purchaser**") of a participation interest in certain of the Debtors' assets related to the Litigation pursuant to the terms and conditions of a Participation Agreement by and among the Debtors and certain non-debtor affiliates, on the one hand, and the Proposed Purchaser, on the other hand (the "**Initial Participation Agreement**").

**WHEREAS,** on December 9, 2020, the Committee filed an objection to the Sale Motion asserting, among other things, that the global settlement it reached with the Gindi Parties, which included the Gindi Parties entry into the Participation Agreement, represented a higher or better offer for those certain assets, and the highest, best and most expeditious resolution of the claims

EXECUTION VERSION

the Committee believed the Debtors' estates held against the Gindi Parties and in turn, the most expeditious manner in which to provide a distribution to creditors.

**WHEREAS,** on December 10, 2020, the Debtors determined to exercise their right to terminate the Initial Participation Agreement pursuant to Section 11(c)(iv) of the Initial Participation Agreement which permitted the Debtors to terminate the Agreement upon a determination of their Independent Director that proceeding with the Initial Participation Agreement would be inconsistent with the Debtors' fiduciary obligations under applicable law.

**WHEREAS**, on the Execution Date, the Gindi Parties, the Debtors and the Committee entered into this Agreement, and subsequent thereto the Debtors exercised the aforementioned right to terminate the Initial Participation Agreement.

**WHEREAS,** after extensive, good faith and arm's length negotiations, the Parties have resolved their disputes as set forth in this Agreement

**NOW, THEREFORE,** the Debtors, the Committee and the Gindi Parties, each intending to be legally bound, and in exchange for the mutual covenants and promises set forth herein, agree as follows:

1.      **Incorporation of Recitals.** The Debtors, the Committee and the Gindi Parties agree that the above recitals are true and correct and that those recitals are incorporated herein by reference and form a part of this Agreement.

2.      **Effectiveness of this Agreement.**

(i)      This Agreement is subject to, and shall not become effective unless and until, (a) a final, non-appealable order is entered by the Court approving this Agreement and the Participation Agreement in a form and with content reasonably satisfactory to each of the Parties to this Agreement (the "**Approval Order**") and (b) the Debtors have received the portion of the Settlement Payments due at Closing under the Participation Agreement. Notwithstanding the foregoing, upon and after the Execution Date, the Parties agree to use their reasonable best efforts to obtain as soon as practicable the Court's entry of the Approval Order by the filing of a motion and other pleadings in the Court requesting such relief.

(ii)      Notwithstanding Section 2(i) hereof, unless otherwise agreed in writing by the Parties, if the Approval Order is not entered by December 31, 2020 (which date shall be extended based upon the Court's availability), time being of the essence, each Party hereto shall have the right to terminate and cancel this Agreement in its entirety by providing written notice of termination to the other Parties and the Court at any time after such date and prior to entry of the Approval Order. If termination is so effected, this Agreement shall be deemed void *ab initio* and of no force and effect.

(iii)      Notwithstanding Section 2(i) hereof, the Debtors have the right to terminate and cancel this Agreement in its entirety at any time prior to entry of the Approval Order by providing written notice of termination to the other Parties and the Court if, based upon a

determination of their Independent Director in good faith and based upon the advice of their outside counsel, proceeding with this Agreement would be inconsistent with the Debtors' fiduciary obligations under applicable law.  If termination is so effected, this Agreement shall be deemed void *ab initio* and of no force and effect.

3.    **Entry into the Participation Agreement.**  Simultaneous with the entry into this Agreement, the Debtors and the Gindi Parties shall each execute the Participation Agreement, thereby agreeing to become bound thereby, subject to Court approval and the terms set forth in the Participation Agreement.

4.    **Transfer of Tenant on Microsoft Cloud.**  Upon entry of the Approval Order, the Debtors shall coordinate with the Gindi Parties to transfer the Debtors' emails as tenant on the Microsoft Cloud to the Gindi Parties' new technology provider; provided however, the Debtors, their estates and successors and assigns shall be granted by the Gindi Parties (and the new technology provider) the right to access the Debtors' emails at any time.

5.    **Settlement Amount.**[2]  In consideration for, *inter alia*, the release provided for under this Agreement and the transfer of tenant on Microsoft Cloud (as set forth in Section 4 above), the Gindi Parties shall indefeasibly pay in good funds the amounts set forth in the Participation Agreement at the times set forth therein (all such payments being the "**Settlement Amount**"), to wit:

   (i)    Payment upon execution of the Participation Agreement of $10 million in cash to be held by the Debtors in escrow pending Closing (and released to the Debtors at Closing).

   (ii)   Payment at Closing (as defined in the Participation Agreement) of $40 million in cash.

   (iii)  Payment of $9 million by no later than January 31, 2021 (the "**Deferred Portion of Settlement Amount**"), for which a promissory note shall be delivered at Closing.

   (iv)   Payment of that portion of the cash gross Proceeds received by any or all Plaintiffs pursuant to a damages award by a court of competent jurisdiction after exhaustion of all appeals (or the time for such appeal having expired), or pursuant to a binding settlement agreement pursuant to the following schedule (the "**Proceeds Sharing**") in the amount of 10% of Proceeds actually received in excess of $75,000,000 as set forth in the Participation Agreement.  For example, if any of all of the Plaintiffs actually receives Proceeds of $100 million, then it will pay Issuer $2.5 million, as set forth more specifically in the Participation Agreement.

---

[2]    In the event of any inconsistency between the terms set forth in this Section 5 and the terms of the Participation Agreement, the terms of the Participation Agreement shall govern.

For the avoidance of doubt, any default under the Participation Agreement shall be a default under this Agreement.

6.     **Security for Deferred Portion of Settlement Amount.**     Simultaneous with the execution of this Agreement, and as security for the Deferred Portion of the Settlement Amount, (i) Raymond Gindi, (ii) Isaac A. Gindi, (iii) Isaac S. Gindi, (iv) Eddie Gindi and (v) Jack Gindi shall each confess to a judgment in favor of the Committee in the amount of Fifteen Million Dollars ($15,000,000.00) by executing a Confession of Judgment in the form annexed hereto as **Exhibit B** (the "**Confession of Judgment**").   For the avoidance of doubt, (i) Raymond Gindi, (ii) Isaac A. Gindi, (iii) Isaac S. Gindi, (iv) Eddie Gindi and (v) Jack Gindi each hereby agree to execute all documents reasonably necessary to effectuate entry of the Confession of Judgment in New York State court (the "**State Court**").   The Committee shall hold these documents and shall not file these documents with the State Court unless and until a default occurs hereunder.  If the Settlement Amount is timely paid in full in good and available funds, the Confession of Judgment and all related documents shall be destroyed and shall be of no force or effect.

7.     **Releases.**

(a)     Effective immediately upon entry of the Approval Order, each of the Gindi Parties, for themselves and on behalf of their respective agents, officers, directors, employees, parents, trustees, attorneys, successors and assigns, affiliates and family members (collectively, the "**Gindi Releasors**") release, acquit, and forever discharge the Debtors, the Committee and the Debtors' estates and each of the foregoing's respective agents, officers, directors, employees, parents, trustees, attorneys, successors and assigns, and affiliates (the "**Estate Releasees**") from any and all claims, demands, debts, liabilities, causes of action, obligations, liens, security interests and liabilities of any kind, which the Gindi Releasors could have had, claim to have had or could ever have, whether at law or in equity, whether known or unknown, whether anticipated or unanticipated, whether secured or unsecured, whether held directly or through an agent, arising at any time from the beginning of time through and including the date upon which the Approval Order is entered.

(b)     For the avoidance of doubt, and without limiting the foregoing, all claims by or on behalf of the Gindi Parties against the Estate Releasees, whether arising prior to, or after the Petition Date, and all claims for rent, whether arising prior to, or after the Petition Date,  are hereby deemed waived and released through this provision and all proofs of claim or scheduled claims held by or on behalf of the Gindi Releasors are hereby deemed released through this provision without the need for further action of the Court.

(c)     Effective immediately upon receipt of the indefeasible payment in good funds of the Settlement Amount, the Debtors and the Committee, on behalf of the Debtors' estates, their successors and assigns, release, acquit, and forever discharge each of  the Gindi Parties and their respective shareholders, members, officers, directors, related trusts or similar instruments, trustees, employees, agents, attorneys, successors, assigns and Affiliates (collectively, together with the Gindi Parties, the "**Gindi Releasees**") from any and all claims, demands, debts, liabilities, causes of action, obligations, and liabilities of any kind, which the Debtors and their estates could have had, claim to have had or could ever have, whether at law

EXECUTION VERSION

or in equity, whether known or unknown, whether anticipated or unanticipated, whether secured or unsecured, arising from the beginning of time through and including the date upon which the Approval Order is entered.  For purposes of this Agreement, **"Affiliate"** means: (i) the spouse, children (and their respective spouses), grandchildren, siblings and parents or other family member of a Gindi Party or (ii) any Person Controlled by or under common Control of a Gindi Releasee or in which a Gindi Releasee, directly or indirectly, is the holder of five percent (5%) or more of any class of the voting securities or equity interests in such Person. For purposes of this Agreement, **"Control"** (or its variations) means the possession, whether by ownership of voting securities, according to the provisions of a contract, by statute, or otherwise, of the power to direct management or policy and **"Person"** means any individual, firm, association, corporation, partnership (general or limited), limited liability company, trust or similar instrument, estate or other entity.

(d)      Notwithstanding anything set forth in this Section 7, nothing herein shall release or otherwise affect any Parties' or releasing parties' claims, rights and interests relating to or arising under the Participation Agreement or the Settlement Agreement, all of which claims, rights and interests are hereby expressly reserved.

8.      **Representations and Warranties.**

(a)      **Representations and Warranties by the Gindi Parties.**

Each of the Gindi Parties hereby represents and warrants, severally and not jointly, to the Committee that:

1.      It has not assigned, sold, transferred, or otherwise disposed of, in whole or part, any the claims asserted against the Debtors.

2.      It has the power and authority to enter into and perform this Agreement.

3.      The execution and performance of this Agreement has been duly authorized by all requisite corporate or other actions.

4.      The individuals signing this Agreement have the power and authority to execute this Agreement on behalf of the respective Parties.

(b)      **Representations and Warranties by the Debtors and the Committee.**

The Debtors and the Committee each represent and warrant to the Gindi Parties that:

1.      Subject to entry of the Approval Order, the execution and performance of this Agreement has been duly authorized by all requisite corporate or other actions.

2.      Subject to entry of the Approval Order, the individual signing

this Agreement has the power and authority to execute this Agreement on behalf of the Debtors or the Committee, as applicable.

3.      Neither the Debtors nor the Committee has assigned, sold or transferred any claims the Debtors or their estates may have against the Gindi Parties.

**(c)      Survival of Representations and Warranties.**

All representations, warranties and covenants contained herein shall survive the execution and delivery of this Agreement and the entry of the Approval Order.

9.      **Indemnification.**   The Estate Releasees shall be indemnified and held harmless under this Agreement by the Gindi Parties from and against any and all claims, demands, suits, obligations, costs, damages, losses, claims for sums of money, controversies, judgments, liabilities, rights, actions, and cause of action of any nature, known or unknown, suspected or unsuspected, fixed or contingent in law or equity, arising out of or relating to, asserted against, imposed upon or incurred by the Debtors and/ or the Committee as a result of any breach by any of the Gindi Parties of a representation, warranty and/ or covenant contained in this Agreement.

10.      **Settlement Procedure**.  Notwithstanding Section 2(i) hereof, counsel for the Gindi Parties shall send copies of this Agreement via email to Debtors' counsel at jmarwil@proskauer.com and Committee's counsel at jcohen@lowenstein.com.  Upon receipt of the copies of this Agreement, counsel for the Debtors or the Committee shall circulate fully executed copies of this Agreement via email to counsel for the Gindi Parties at tklestadt@klestadt.com.

11.      **Affirmative Covenants**.  Each of the Gindi Parties hereby agrees that effective as of the Execution Date, it shall not acquire, purchase or take any interest of any kind in any cause of action or claim asserted or that may be asserted against the Debtors.

12.      **Miscellaneous.**

(a)      **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified, or (b) when sent by confirmed electronic mail or facsimile, if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day,

| If to the Debtors: | If to the Committee: |
|---|---|
| Proskauer Rose LLP<br>Attn:  Jeff Marwil, Esq.<br>70 West Madison, Suite 3800<br>Chicago, IL 60602-4342<br>Telephone:  (312) 962-3550<br>E-mail: jmarwil@proskauer.com | Lowenstein Sandler LLP<br>Attn:  Jeffrey L. Cohen, Esq.<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Telephone:  (212) 262-6700<br>E-mail: jcohen@lowenstein.com |

| | |
|---|---|
| | <u>If to the Gindi Parties:</u><br><br>Klestadt Winters Jureller Southard Stevens, LLP<br>Attn:  Tracy Klestadt, Esq.<br>200 West 41st Street, 17th Floor<br>New York NY 10036<br>Telephone: (212) 972-3000<br>E-mail: tklestadt@klestadt.com |

(b)      **Venue and Choice of Law.** Notwithstanding Section 2(i) hereof, the Parties consent and submit to the exclusive jurisdiction of the Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement.  Any Party bringing any action or proceeding relating to the enforcement or interpretation of this Agreement shall bring such action or proceeding in the Court.  This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York, without regard to choice of law principles, to the extent such principles would apply a law other than that of the State of New York.   Each of the Parties hereto hereby waives any right to a trial by jury in any action, proceeding or counterclaim based upon or arising out of this Agreement, and agrees that any such action, proceeding or counterclaim shall be tried before a court and not before a jury.

(c)      **Entire Agreement.** This Agreement, along with the Participation Agreement, constitutes the entire and only agreement of the Parties concerning the subject matter hereof.  This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written agreements or understandings between the Parties concerning the subject matter hereof.  The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein.

(d)      **No Oral Modifications.**  This Agreement may not be modified or amended orally.   This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each of the Parties hereto.  No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

(e)      **Construction.** This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

(f)      **Headings.** The heading of any section of this Agreement is intended only for convenience and shall not be construed to be or interpreted as a part, or limitation on the scope, of any such section.

(g)    **Binding Effect; Successor and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns including any trustee or other estate representative appointed in any of the Chapter 11 Cases, any litigation or liquidation trustee appointed pursuant to a Chapter 11 plan, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (collectively, "**Successor Cases**") and/or upon the dismissal of any Chapter 11 Case or Successor Case; provided, however, that no Party may assign its rights or obligations under this Agreement without the written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Any assignment not in accordance with the terms hereof shall be null and void ab initio.

(h)    **Costs.** Each Party shall bear its own costs in connection with the negotiation and execution of this Agreement and all other costs shall be borne as set forth in the Participation Agreement.

(i)    **Further Assurances.** The Parties each agree to execute such further and additional documents, instruments and writings as may be reasonably necessary, proper, required, desirable or convenient for the purpose of fully effectuating the terms and provisions of this Agreement.

(j)    **Counterparts.** This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart.

(k)    **PDFs as Originals**. This Agreement may be executed using facsimile or PDF signatures, with the same effect as if the signatures were original. Facsimile or electronic copies of this Agreement shall be deemed for all purposes to have the same force and effect of the original thereof.

**IN WITNESS WHEREOF,** the Parties have executed this Settlement Agreement as of the date set forth below.

[SIGNATURE PAGES TO FOLLOW]

**Century 21 Department Stores LLC,**
**on behalf of itself and its affiliated**
**debtors-in-possession**

By: _____

Name: _____Brian Cashman_____

Its: _____CEO_____

**LOWENSTEIN SANDLER LLP**

Jeffrey Cohen, Esq.
Michael A. Kaplan, Esq.
Brent Weisenberg, Esq.
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 262-6700
Fax: (212) 262-7402

*Counsel to the Official*
*Committee of Unsecured Creditors*

**Raymond Gindi**

By: _____

Name: Raymond Gindi


**Isaac A. Gindi**

By: _____

Name: _____


**Isaac S. Gindi**

By: _____

Name: _____


**Isaac A. Gindi**

By: _____

Name: _____


**Eddie Gindi**

By: _____

Name: _____


**Jack Gindi**

By: _____

Name: _____

**Raymond Gindi**

By: _____

Name: _____


**Isaac A. Gindi**

By: _____

Name: _Isaac Gindi_____


**Isaac S. Gindi**

By: _____

Name: _____


**Isaac A. Gindi**

By: _____

Name: _ISAAC  Gindi_____


**Eddie Gindi**

By: _____

Name: _____


**Jack Gindi**

By: _____

Name: _____

**Raymond Gindi**

By: _____

Name: _____

**Isaac A. Gindi**

By: _____

Name: _____

**Isaac S. Gindi**

By: ____Isaac S. Gindi____

Name: _____

**Isaac A. Gindi**

By: _____

Name: _____

**Eddie Gindi**

By: _____

Name: _____

**Jack Gindi**

By: ____Jack Gindi____

Name: _____

Signature Pages to Settlement Agreement

**Raymond Gindi**

By: _____

Name: _____

**Isaac A. Gindi**

By: _____

Name: _____

**Isaac S. Gindi**

By: _____

Name: _____

**Isaac A. Gindi**

By: _____

Name: _____

**Eddie Gindi**

By: _____

Name: _____

**Jack Gindi**

By: _____

Name: _____

Signature Pages to Settlement Agreement

**I.G. Gindi 2009 Generational Trust**

By: _____

Name: _____

Its: _____

**Raymond Gindi 2012 Generational Trust**

By: _____

Name: ___Isaac Gindi___

Its: ___Trustee___

**Eddie Gindi Generational Trust**

By: _____

Name: _____

Its: _____

**Isaac S. Gindi 2010 Gift Trust**

By: _____

Name: _____

Its: _____

**10-12 Cortlandt Blue LLC**

By: _____

Name: _____

Its: _____

**I.G. Gindi 2009 Generational Trust**

By: _____

Name: _____

Its: _____

**Raymond Gindi 2012 Generational Trust**

By: _____

Name: _____

Its: _____

**Eddie Gindi Generational Trust**

By: _____

Name: _Ariel Weinstock_____

Its: _Trustee_____

**Isaac S. Gindi 2010 Gift Trust**

By: _____

Name: _Eddie Gindi_____

Its: _Trustee_____

**10-12 Cortlandt Blue LLC**

By: _____

Name: _____

Its: _____

Signature Pages to Settlement Agreement

**I.G. Gindi 2009 Generational Trust**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**Raymond Gindi 2012 Generational Trust**

By: _____

Name: _____

Its: _____

**Eddie Gindi Generational Trust**

By: _____

Name: _____

Its: _____

**Isaac S. Gindi 2010 Gift Trust**

By: _____

Name: _____

Its: _____

**10-12 Cortlandt Blue LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**173 Bway Blue LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**175-177 Bway Blue LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**Blue Millennium Realty LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**C21 BK Home LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**Strike Enterprises LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**86 Blue LLC**

By: _____

Name: Raymond Gindi

Its: Authorized Signatory

**CCC Partners**

By: _____

Name: Raymond Gindi

Its: Authorized Signatory

**ASG Equities Secaucus LLC**

By: _____

Name: Raymond Gindi

Its: Authorized Signatory

**C21 SDC Blue LLC**

By: _____

Name: Raymond Gindi

Its: Authorized Signatory

**Secaucus Blue LLC**

By: _____

Name: Raymond Gindi

Its: Authorized Signatory

Signature Pages to Settlement Agreement

**ADC Blue LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**Century Rego Realty LLC**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**C21 Property Management Partners**

By: _____

Name: __Raymond Gindi__

Its: __Authorized Signatory__

**ADC Blue LLC**

By: _____

Name: _____

Its: _____

**Century Rego Realty LLC**

By: _____

Name: _____

Its: _____

**C21 Property Management Partners**

By: _____

Name: _____

Its: _____

**C21 Bay Ridge Blue LLC**

By: _____

Name: _____Raymond Gindi_____

Its: _____Managing Member_____

**<u>Exhibit B</u>**

**Cashman Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re<br><br>**CENTURY 21 DEPARTMENT STORES LLC,**<br>***et al.*,**<br><br>    **Debtors.**[1] | **Chapter 11**<br><br>**Case No. 20-12097 (SCC)**<br><br>**(Jointly Administered)** |

## DECLARATION OF BRIAN M. CASHMAN IN SUPPORT OF THE MOTION OF DEBTORS FOR AN ORDER AUTHORIZING AND APPROVING (A) SALE OF INSURANCE ACTION INTEREST FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND (B) SETTLEMENT WITH GINDI PARTIES

I, Brian M. Cashman, make this declaration pursuant to 28 U.S.C. § 1746, and state:

1.      I am a Managing Director of Berkeley Research Group, LLC ("BRG"), a financial advisory services firm with numerous offices throughout the country and around the globe that helps organizations in three key areas: disputes and investigations, corporate finance, and performance improvement and advisory.

2.      I am Chief Restructuring Officer of Century 21 Department Stores LLC and each of its affiliated debtors in possession (collectively, the "Debtors").  In such capacity, I, among other things:

    a.      report to the Board of Directors or, when appropriate with respect to conflict matters delegated to the independent director, to the independent director;

---

[1]      The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are Century 21 Department Stores LLC (4073), L.I. 2000, Inc. (9619), C21 Department Stores Holdings LLC (8952), Giftco 21 LLC (0347), Century 21 Fulton LLC (4536), C21 Philadelphia LLC (2106), Century 21 Department Stores of New Jersey, L.L.C. (1705), Century 21 Gardens Of Jersey, LLC (9882), C21 Sawgrass Blue, LLC (8286), C21 GA Blue LLC (5776), and Century Paramus Realty LLC (5033).  The Debtors' principal place of business is: 22 Cortlandt Street, 5th Floor, New York, NY 10007.

      b.      in consultation with management of the Debtors and subject to the approval of the independent director, where applicable, develop and implement a chosen course of action to preserve asset value and maximize recoveries to stakeholders; and

      c.      oversee the activities of the Debtors in consultation with other advisors and the management team to effectuate the selected course of action, including the disposition of assets, as applicable.

3.      I submit this declaration in support of the *Motion of Debtors for an Order Authorizing and Approving (A) Sale of Insurance Action Interest Free and Clear of Liens, Claims and Encumbrances and (B) Settlement with Gindi Parties* (the "Motion").[2]

4.      Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## The Sale Documents

5.      Despite exploring strategic alternatives, the Debtors' lack of liquidity and mounting expenses forced the Debtors to liquidate their assets for the benefit of their creditors.  Accordingly, since the Petition Date, the Debtors have been engaged in the orderly liquidation of their assets to maximize value.

---

[2]     Each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in the Motion.

6.    As part of those liquidation efforts, the Debtors have sought to monetize their largest asset, their claim against the Insurers under the Insurance Policies, which the Debtors (and other non-debtor Plaintiffs) are prosecuting in an adversary proceeding pending before this Court. In my experience, litigation is inherently fraught with risk.  I believe the Defendants in the Insurance Action are well-funded and intend to defend vigorously the Insurance Action, which means prosecuting the Insurance Action likely will be costly and protracted.  Therefore, I believe that a sale of the Insurance Action Interest now, which is supported by the Committee and required by the Prepetition Agent under the terms of the Cash Collateral Order, is in the best interests of the Debtors' estates in that it (a) maximizes the value of a contingent asset, (b) provides means to satisfy the ABL Facility and other secured debts in full, (c) provides means to satisfy chapter 11 administrative expenses and priority claims in full and (d) provides an immediate and meaningful distribution to the Debtors' general unsecured creditors, while at the same time preserving their ability – without risk to the Debtors – to receive additional consideration through the Proceeds Sharing if the Proceeds of the Insurance Action exceed a certain threshold.

7.    At present, the Debtors have insufficient funds to repay the ABL Facility, let alone to fund the expected significant litigation costs to be incurred in the Insurance Action, particularly against well-funded adversaries, which I believe are intent on delaying payout under the Insurance Policies and the litigation of the Insurance Action.

8.    I have reviewed the Initial Agreement, the Participation Agreement, and the Settlement Agreement and have discussed the same with the Debtors' advisors.

9.    I have compared the Initial Agreement with the Sale Documents and have determined that the terms of the Sale Documents are superior to the terms of the Initial Agreement and represent the highest or otherwise best offer for the asset.

10.     I believe the Sale Documents are superior to the Initial Agreement in the following respects:  they deliver *at least* $59 million – millions of dollars more than the Initial Agreement – in cash to the Debtors' estates, resolve claims against the Gindi Parties (providing certainty for recovery on those claims), provide the Debtors' estates with releases of all claims – including millions of dollars in unpaid rent and lease rejection damages – and indemnification by the Gindi Parties, and have greater upside potential for the estates in the event that proceeds from the Insurance Action exceed $75 million.  Notwithstanding that the Debtors' intention to sell the Insurance Action Interest has been public for months, no higher or better offer has materialized, despite numerous inbound indications of interest by market players.

11.     The Debtors' evaluation of the Sale Documents was done through an independent process, in which the Gindi Parties played no part.  The Independent Director, to whom the sole authority to approve and negotiate the Sale Documents was delegated by each Debtor's board, reviewed and approved,  in consultation with the Debtors' advisors, the Debtors' entry into, and my execution of, the Sale Documents.

12.     Specifically, on December 9, 2020, the Independent Director reviewed the filed Committee Objection, to which the Sale Documents were attached.  On December 10, 2020, the Independent Director heard from the Committee's professionals directly the Committee's views on the estates' claims against the Gindi Parties.  Based on his review of the Committee's presentation and analysis, discussions with the Debtors' professionals and review of the Sale Documents, the Independent Director determined that (a) the Sale Documents' terms were better for the estates than those provided under the Initial Agreement, (b) in light thereof, proceeding under the Initial Agreement would be inconsistent with the Debtors' fiduciary obligations under applicable law and (c) the terms therein settling the Related Party Claims were in the best interests

of the Debtors' estates.  Accordingly, the Independent Director ultimately approved the Debtors'

termination of the Initial Agreement and the entry into the Sale Documents.

13.     Based on my review of the Settlement Agreement and the other Sale Documents, I

believe the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the

Debtors' estates and, thus, should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my information, knowledge, and belief.

Dated: December 11, 2020

By: */s/ Brian M. Cashman*
Name: Brian M. Cashman
Title:   Chief Restructuring Officer
         Century 21 Department Stores LLC