| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | | FOR PUBLICATION |

-----------------------------------------------------------x
In re:                                                                  :     Chapter 11
                                                                             :
**CORTLANDT LIQUIDATING LLC,** *et al.*,       :     Case No. 20-12097 (MEW)
                                                                             :
             Debtors.                                              :     (Jointly Administered)
-----------------------------------------------------------x

### DECISION REGARDING SECTION 502(B)(6) COMPUTATION ISSUES RAISED BY PLAN ADMINISTRATOR'S OBJECTIONS TO PROOFS OF CLAIM FILED BY AAC CROSS COUNTY MALL, LLC AND <u>LINCOLN TRIANGLE COMMERCIAL HOLDING CO. LLC</u>

A P P E A R A N C E S :

LOWENSTEIN SANDLER LLP
New York, New York
*Attorneys for the Plan Administrator*
  By: Jeffrey L. Cohen, Esq.
       Keara M. Waldron, Esq.
       Lindsay H. Sklar, Esq.

LOWENSTEIN SANDLER LLP
Roseland, New Jersey
*Attorneys for the Plan Administrator*
  By: Brent Weisenberg, Esq.

PAUL HASTINGS LLP
New York, New York
*Attorneys for Lincoln Triangle Commercial Holding Co LLC*
  By: Harvey A. Strickon, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

On November 5, 2021, Alan D. Halperin, the Plan Administrator of the Debtors (the "**Plan Administrator**") filed (i) the *Plan Administrator's Objection to Proof of Claim Nos. 1268 and 1443 Filed by AAC Cross County Mall, LLC* [ECF No. 1082] (the "**AAC Objection**") and (ii) the *Plan Administrator's Objection to Proof of Claim No. 1066 Filed by Lincoln Triangle Commercial Holding Co. LLC* [ECF No. 1083] (the "**Lincoln Triangle Objection**"). On May 20, 2022, Judge

1

Chapman entered interim orders [ECF Nos. 1260 and 1261] holding, among certain other things, that the relevant leases had terminated for purposes of the application of section 502(b)(6) of the Bankruptcy Code, and directing the parties to meet and confer as to the proper calculation of the claims. This case subsequently was reassigned from Judge Chapman to me. The parties have informed the Court that they have been unable to agree on the following issues:

(1) Whether the "cap" on AAC's and Lincoln Triangle's rejection damages claims pursuant to section 502(b)(6) of the Bankruptcy Code should be calculated in accordance with the "time" or "rent" approach;

(2) In the case of Lincoln Triangle, whether certain store cleanup, mechanics' liens, window repairs, and "other repairs" (collectively, the "**Additional Damages**") arose from the termination of the lease such that they are subject to the § 502(b)(6) cap;

(3) In the case of Lincoln Triangle, whether the Additional Damages qualify as "rent reserved" such that they should be included in calculating the amount of the cap that is applicable pursuant to § 502(b)(6); and

(4) In the case of Lincoln Triangle, whether the projected future rent assumptions for real estate taxes and operating expense escalation should be calculated as outlined in Clam Number 1066 or in accordance with the historical data and assumptions outlined in the Plan Administrator's Objection.

The parties briefed certain of these issues in connection with the Plan Administrator's objections to the AAC and Lincoln Triangle claims, and Lincoln Triangle and the Plan Administrator were permitted to file supplemental submissions regarding these issues. Each of the open questions is addressed in turn in this Decision.

**Discussion**

**1.    Whether the Section 502(b)(6) Cap Is Based On a "Time" or "Rent" Approach**

Section 502(b)(6) of the Bankruptcy Code states as follows:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that – …
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds –
>
> (A) the rent reserved by such lease, without acceleration, *for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease*, following the earlier of –
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6) (emphasis added). The parties disagree on the meaning of the italicized language in subsection (A) of section 502(b)(6). The Plan Administrator contends that the relevant language imposes a "cap" equal to the rent that is reserved under the relevant lease for a specified time period; that time period is equal to 15 percent of the remaining lease term, so long as that time period is at least one year and no more than three years. The Plan Administrator's interpretation has often been referred to as the "**Time Approach**" to the calculation of the section 502(b)(6) cap. Lincoln Triangle contends, by contrast, that the relevant language imposes a "cap" equal to 15 percent of the total dollar amount of the rent that would be payable for the entire remaining term of the lease, so long as that dollar amount is at least equal to the rent reserved for one year rent and does not exceed the rent reserved for the next three years of the lease term. This

interpretation has often been referred to as the "**Rent Approach**" to the calculation of the section 502(b)(6) cap.

The differences between the Time Approach and the Rent Approach are irrelevant in cases where it is clear that the section 502(b)(6) cap must be based either on the one-year rent minimum or the three-year rent maximum. In other cases, however, the Time Approach and the Rent Approach can yield significantly different outcomes. Rents under a lease often escalate over time. The Time Approach imposes a cap that is based on the rents that are specified for the first 15% of the remaining lease term; it thereby ignores rent escalations that would occur in later years. The Rent Approach, by contrast, imposes a cap that is based on 15% of all of the rents that are specified for the entire remaining least term. The Rent Approach thereby captures an element of rent escalations that the Time Approach does not capture, and in doing so it results in a higher cap on the relevant parts of a landlord's claim.

There are a few decisions in this District that address whether the Rent Approach or the Time Approach should be used. In 1993, the court in *In re Financial News Network, Inc.* applied the Rent Approach in calculating the landlord's allowable damages, without any discussion of the alternative approach. *See In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr. S.D.N.Y. 1993). In that case, however, the debtor had objected to the amount of the landlord's claim on other grounds. *Id.* Whether the Time Approach or Rent Approach should be used in calculating the § 502(b)(6) cap was not at issue and was not addressed in the decision. *Id*.

In 1999, the court in *In re Andover Togs, Inc.* discussed both the Rent Approach and the Time Approach. *See In re Andover Togs, Inc.*, 231 B.R. 521, 547 (Bankr. S.D.N.Y, 1999). After determining that the legislative history was unhelpful and that the Rent Approach was then the majority view, the court held that the Rent Approach was the correct one. The *Andover Togs*

decision also held that the Rent Approach was the "logically sounder" approach, and noted that at the time the Rent Approach was supported by the *Collier's* treatise and the *Norton Bankruptcy Law* treatise. *Id*. at 545-547.

The courts in this District next addressed the relevant question in 2011. *See In re Rock & Republic Enters.*, 2011 Bankr. LEXIS 2401 (Bankr. S.D.N.Y. 2011). In that case, the court declined to depart from the precedents established by the *Financial News Network* and *Andover Togs* decisions, and held that the Rent Approach should govern the calculation of the section 502(b)(6) cap. *Id*.

So far as our research and inquiries have been able to determine, there are no other relevant decisions in this District with respect to this issue. In the ten years since the entry of the decision in the *Rock & Republic Enters.* case, however, the weight of the relevant authorities in other districts has shifted very strongly in favor of the Time Approach. All of the reported decisions that we have found that have addressed this issue since the beginning of 2012 have concluded that the Time Approach is the correct one. *See In re Keane*, 2020 WL 6122296, at *2 (Bankr. E.D.N.C. Oct. 14, 2020); *In re Denali Family Servs.*, 506 B.R. 73, 83 (Bankr. D. Alaska); *In re Filene's Basement, LLC,* 2015 Bankr. LEXIS 1350, at *18; *In re Shane Co.*, 464 B.R. at 39. The *Collier's* Treatise now also endorses the Time Approach rather than the Rent Approach. *See e.g.* 4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2022). So, too, do other authorities. *See, e.g.,* American Bankruptcy Institute Commission to Study the Reform of Chapter 11, ISBN: 978-1-937651-84-8, Section V.A.6, pp. 129-30, 135 (concluding that the Time Approach as the correct way to calculate the 502(b)(6) cap); S. Deshpande, *A Fresh Look at the Bankruptcy Code's Limitation on Landlords' Rejection Claims*, 2011 Ann. Surv. Of Bankr. Law 11 (2011) (concluding that the Time Approach represents the correct interpretation of the statute).

We have reviewed the language of the statute and the decisions that have endorsed each of the relevant approaches. I do not lightly depart from prior precedent in this District. After considering the statutory language and the relevant authorities, however, I am convinced that the Time Approach represents the correct view.

First, and most importantly, the plain language of the statute makes clear that the Time Approach is the correct one. Section 502(b)(6) refers to the rent reserved by a lease, without acceleration, "for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." 11 U.S.C. § 502(b)(6). The entire phrase is worded in terms of periods of time. Plainly the words "one year" and "three years" modify the words "of the remaining term of such lease." In context, the words "15 percent" plainly modify the same phrase. The result is to impose a limit on allowable damages that is computed by reference to a period of time. That period of time is equal to 15 percent of the remaining term of the lease, so long as that period is more than one year but less than three years.

If section 502(b)(6) were intended to impose a cap that is based on 15% of a dollar amount (as the proponents of the Rent Approach suggest), then the words "15 percent" would not have been sandwiched between two other time periods, and they would not have been used as a modifier of the phrase "of the remaining term of such lease." Instead, if the Rent Approach had been intended, the statute would have stated that the allowable rejection damages would not exceed "15 percent of the rent reserved for the remaining term of such lease, *provided* that such amount will not be less than the rent reserved for the next year of the lease term, and shall not be more than the rent reserved for the next three years of the lease term." Those are not the words that are set forth in the statute, and they cannot reasonably be derived from the language that does appear.

6

The *Collier's* Treatise once endorsed the Rent Approach, but since at least 2015 it has endorsed the Time Approach. The current treatise concludes that the Rent Approach is not in accord with the language of the statute:

> The 15 percent limitation of section 502(b)(6) speaks in terms of time, not in terms of rent … Grammatically, the "greater of" phrase contemplates two time periods, one year and 15 percent of the remaining term. But the latter period (15 percent of the remaining term) is further limited to three years, so that if the remaining lease term exceeds 20 years, the allowable damage claim will not increase.

*Id.* 4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2022). The better-reasoned decisions have reached the same conclusion. As the District Court for the Northern District of California has explained:

> Structurally, in comparing the greater or lesser of two things, the measurements of those things must be parallel, e.g. time versus time. The statute allows landlords to claim damages in the amount of rent reserved for the greater of one year or 15% of the remaining term. Because "one year" is inherently temporal, the phrase "remaining term" necessarily refers to time. This establishes that the statute measures "rent reserved within time periods." Therefore, the sentence structure of the statute supports the time approach.
>
> An ordinary reading of the statute is consistent with this reasoning. The phrase "term of a lease" commonly refers to the length of a lease based on time rather than rent. In addition, the statute is generally written in terms of time: the calculation of the cap begins following the earlier of two dates, the date of petition or repossession, the maximum cap is worded in terms of time, three years, and the statute requires the rent to be calculated "without acceleration."

*In re Heller Ehrman LLP*, 2011 U.S. Dist. LEXIS 19552, at *6 (N.D. Cal. Feb. 11, 2011) (citations omitted); *see also Shane Co.*, 464 B.R. at 40 ("To read §502(b)(6)(A) as referring to 15% of the total rent due over the full remaining term of the lease is inconsistent with the natural reading of the remainder of that subsection."); *In re Filene's Basement, LLC*, 2015 Bankr. LEXIS 1350, at *12, 14 (Bankr. Del. 2015) (concluding that the Time Approach reflects the "natural reading" and the "plain language" of the statute).

The current consensus view is that the Time Approach (not the Rent Approach) represents the correct interpretation of the wording of section 502(b)(6). I agree, and I hold that the Time Approach is the proper method by which to calculate the amount of the section 502(b)(6) cap.

Second, while I agree with those courts that have held that the language of section 502(b)(6) is clear and that a resort to other interpretive aids is not required, I take comfort in the fact that the Time Approach finds strong support in the legislative history. *See Filene's Basement*, 2015 Bankr. LEXIS 1350, at *14-17 (citing *In re Connectix Corp.*, 372 B.R. 488, 493-94 (Bankr. N.D. Cal. 2007)); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] (16th ed. 2022). The *Filene's Basement* decision incorporated a detailed summary of the legislative history that had been set forth in the *Connectix* decision, and concluded as follows:

> "Prior to 1934, a landlord's claim for future rent damages due to premature lease termination was not recognized in bankruptcy because it was considered contingent and not capable of proof." *Connectix*, 372 B.R. at 491. A compromise was reached in the 1934 and 1938 amendments to the Bankruptcy Act to allow "landlords to assert some amount as a claim for future rent, but with limited sacrifice on the part of general creditors." *Id*. at 492. The Bankruptcy Act . . . limited a landlord's claim in a rehabilitation case to rent for "the three years next succeeding" surrender or reentry. *Id.* The draft of the 1978 Bankruptcy Code continued the Act's limitation on landlord claims for lease rejection damages, but introduced the percentage calculation. *Id.* However, as noted by the *Connectix* Court:
>
>> [T]he percentage calculation was intended to replace the dual time provisions employed in the Bankruptcy Act. There is no indication, however, that Congress intended to move away from calculating the cap based on the rent that would become due within a time period immediately succeeding the statutory trigger date. Because there is no clear expression of an intent to change from a time approach to a "total rent" based formula, it cannot be presumed that Congress intended to make that shift. *Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 227, 77 S. Ct. 787, 791, 1 L. Ed. 2d 786 (1957) ("'no changes in law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed.")
>
> *Connectix*, 372 B.R. at 493.

*See Filene's Basement*, 2015 Bankr. LEXIS 1350, at *14-16.

8

A House Judiciary Report that related to an earlier version of the statute further supports the notion that the Code applies the Time Approach and not the Rent Approach. The Report stated:

> The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years after the earlier of [the petition date or the date of surrender or repossession.]

*See* H.R.Rep. 95-595 at 353, 1978 U.S.C.C.A.N. 5963, 6309; *see also Connectix*, 372 B.R. at 493-94.

Third, I disagree with those courts that have held that considerations of equity or fairness somehow favor the Rent Approach over the Time Approach, and therefore that the Rent Approach somehow better implements Congressional intent or the purposes of section 502(b)(6). The plain "intent" of section 502(b)(6) was to limit landlords' claims. Identifying that general intent is of no help in deciding whether Congress intended that the Rent Approach or the Time Approach would be used. As to statutory purposes: Congress plainly sought to strike a balance between the interests of landlords and the interests of other creditors, whose claims might be diluted if landlords were allowed to assert very large lease termination claims. Identifying that particular "purpose" sheds no light on *how* Congress elected to strike the balance, or on whether the Rent Approach or the Time Approach better reflects the balance that Congress struck. Similarly, I do not believe that considerations of "fairness" or "equity" are helpful in figuring out whether the Rent Approach or the Time Approach represents the better interpretation of the statute. From the point of view of landlords, I suspect that any interpretation of the statute that results in a lower cap (and therefore a lower landlord claim) might be considered unfair or inequitable. On the other hand, from the point of view of other creditors, I suspect that any interpretation of the statute that results in a higher cap (and therefore a larger allowed landlord claim) would be regarded as unfair or inequitable. Only Congress was empowered to strike the balance between these competing

equities, and we must always be on guard not to substitute our own views of fairness in place of what a statute's plain language demands.

For the foregoing reasons, I hold that the Time Approach is the correct interpretation of section 502(b)(6). Accordingly, the section 502(b)(6) caps with respect to the AAC and Lincoln Triangle claims are to be calculated by reference to the rents reserved under the relevant leases for the first 15% of the remaining lease terms, *provided*, that such amounts shall not be less than the rents reserved for the first remaining year of the relevant lease terms, and shall not be greater than the rents reserved for the first three remaining years of the relevant lease terms.

## II.     Damages That Are Subject to the Section 502(b)(6) Cap

Section 502(b)(6) speaks of damages arising from the "termination" of a lease. As a preliminary matter, Lincoln Triangle questions whether its Lease was "terminated." However, this question has already been decided. *See* Interim Order 8-9, ECF No. 1261. In the Interim Order, Judge Chapman found that the Lease was "functionally dead" and concluded that "the Court need not reach the question of whether the Lease was terminated pursuant to New York law in order to conclude that, once the Lease was 'functionally dead,' it can be considered 'terminated' for purposes of section 502(b)(6)." *Id.* Pursuant to Judge Chapman's ruling, therefore, the Lincoln Triangle lease has been rejected and terminated for purposes of section 502(b)(6).

Section 502(b)(6) provides that "damages resulting from the termination of a lease of real property" are subject to the statutory cap. *See* 11 U.S.C. § 502(b)(6). Some courts have held that the section 502(b)(6) cap applies to all damages of any kind that are sought by a landlord, regardless of whether the damages are attributable to a lease termination or instead are attributable to other events or factors. *See, e.g., In re Foamex Intern., Inc.*, 368 B.R. 383, 393-394 (Bankr. D. Del. 2007) (holding that a rejection results in a breach of all covenants of a lease and that any claim

10

for breach of any covenant is covered by the section 502(b)(6) cap). The better view, and the one dictated by the plain language of the statute, is that the statutory cap applies only to damages that are attributable to the fact that the term of the lease has come to an end. The Court of Appeals for the Ninth Circuit has adopted a simple test for this purpose: "Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?" *See In re Rock & Republic Enters.*, 2011 Bankr. LEXIS 2401, at \*80 (quoting *Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978, 980-981 (9th Cir. 2007)). I agree that this is the appropriate test and I will apply it in ruling upon the various categories of damages that Lincoln Triangle has sought.

  A. **Store Cleanup**

Lincoln Triangle has asserted a claim for store cleanup costs. It argues that this amount arises from the tenant's prior use and occupancy of the leased premises, not from the termination of the Lease. *See* Lincoln Triangle Mem [ECF No. 1302] at 5. However, the Lease expressly states that: *"[u]pon expiration or other termination of this Lease*, Tenant shall quit and surrender to Landlord the Premises, vacant, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted …" Lease, § 23.22 (emphasis added). Under the *El Toro* test, Lincoln Triangle would not have a claim for store clean up damages if the lease had been assumed. *See El Toro,* 504 F.3d at 980-981. Where a lease provides that the obligation to remove furniture and fixtures and leave the store in broom clean condition only arises upon termination of the lease, the related damages arise from the termination of the lease and are subject to the § 502(b)(6) cap. *See In re Filene's Basement, LLC*, 2015 Bankr. LEXIS 1350, at \*30. Therefore, any claim for store cleanup costs arose from the termination of the Lease and shall be subject to the § 502(b)(6) cap.

11

As a practical matter the application of the section 502(b)(6) cap may make it unnecessary to consider or to resolve any factual disputes over the alleged store cleaning costs. However, to the extent that any factual issues need to be resolved as to whether store cleanup costs were incurred, and as to the amounts of such damage claims, those would require resolution through an evidentiary hearing.

B.   **Mechanics' Liens**

Lincoln Triangle has asserted a claim for mechanics' liens placed on the leased premises by unpaid contractors engaged by the tenant. Apparently none of the lienors has commenced any foreclosure or other proceedings, which may mean there are open issues as to the amount of damages that Lincoln Triangle can properly claim. However, any damages associated with a mechanic's lien plainly would have existed regardless of whether the lease was terminated. The lease required the tenant to discharge any mechanic's lien filed against the property for work done for or materials furnished to the tenant within thirty days after receiving notice thereof. Lease, § 7.1(c). Therefore, under the *El Toro* test, any claim for mechanics' liens is not subject to the § 502(b)(6) cap. *See El Toro,* 504 F.3d at 980-981; *see also In re Filene's Basement, LLC*, 2015 Bankr. LEXIS 1350, at *32 (applying the *El Toro* test in finding that a mechanic's lien claim exists independent of whether the lease is terminated and therefore is not subject to the § 502(b)(6) cap and may be asserted as a separate claim).

If any factual exists exist as to the validity and amount of any mechanic's lien claims, those must be determined through an evidentiary hearing.

C.   **Window and Other Repairs**

Lincoln Triangle has also asserted a claim for window repair costs and "other repairs" such as "façade repairs and restoration costs." *See* Lincoln Triangle Memorandum 4, ECF No. 1302.

12

Lincoln Triangle has not elaborated on the nature or scope of such repairs and has not pointed to a basis for such a claim under the Lease. Finding no other basis, the Court assumes Lincoln Triangle is relying on Article 8 of the Lease which required the tenant to maintain the leased premises, including framing and glass of the exterior of the building, and provided that the tenant would be responsible for the repairs of any damage caused by the negligence, neglect, or improper conduct of the tenant or its invitees or licensees. *See* Lease, § 8(c). Applying the *El Toro* test, the Court finds that a claim for damages under Article 8 of the Lease does not arise from termination of the Lease. *See El Toro,* 504 F.3d at 980-981. To the extent Lincoln Triangle has a valid claim for damages resulting from window and/or other repairs for which the tenant was responsible under Article 8, such claim is not subject to the § 502(b)(6) cap. For the avoidance of doubt, however, to the extent Lincoln Triangle seeks damages for these repairs on any other basis, the Court does not have sufficient information to determine whether the § 502(b)(6) cap is applicable.

If any factual issues need to be resolved as to the validity or amounts of the claims for various repairs, those matters must be resolved through an evidentiary hearing.

### III. Do The Additional Damages Constitute "Rent Reserved" Under the Lease for Purposes of Calculating the Amount of the Section 502(b)(6) Cap?

The third question before the Court is whether any of the Additional Damages constitute "rent reserved" under the Lease such that they may be included in the calculation of the amount of the cap that is imposed by section 502(b)(6). The parties now appear to be in agreement that none of the Additional Damages constitute "rent" reserved under the Lease. *See* Objection [ECF No. 1083] at 15; Lincoln Triangle Mem. [ECF No. 1302] at 5. Accordingly, none of the Additional Damages shall be included in the calculation of the cap that is applicable under section 502(b)(6).

**IV.     How Should The "Rents Reserved" for Future Periods Be Calculated?**

The rents reserved under the Lincoln Triangle lease include requirements that the lessee pay real estate taxes and certain operating expenses. It is proper to include such items in calculating the "rent reserved" under the lease and therefore in calculating the amount of the section 502(b)(6) cap. *See In re Andover Togs, Inc.*, 231 B.R. at 541-542 (real estate tax escalations and operating expense escalations are properly included in "rent reserved" where these items appear in the Lease as charges the tenant is obligated to pay). However, such amounts are subject to change over time, and the parties disagree as to what the reasonable assumptions are with respect to future escalations. Their differences may be less significant in light of the Court's rulings with respect to the application of the Time Approach to the calculation of the section 502(b)(6) cap, but the parties' differing assumptions still will generate different projections as to what the relevant rents would be.

Lincoln Triangle has projected that real estate taxes would increase over the next ten years at rates ranging from 5.6% to 19.1% per year and that relevant operating expenses would increase 20.2% in 2021 and between 8% and 16.47% thereafter. *See* Claim Number 1066 7. The Plan Administrator argues that these projected future rent assumptions are unreasonable and not based in historical data. Objection 15, ECF No. 1083. Relying on "the five prior years of real estate taxes for Class 4 properties obtained from the NYC Department of Finance," the Plan Administrator submits that "real estate taxes *decreased* or remained static from 2016 to 2019, and only increased by 0.2% and 1.5% in 2020 and 2021, respectively." Objection 15-16, ECF No. 1083. With respect to operating expenses, the Plan Administrator asserts that Lincoln Triangle cannot justify how such amounts would grow at the rates projected and submits that more

reasonable assumptions derived from actual historical charges made under the Lease should be applied. *See Id.* at 16.

Contrary to the parties' suggestions, these are not legal issues to be decided in the absence of a factual record. Instead, they are factual issues to be decided after evidence is submitted to the Court. I note that a significant amount of the relevant 502(b)(6) period has already passed, so that actual changes in taxes and other expenses ought to be known. Nevertheless, the amounts of the increases that ought to be assumed in calculating the section 502(b)(6) cap cannot be determined without a factual hearing.

## **Conclusion**

For the foregoing reasons, the Plan Administrator's Objection is granted to the extent it asks that the section 502(b)(6) cap be calculated using the Time Approach. The Store Cleanup Costs sought by Lincoln Triangle (if proved) would constitute damages arising from the termination of the lease for purposes of section 502(b)(6), but the alleged damages due to mechanic's liens and allegedly necessary repairs would not. None of the "Additional Damages" would constitute "rent" for purposes of calculating the amount of the section 502(b)(6) cap that is applicable to Lincoln Triangle's claims. All other issues relating to the amounts of the damage claims asserted by AAC and Lincoln Triangle, if not settled by the parties, will require a factual hearing in order to be resolved.

The parties are directed to confer and to determine whether it is now possible to settle their differences. They are further directed to appear at a status conference on February 28, 2023 at 10:00 a.m. to inform the Court as to whether they have agreed to a resolution or whether a factual hearing will be required. If a factual hearing is required, the court will issue a schedule on February 28, 2023 for the submission of a Joint Pretrial Order and for the conduct of the hearing.

A separate Order will be issued to this effect.

Dated: New York, New York
February 2, 2023

**s/Michael E. Wiles**
Hon. Michael E. Wiles
United States Bankruptcy Judge